UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SETH D. HARRIS,<br>Acting Secretary of the United States<br>Department of Labor, | )<br>)<br>)<br>) | No. 1:12-cv-08648-GBD |
| Plaintiff, | )<br>) | AMENDED COMPLAINT<br>FOR ERISA VIOLATIONS |
| v. | )<br>) | (29 U.S.C. §§ 1001 <u>et</u><br><u>seq.</u>) |
| FIRST BANKERS TRUST SERVICES, INC.,<br>MARAN, INC., THE MARAN,<br>INC. EMPLOYEE STOCK<br>OWNERSHIP PLAN, DAVID GREENBERG,<br>and RICHARD HUANG, | )<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## AMENDED COMPLAINT FOR ERISA VIOLATIONS

Plaintiff Seth D. Harris, Acting Secretary of the United States Department of

Labor (the "Secretary"), alleges:

### JURISDICTION AND VENUE

1.      This action arises under the Employee Retirement Income Security Act of

1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, <u>et</u> <u>seq.</u>, and is brought by the Secretary

to obtain relief under ERISA §§ 409 and 502(a)(2) & (5), 29 U.S.C. §§ 1109 and

1132(a)(2) & (5), to redress violations and enforce the provisions of Title I of ERISA.

2.      This Court has subject matter jurisdiction over this action pursuant to

ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

3.      Venue with respect to this action lies in the United States District Court for

the Southern District of New York, pursuant to ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2), because the Maran Inc. Employee Stock Ownership Plan (the "Plan" or "ESOP") is administered in New York City, New York, within this district, and the fiduciary breaches at issue took place within this district.

## PARTIES

4.     Plaintiff, the Secretary, is vested with authority to enforce the provisions of Title I of ERISA by, among other things, filing and prosecuting claims against fiduciaries and other parties who violate ERISA.  ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5).

5.     Defendant First Bankers Trust Services, Inc. ("First Bankers") is an Illinois corporation with a principal place of business in Quincy, Illinois.  At all relevant times, First Bankers was a full service trust company whose specialties included serving as the trustee of employee stock ownership plans.  At all relevant times, First Bankers was the Trustee of the ESOP.

6.     Defendant Maran, Inc. ("Maran" or the "Company") is a Delaware corporation with a principal place of business in New York, New York.  At all relevant times, Maran primarily sourced lower-end private label denim jeans for retailers, such as Kmart, Wal-Mart and Charming Shoppes.  At all relevant times, Maran was the sponsor of the ESOP.

7.     Defendant David Greenberg ("Greenberg") was, at all relevant times, Maran's President, Chief Executive Officer, a member of Maran's Board of Directors, a member of the Maran, Inc. Employee Stock Ownership Plan Committee ("ESOP Committee"), and the ESOP's Administrator.   Greenberg sold shares of Maran stock to the ESOP pursuant to the transaction that is the subject of this case.

2

8.       Defendant Richard Huang ("Huang") was, at all relevant times, Maran's Executive Vice President, Chief Operating Officer, Chief Financial Officer, a member of Maran's Board of Directors, a member of the ESOP Committee, and the ESOP's Administrator.  Huang sold shares of Maran stock to the ESOP pursuant to the transaction that is the subject of this case.

9.       Defendants Huang and Greenberg signed waivers and agreements to toll ("waiver") on November 28, 2012, which stated that the statute of limitations for any of the Secretary's ERISA actions related to the Maran ESOP "shall be tolled as of November 28, 2012, and shall remain tolled through and including April 1, 2013 (the "Tolling Period")."  Greenberg and Huang "agree[d] that the Tolling Period will not be included in computing the time limited by any statute of limitations, nor will the Tolling Period be raised in any other defense raised by [Huang and Greenberg] (including laches, waiver or estoppel) that otherwise would be available to [Huang and Greenberg] concerning the timeliness of any legal proceedings that may be brought against [Huang and Greenberg] as the result of the Secretary's findings from this investigation."

10.       The ESOP is an employee benefit plan as defined by ERISA § 3(3), 29 U.S.C. § 1002(3), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).  The ESOP also includes the Maran Employee Stock Ownership Trust ("ESOT"), which held the ESOP's assets.  The ESOP is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

## INTRODUCTION

11.     The ERISA violations arise from First Bankers' failure to protect the ESOP's interests in connection with the ESOP's purchase of Maran stock from Greenberg and Huang (collectively, "the Sellers"), the Company's top two executives and largest shareholders.  First Bankers, with the aid and knowledge of Greenberg and Huang, caused the ESOP to buy stock from Greenberg and Huang, who were parties-in-interest to the ESOP, for more than the stock's fair market value based on a flawed valuation of the stock, and without prudently investigating the merits of the transaction on behalf of the ESOP.  As a result, First Bankers, Greenberg, and Huang violated ERISA's prohibited transactions provisions and duties of prudence, loyalty, and adherence to plan documents.

## GENERAL ALLEGATIONS

### *CSG's Role in Arranging the ESOP Transaction*

12.      In the Summer of 2006, Maran retained CSG Partners LLC ("CSG"), a boutique investment banking firm that at the time was known as Corporate Solutions Group, to advise it on whether Maran should form an ESOP to which Greenberg and Huang would in turn sell shares of Maran stock, and to act as a facilitator of any such transaction.

13.     On its website, CSG describes its role in ESOP transactions as a "vigorous advocate" on behalf of the sellers, and says that its services "were designed with owners in mind."  CSG states that it "has developed numerous proprietary methodologies that reflect the industry's best practices and serve to optimize all aspects of a transaction[ ] for our client's benefit."  CSG's goal in structuring ESOP transactions is to "develop solutions that maximize cash flows for owners and their companies."

4

14. CSG further promises its clients, the sellers, that it will "arrange" the other parties to the ESOP transaction, the buyers, including the ESOP trustee, the valuation firm retained by the ESOP trustee to value the sellers' stock, and the law firm to advise the ESOP trustee. CSG's stated role is to then "negotiate" the price of the transaction on behalf of the sellers with the ESOP trustee and the valuation firm, who CSG selected.

15. CSG's compensation for its services to Maran was based, in part, on a percentage of the price paid by the ESOP for Greenberg's and Huang's shares.

16. In August 2006, prior to the retention of First Bankers as the ESOP's trustee, CSG provided Greenberg and Huang with an initial valuation of the 49,000 shares of Maran stock to be sold by Greenberg and Huang to the prospective ESOP. CSG valued the stock at $60 million.

17. CSG's valuation was based solely on Huang and Greenberg's projections and the information they provided. As CSG disclaims, the projections and information upon which its valuation relies "merely represent the opinion of the Company's Management."

*Greenberg's and Huang's Role as ESOP Committee Members and ESOP Administrators*

18. Based upon CSG's advice, Greenberg and Huang, the sellers, decided that Maran should form an ESOP to purchase some of their stock. At all relevant times, Greenberg and Huang served as members of the Maran ESOP Committee. Under the ESOP's Plan Document, the Plan Administrator consists of one or more individuals comprising the ESOP Committee. As such, Greenberg and Huang served at all relevant times as the Plan's Administrators.

19.     Greenberg and Huang signed an "Acceptance of Designation By Committee Members," ("Acceptance") which was attached to a document entitled the "Guidelines for the Employee Stock Ownership Plan Committee of Maran, Inc." ("Guidelines").

20.     In signing the Acceptance, Greenberg and Huang explicitly acknowledged that as ESOP Committee members, they were ERISA "named fiduciaries" of the Maran ESOP and that they would follow the Guidelines.

21.     In signing the Acceptance, Greenberg and Huang also acknowledged that the ESOP Committee had supervisory authority over the ESOP's trustee, and that they could remove the trustee with the approval of Maran's Board of Directors.

22.     At all relevant times, Greenberg and Huang were also the sole members of Maran's Board of Directors.

### The Retention of First Bankers and its Role as the ESOP's Trustee

23.     Pursuant to an engagement agreement signed on October 24, 2006, by and between First Bankers and Maran ("Engagement Agreement"), First Bankers was appointed the ESOP's Trustee.  The Engagement Agreement was signed by David Greenberg.

24.     Under the Engagement Agreement, Maran agreed to pay First Bankers a transaction fee of $45,000, half of which was to be paid upon execution of the Engagement Agreement, and half of which was to be paid at such time as First Bankers was presented with an offer to purchase Maran stock on the ESOP's behalf.  In addition, Maran agreed to pay First Bankers a percentage of the fair market value of the assets held by the ESOP as an "ongoing trustee fee," subject to a minimum annual fee of $20,000. First Bankers also could earn credits on deposited funds or funds awaiting distribution, known as "float."

6

25.     First Bankers' services were referred to Maran by CSG.  First Bankers appreciated the referral and emphasized the "value on building a relationship with CSG and its respect for the business you have bought to the table in the past."  In light of its desire to work with CSG on this transaction, First Bankers lowered its fee from $50,000 to $45,000.

26.     In proposing its services to Greenberg and Huang in early October, as fiduciaries of the ESOP, First Bankers stated that "[t]he [First Bankers] Team that would be assigned to your Plan individually has extensive knowledge in working with organizations in the Garment and Fashion Design Industry."

27.     At the time of its proposal, First Bankers also promised to "help ensure that the Transaction closes within six weeks" and that it recognized the value of the transaction to be about $70 million dollars, which is approximately the final price approved by First Bankers six weeks later.

28.     Under the Engagement Agreement, the ESOP Committee (Huang and Greenberg) had the power to "(a) extend the time for the performance of any of the obligations or other actions of [First Bankers] … or (b) waive or modify performance of any of the obligations of [First Bankers]."  Engagement Agreement ¶ 22.

29.     Maran and First Bankers also entered into a trust agreement for the ESOP on November 3, 2006 (the "Trust Agreement").  The Trust Agreement sets forth the duties and responsibilities of First Bankers as the ESOP's Trustee.

30.     The Trust Agreement vested in the ESOP Committee, of which Greenberg and Huang were both members, the ultimate discretion to remove the Trustee.  It provides that the ESOP Committee "may, with the consent of the Company, which shall not be

unreasonably withheld, remove the Trustee by giving thirty (30) days' advance written notice to the Trustee, subject to providing the removed Trustee with satisfactory written evidence of the appointment of a successor Trustee and of the successor Trustee's acceptance of the trusteeship."  Trust Agreement ¶ 4.2.

31.     Section 2.5 of the Trust Agreement provides that the "Trustee shall discharge its duties . . . solely in the interest of Plan Participants and other persons entitled to benefits under the Plan."

32.     Section 2.3 of the Trust Agreement sets forth the Trustee's powers and duties.  Among the Trustee's enumerated responsibilities is to select an independent appraiser and to determine the fair market value of Maran's stock that the ESOP is considering for purchase.

33.     Section 3.1 of the Trust Agreement provides that "[t]he Trustee, in its sole discretion, may purchase Company Stock from the Company or from any shareholder, and such stock may be outstanding, newly issued or treasury stock."  The Trust Agreement continues: "[a]ll such purchases must be at a price that does not exceed the fair market value, as determined by an Independent Appraiser (as described in Code Section 401 (a)(28)(C)) if such stock is not publicly traded."

*The Retention of Meyers, Harrison, & Pia LLC at the Behest of CSG*

34.     Because Maran is not a publicly traded company with a readily identifiable stock value, First Bankers' Engagement Agreement with Maran required First Bankers to retain an "independent financial advisor" to provide an analysis of the fair market value of the Maran stock offered to the ESOP and an opinion as to whether the proposed sale of stock to the ESOP would be fair to the ESOP from a financial point of view.

8

35.     Although First Bankers, on October 23, 2006, technically retained the accounting firm of Meyers, Harrison & Pia, LLC ("MHP") to value Maran stock and provide a fairness opinion regarding the proposed transaction, it did so at the behest of CSG, the sellers' agent.  Indeed, CSG had already pre-selected MHP prior to First Bankers' engagement as the ESOP's Trustee.  Weeks before First Bankers was actually hired as the trustee for the ESOP transaction, First Bankers stated that "[w]e are comfortable with the suggested Team being assembled by Corporate Solutions Group. . . ."  And when questioned by a colleague as to why MHP was selected as the financial advisor, a First Bankers Vice President replied "Ask Alex."  On a Maran, Inc. Working Group List dated October 18, 2006, the only individuals named "Alex" included on the list worked for CSG.

36.     MHP's engagement agreement with First Bankers was memorialized in a letter dated October 23, 2006 that was sent from MHP to First Bankers.  MHP's engagement agreement defines the scope of its duties as follows:

> We will develop a valuation opinion of the equity in MARAN as of the date most recent financial data is available and that is nearest to the projected closing date for purposes of analyzing the proposed purchase of stock by the Employee Stock Ownership Trust ("ESOT"). Our opinion will specifically address the price the ESOT proposes to pay for the shares of MARAN stock offered to it. In addition our opinion will include a fairness opinion as to the overall fairness to the ESOT of the proposed transaction from a financial point of view, including the financing package offered to the ESOT (the "Transaction").  Notwithstanding that we report solely to First Bankers Trust Services, Inc. as trustee of the ESOT ("Trustee"), Maran Inc./Arnica Apparel Corporation will pay our fees.

37.     First Bankers had the obligation to direct MHP in its analysis before the final valuation report was completed.  First Bankers also had opportunities to direct MHP's analysis before the final version of the report was completed.

*MHP's Appraisal Report*

38.     On or about November 1, 2006, MHP and First Bankers met with Greenberg and Huang, who provided MHP and First Bankers with information concerning Maran's history, corporate structure, operations, markets, finances, and outlook of the company, including their projections for Maran's future sales and gross profits.

39.     MHP also relied on CSG's valuation of the company as a "significant source of information" and relied on the same assumptions, projections, and data utilized by CSG in its valuation for the sellers.  These assumptions and projections were critical to the valuation approaches MHP adopted.

40.     On November 30, 2006, MHP provided First Bankers a valuation report in connection with the 2006 Transaction (the "Appraisal Report").

41.     Whereas CSG's August 2006 valuation of the proposed ESOP transaction – that is, the valuation conducted by the agent for the sellers – valued the Maran shares at $60 million, in the Appraisal Report, MHP valued the Sellers' offer of 49,000 shares (49% of Maran) of Maran convertible preferred stock as being in the range of $65 to $73 million, equating to a range of $1,326.53 to $1,489.80 per share.  MHP also noted that the actual transaction price of $70,961,000, or $1,448.18 per share, fell within those ranges. The Appraisal Report does not address the differences between the CSG valuation and the higher price now being paid by the ESOP only a few months later.

42.     In its Appraisal Report, MHP used two methods to value Maran that were weighted equally: (1) the Discounted Cash Flow Method, or "Earnings-Based Method;" and (2) the Guideline Company Method, or "Market-Based Method."  The "Earnings-Based Method" relies on projections of a company's earnings and its future revenue stream in order to value a potential investor's expected return on its investment.  The "Market-Based Method" values a company by comparing it to similar companies whose market values are readily ascertainable, either because they are publicly traded or because they were recently purchased.

43.     In applying the Earnings-Based Method in its Appraisal Report, MHP relied upon unreasonably aggressive projections of Maran's future growth supplied by Greenberg and Huang – the same projections that CSG relied upon for its August 2006 $60 million valuation of the ESOP transaction.  These projections envisioned a dramatic increase in sales and gross profits for fiscal years 2007 to 2011 that were unlike any performance Maran had generated in the five years prior to the 2006 Transaction, and which were inconsistent with the economy's downward tilt.

44.     As MHP itself recognized in the Appraisal Report, "economic growth expectations point towards a slowdown for 2006 relative to 2004 and 2005 levels," a projection that MHP said was "at least partially due to a decline in the housing sector in 2006."  Given this cloudy economic outlook, it would have been unrealistic to assume that Maran would experience even the same growth rates from 2007 to 2011 that it enjoyed during the housing-fueled 2002-2006 period, let alone to assume that Maran would grow at an even faster clip.

45.     Yet that is exactly what Maran, and MHP, assumed.  For the five-year period from fiscal year 2002 to 2006, Maran generated a total of approximately $471,230,000 in sales.  In stark contrast to this historical performance, Maran forecasted that its future sales for the five-year period following the 2006 Transaction (from 2007 to 2011) would total $782,244,000.  MHP did not offer any explanation for why Maran expected to realize such a dramatic increase in sales.  MHP and First Bankers thus relied on an unfounded projection that Maran's sales for the five-year period from 2007 to 2011 would be 66% greater than its sales for the prior five-year period from 2002 to 2006.

46.     MHP relied on Maran's similarly unfounded projections regarding its gross profits.  Maran's gross profits rose from $18,581,000 in 2002 to $25,530,000 in 2006, a 37% increase.  Nevertheless, Maran projected that its gross profits would rise from $31,788,000 in 2007 to $50,631,000 in 2011, a 59% increase.  MHP and First Bankers failed to engage in any independent exploration of the credibility of Maran's aggressive earnings projections and MHP's reliance on those projections.

47.     Maran's aggressive projections depended on a forecast of steady and inexorable year-by-year revenue and profit growth from 2007 to 2011 that was incongruous with Maran's erratic historical performance.  For example, gross sales and gross profits *decreased* during the 2005-2006 and the 2003-2004 years.  From 2003 to 2004, gross profits actually decreased by over 33%.  Such dramatic fluctuations are consistent with MHP's general observations about the competitive apparel market.  As MHP noted, "[t]he Company does not hold a dominant competitive position and is dependent upon the anticipated popularity of their designs, price, fit, finishes and overall quality of their products and their ability to meet their customers' delivery schedules."

12

Thus, "[t]he Company is exposed to risk due to its dependence on the most current fashions." Despite Maran's exposure to the vicissitudes of the fashion industry and its inconsistent historical performance, First Bankers and MHP never questioned Maran's unrealistic projections of consistent growth in sales and gross profits.

48.     The Appraisal Report's acceptance of Maran's bullish projections was also unreasonable because of Maran's troubling dependence on a single-customer, Wal-Mart, for the majority of its business. MHP recognized that sales to Wal-Mart accounted for 50.8 percent of Maran's gross sales in 2006. Maran had no other major customers in 2006. Sales to Maran's next largest customer, Kmart, constituted only 6.9% of Maran's gross sales in 2006. The Appraisal Report also indicated that Wal-Mart's share of Maran's sales was projected to increase over the next year. Compounding Maran's dependence on Wal-Mart was the fact that, as of 2006, Maran did not have a legally assured contractual relationship with Wal-Mart; the next order could always have been the last.

49.     Maran's heavy reliance on Wal-Mart exposed it to obvious and significant risks. Most prominently, were Maran ever to lose Wal-Mart as a customer its revenues would plummet. And given that MHP acknowledged that companies like Wal-Mart had been increasingly successful at sourcing private-label denim directly from suppliers, and that Maran did not have a contract with Wal-Mart, this was hardly an inconceivable possibility. Even CSG, in its initial valuation, acknowledged that Maran's management was concerned that Wal-Mart would bypass Maran and directly source their products with suppliers. But even if the Wal-Mart relationship were to continue, as the customer responsible for the majority of Maran's sales, Wal-Mart was in a position to exert significant leverage over Maran by forcing it to accept ever decreasing profit margins.

50.    Maran's prior experience with other customers (apart from Wal-Mart) demonstrated that the demand for Maran's products was subject to significant fluctuations, and should have given MHP even further reason for concern about Maran's reliance on Wal-Mart.  For example, Maran projected that its sales to Kmart in 2007 would be 88% below its 2006 sales to Kmart.  Similarly, Maran projected that its sales to Charming Shoppes in 2007 would be 41% below what they were in 2006.

51.    Consistent with this volatile sales history, MHP did recognize the highly competitive nature of the apparel market:

-    "The Company's branded lines face intense competition from these larger, well-financed, nationally known branded products."

-    "Many of the Company's competitors possess greater financial, technical and other resources than the Company."

-    "The Company competes with a large number of similar apparel companies. In addition, the Company competes with manufacturers for private label apparel products. The Company does not hold a dominant competitive position . . ."

52.    Nevertheless, the Appraisal Report failed to account for the risks posed by Maran's relationship with Wal-Mart.  To the contrary, MHP downplayed these risks by noting that "[t]he Company has consistently provided Wal-Mart with superior design and sourcing expertise which sets the Company apart from its nearest competitors."  This was nearly identical to CSG's statement in its August 2006 valuation that "[t]he Company's superior design and sourcing expertise serves as a major differentiating factor and a barrier to entry."  Similarly, MHP merely repeated CSG's claim, using identical language, that the Company's experience in "identifying and interpreting fashion trends" provided it a "substantial competitive advantage."

14

53.     In addition to its reliance on unfounded projections and minimization of obvious business risks, MHP also overvalued Maran by comparing it to companies with higher-end product lines, broader customer bases, and significantly lower risk profiles.  In applying the Market-Based Approach (or Guideline Company Method), MHP selected three publicly traded companies whose product lines and operations it deemed "similar" to Maran's:  Guess? Inc. ("Guess"), True Religion Apparel, Inc. ("True Religion"), and Blue Holdings, Inc. ("Blue") (collectively, the "Guideline Companies").  MHP then calculated the average "multiples" by which the Guideline Companies' market values exceeded their earnings, and applied these multiples to Maran's earnings to calculate an estimated valuation range for the Company.

54.     MHP's use of the Guideline Companies to extrapolate Maran's value was improper, as the Guideline Companies differed from Maran in critical respects for which the Appraisal Report failed to account.  First, whereas the Appraisal Report projected that, in 2007, "private label" sales of jeans under another company's brand would constitute 63% of Maran's total sales, the Guideline Companies primarily sell premium "branded" jeans under their own name brands, and often in their own retail stores.  In an earlier section of the Appraisal Report, MHP recognized that branded denim is more lucrative and stable than private label denim.  It noted that "branded denim – which provides a superior fit and styling – [has] becom[e] one of the hottest segments of the apparel industry;" that "branded denim apparel [] produces higher profit margins" than private-label denim; and that private-label customers (like Wal-Mart) have been increasingly successful at sourcing their denim directly from suppliers and cutting out companies like Maran.  Nevertheless, in comparing Maran to the Guideline Companies, First Bankers and

MHP failed to account for Maran's heavy reliance on private-label denim sales, let alone the fact that the majority of those sales were concentrated in only one client: Wal-Mart.

55. The Appraisal Report also failed to account for the fact that the Guideline Companies' branded denim products were sold at much higher price point than Maran's branded products. MHP explained in the Appraisal Report that "[d]enim apparel can be segmented into three distinct categories – Basics, Fashion Basics, and Fashion," and that Maran's products "are primarily categorized as fashion basics." Indeed, MHP noted that one of Maran's branded lines, Blue SpiceTM, "targets juniors, children and women at the $39.99 retail price point." In contrast, the Guideline Companies' products, like True Religion and Guess? Jeans, which are considered fashion jeans, can retail for hundreds of dollars. MHP even acknowledged that it was True Religion and Guess? Jeans' higher-end jeans market that was the industry's "hottest segment." In short, True Religion and Guess? Jeans sold up-scale products for a different, and more profitable, market. Yet in comparing Maran with these Guideline Companies, First Bankers and MHP ignored Maran's down-market concentration, and instead acted as if they were comparing apples to apples.

56. MHP's decision to value Maran in part by comparing it to the improper Guideline Companies directly inflated the final valuation of Maran. Whereas MHP calculated Maran's value under the Earnings-Based Method as ranging from $103,147,000 to $115,734,000, the Market-Based Method yielded an even higher range of $108,800,000 to $124,250,000. MHP then "reconciled" the two approaches by averaging the ranges, which resulted in a "reconciled market value" for Maran of between $105,970,000 and

$119,990,000.  In short, MHP's selection of faulty comparables tangibly increased its final valuation of Maran.

57.     A few months later, in a subsequent valuation report that purported to value Maran as of December 31, 2006 ("the December 2006 Report"), MHP itself conceded that the Guideline Companies were not in fact "comparable" to Maran.  MHP explained in the December 2006 Report that "[d]ue to the limited availability of publicly-traded companies which we deemed to be similar to Maran, we included the guideline public company (market-based) method as a reasonableness check of the fair market value of the Company.  This method received no weighting in the reconciliation of the methods."

58.     In sum, for both the Earnings-Based and Market-Based Methods, the Appraisal Report contained several obvious errors and flaws.  For the Earnings-Based Method, the Appraisal Report failed to recognize that Maran's projections were unrealistic given the Company's historical performance and its dependence on one dominant customer.  For the Market-Based Method, the companies MHP selected as benchmarks for Maran had broader customer bases and materially different businesses that were focused on higher-end branded products (as opposed to private label) and independent retail stores, and which thus had significantly lower risk profiles than Maran.

59.     As a result of these flaws, MHP's valuation of the Maran stock that the ESOP purchased in the 2006 Transaction was far higher than the stock's actual fair market value.  The Appraisal Report estimated that the fair market value of the 49,000 shares of Maran stock offered to the ESOP ranged from between $65 million and $73 million. Fully endorsing this inaccurate appraisal, First Bankers, acting on behalf of the ESOP as its Trustee, caused the ESOP to enter into the 2006 Transaction and purchase the Maran

stock for approximately $71 million.  By failing to question the Appraisal Report 's

disregard for the obvious risks facing Maran and its reliance on unreasonable and overly

optimistic assumptions concerning the Company's future prospects, First Bankers caused

the ESOP to overpay for the Maran stock by at least 65% over and above the stock's then-

fair market value.

*The November 30, 2006 Stock Purchase Transaction*

60.     On November 30, 2006, First Bankers, acting on the ESOP's behalf,

engaged in a leveraged stock transaction to purchase shares of Maran stock from

Greenberg (Maran's President and CEO) and Huang (Maran's Executive Vice President,

COO, and CFO) (the "2006 Transaction").  As fiduciaries to the ESOP by virtue of their

status as the ESOP's Administrators with the power to remove the ESOP's Trustee, and as

officers of Maran and owners of 10% or more of Maran common stock at the time of the

2006 Transaction, Greenberg and Huang, at the time of the 2006 Transaction, were

"parties in interest" to the ESOP under ERISA § 3(14)(A) and (H), 29 U.S.C. §

1002(14)(A) and (H).

61.     Pursuant to the 2006 Transaction, the ESOP purchased 49,000 shares of

Maran's convertible preferred stock from Greenberg and Huang for approximately $71

million, nearly $11 million more than CSG's valuation of the transaction in August 2006,

which they received.  The convertible preferred stock was common stock with additional

rights to dividends worth 10% of the purchase price for eight years, valued at

approximately $32 million.

62.     To fund the approximately $71 million purchase price, First Bankers,

acting on the ESOP's behalf, borrowed $71 million from Maran, which was evidenced by

18

a promissory note requiring the ESOP to repay Maran in equal annual principal installments of $4,730,733.33, concluding with a final payment on December 31, 2020. The ESOP agreed to pledge the 49,000 shares of Maran convertible preferred stock as collateral for the loan.

63.     As a result of the 2006 Transaction, the ESOP owns 49% of Maran.  As of December 2011, the remaining Maran shares were owned by (a) David Greenberg 2009 Irrevocable Trust; (b) David Greenberg; (c) Richard Huang; and (d) Sara Sanchez 2009 Irrevocable Trust.

### *Events Subsequent to the 2006 Transaction*

64.     In September of 2008, Wal-Mart dropped Maran as its primary supplier of denim jeans in favor of a nationally known branded company, BCBG.  In its 2008 report on the value of the ESOP's stake in Maran, MHP made these observations about Maran's actual relationship with Wal-Mart and other large retailers:

-       "The Company faces increasing pressure due to its dependence on large retailers, such as Wal-Mart and Kohl's. The capricious nature of the fashion industry has proved to be a challenge to the Company."

-       "The Company has also been impacted by Wal-Mart's decision to design and source their own products."

-       "Wal-Mart has also reduced its orders from Maran as it has gone directly to the suppliers for similar products."

65.     On December 31, 2011, MHP issued its most recent appraisal report of the Maran stock held by the ESOP.  It opined that the stock is now worthless.  As of the fiscal plan year ending on December 31, 2011, the ESOP had 88 participants.

66.     On April 20, 2012, Maran, Greenberg, Huang and First Bankers, which was acting on behalf of the ESOP, decided to restructure the 2006 Transaction.  Maran

agreed to reduce the ESOP's outstanding loan principal from approximately $53 million to approximately $1 million.  The ESOP, in turn, agreed to convert all 49,000 of its Maran preferred shares into 49,000 shares of Maran common stock, and to waive all of its accrued but unpaid preferred dividends and its rights to unaccrued dividends.  None of the principal or interest the ESOP had already paid for Maran stock – approximately $17 million – was returned to the ESOP as part of the 2012 restructuring.

## ERISA VIOLATIONS

### The ESOP's November 30, 2006 Stock Purchase Transaction

67.     By their actions and omissions in connection with the 2006 Transaction, First Bankers, Greenberg, and Huang violated ERISA's fiduciary standards, 29 U.S.C. § 1104, and prohibited transactions provision, 29 U.S.C. § 1106.

*Fiduciary Status of First Bankers, Greenberg, and Huang*

68.     Under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), a person acquires fiduciary status if, as pertinent here, he (i) exercises discretionary authority or control over the management of a plan or exercises any authority or control over plan assets or (iii) has discretionary authority or responsibility in the administration of a plan.

69.     At all relevant times, First Bankers, by virtue of its authority as the ESOP's Trustee, was a fiduciary of the ESOP pursuant to ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii).

70.     At all relevant times, Greenberg and Huang were fiduciaries to the ESOP pursuant to ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), by virtue of their ability as the ESOP's Administrators and ESOP Committee members to exercise discretionary authority or control over Plan assets, and further by virtue of their authority

20

to appoint and remove First Bankers as Trustee and their attendant duty to monitor First Bankers.

### *First Bankers' Failure to Prudently Investigate the 2006 Transaction*

71.     Despite the fact that First Bankers knew, or should have known, that many of the assumptions about Maran on which the Appraisal Report relied were flawed, First Bankers never questioned these assumptions or requested that MHP perform its fair market value analysis based on more realistic assumptions.

72.     One of the foundations for CSG's and MHP's assumptions of Maran's future growth was the continued growth in sales to Wal-Mart.  Yet First Bankers knew or should have known that Wal-Mart had not renewed its contract with Maran since 2004, and that Maran's relationship with Wal-Mart was "day-to-day" (as described by MHP during a meeting with First Bankers).  First Bankers also did not receive any assurances from Wal-Mart that a contractual or other legally assured relationship existed.  One of First Bankers' own lawyers thus pointed out to First Bankers that "[t]he Company needs Wal-Mart, more than Wal-Mart needs the Company."

73.     Particularly in the absence of any contractual arrangement between Wal-Mart and Maran, First Bankers should have required MHP to discount its valuation of Maran based on the significant uncertainties surrounding Maran's future relationship with Wal-Mart.  Instead, the exact opposite occurred.  Maran's relationship with Wal-Mart was treated as a positive factor in MHP's valuation of Maran without any skepticism or input from First Bankers as to whether this risk affected MHP's assessment of the Company's fair market value.

74.     First Bankers, as an experienced ESOP trustee with years of experience reading and interpreting financial statements, and as a self-described expert on the fashion industry, also knew or should have known that the projections of Maran's future growth relied upon by the Appraisal Report were out of line with Maran's erratic historical performance, and represented only a best-case scenario.  First Bankers should have required MHP to incorporate into its valuation of Maran more realistic projections of Maran's future financial performance that tracked the Company's actual historical performance.   First Bankers failed to do so.  Had they done so, MHP's valuation would have been lower and the ESOP would have paid less for its stock.

75.     As a self-described fashion industry expert, First Bankers also knew, or should have known, that the Guideline Companies by which MHP valued Maran were not in fact comparable to Maran.  In selling its services to Maran, First Bankers stated that "[t]he [First Bankers] Team that would be assigned to your Plan individually has extensive knowledge in working with organizations in the Garment and Fashion Design Industry." Despite the fact that First Bankers knew or should have known that Maran specialized in lower-end private-label denim, First Bankers should have, but did not, question MHP's comparisons of Maran to companies that specialized in higher-end branded denim, like Guess? and True Religion, or require MHP to compare Maran to other companies in the private-label business.  Had First Bankers done so, MHP would have been obligated to conclude that the Guideline Companies were not in fact comparable to Maran, and the price paid by the ESOP for its Maran shares would have been lower.

76.     First Bankers also knew, or should have known, that CSG – the seller's agent whose stated goal is to act as "vigorous advocate" on behalf of the sellers and

"maximize cash flows for owners and their companies" – influenced MHP's determination of what is "fair market value" for the contemplated stock purchase.   MHP's Appraisal Report listed CSG's August 2006 valuation of the prospective ESOP transaction as a "significant source[] of information."   MHP also just adopted CSG's assumptions.  First Bankers never questioned but, rather, welcomed CSG's involvement in the selection of its appraiser, legal counsel, and CSG's valuation of the company on behalf of the seller.  Moreover, having adopted CSG's assumptions, First Bankers did not seek an explanation as to why the ESOP should pay $10 million more than the value CSG earlier placed on the Company stock on behalf of the sellers.  Even having this discrepant information, First Bankers did not negotiate a different or lower price.

77.     Aside from requiring MHP to re-evaluate Maran in light of the risks posed by the Wal-Mart relationship, the Company's actual historical performance, and a more comparable set of Guideline Companies, and questioning MHP about its reliance on CSG's valuation, First Bankers, as First Bankers had done in the past, also could have removed MHP, retained another valuation firm, or resigned as Trustee of the ESOP.  First Bankers also could have assessed the appraisal using its internal resources, which included financial experts.  What First Bankers could not do and should not have done, was blindly rely on MHP's obviously flawed Appraisal Report.

78.     First Bankers approved the transaction price after a call with MHP a week before the deal and before the final version of the appraisal report was actually completed.  First Bankers approved the price without any attempt to negotiate with the sellers.  There was no negotiation over the price despite the fact that the proposed transaction price was toward the higher end of even MHP's flawed range of fair market values.

79.     By failing to require MHP to use projections that were more in line with Maran's historical performance, compare Maran to a more comparable set of guideline companies, account for the risk based on Maran's "day-to-day" relationship with Wal-Mart, and reconcile its valuation with CSG's lower valuation – and instead relying on MHP's Appraisal Report as written without any meaningful negotiation with the sellers – First Bankers caused the ESOP to purchase Maran stock from parties-in-interest to the ESOP in an amount at least 65% over and above the proper fair market value.

80.     First Bankers' decision, on behalf of the ESOP, to enter the 2006 Transaction was imprudent, disloyal, and illegal because First Bankers, based on a flawed valuation that it did not adequately investigate, caused the ESOP to purchase Maran stock from parties-in-interest to the ESOP for more than the stock's fair market value.  The purchase violated the 2006 Trust Agreement and ERISA, both of which required that the Trustee perform its duties solely in the interests of the Plan's participants and beneficiaries and that all purchases of Maran stock by the Trustee be made only at prices which do not exceed the fair market value as of the date of purchase.

81.     First Bankers failed to properly identify questions to test the appraisal and its main underlying assumptions.  First Bankers did not verify that the appraisal's conclusions as to fair market value were consistent with the underlying quantitative data or the qualitative descriptions of the company and its place within the industry. Ultimately, First Bankers did not ensure the appraisal made sense and was internally consistent.  Specifically, First Bankers, for example:  (1) failed to verify that the financial projections relied upon by the Appraisal Report were consistent with Maran's historical performance; (2) failed to identify the risks to Maran posed by its heavy dependence on

Wal-Mart; (3) failed to recognize that the Guideline Companies chosen by MHP were not in fact comparable to Maran; (4) failed to question MHP concerning its dependence on CSG's valuation.  To remedy these failures, First Bankers should have, at least: (1) required MHP to value Maran based on a more realistic set of projections that were more consistent with historical performance; (2) required MHP to account for Maran's obvious risks, such as Maran's wide fluctuations with customer demand and Maran's precarious "day-to-day" relationship with its one major customer, Wal-Mart; (3) required MHP to compare Maran to companies that were in fact comparable to Maran; (4) required MHP to question and test the CSG valuation and CSG's conclusions; (5) hired its own appraiser and maintained independence from CSG's and the sellers' influence on its investigation of Maran's fair market value; (6) negotiated in good faith on the ESOP's behalf; (7) hired a new appraiser if MHP did not do an independent and proper appraisal; and (8) refused to engage in the transaction if errors were not corrected.  Had First Bankers properly done these things and had it properly valued the company, First Bankers would have caused the ESOP to pay less for the stock at the proper fair market value.  By failing to do so, First Bankers breached its fiduciary duties to the ESOP's participants and beneficiaries.

### *Greenberg's and Huang's Failure to Monitor First Bankers and Participation in First Bankers' Breach*

82.     By virtue of their decision, as members of Maran's Board of Directors, to appoint First Bankers as the ESOP's Trustee, and by their authority, as ESOP Committee members, to remove First Bankers as Trustee, Greenberg and Huang had a fiduciary duty to monitor First Bankers.  Greenberg and Huang failed to monitor First Bankers, and in addition, knowingly participated in First Bankers' fiduciary breach.

83.     Greenberg and Huang participated in a meeting between MHP, First Bankers, and the Company during which MHP and First Bankers were provided with information about Maran, including projections of Maran's future financial performance. Greenberg and Huang knew or should have known that the projections of Maran's future financial performance provided to MHP and First Bankers were patently overstated and did not sufficiently account for the risks posed by Maran's customer concentration, the competitive nature of the apparel industry, and Maran's inconsistent historical performance.

84.     Despite knowing that MHP and First Bankers would and did rely on these inaccurate projections, Greenberg and Huang failed to intervene at any time prior to the purchase, to provide MHP and First Bankers with more reasonable projections of Maran's future financial performance.  By failing to do so, Greenberg and Huang failed adequately to monitor First Bankers and knowingly participated in First Bankers' fiduciary breach.

85.     Greenberg and Huang knew or should have known that the work performed by their co-fiduciary First Bankers was flawed for the reasons described in the preceding paragraphs, including, but not limited to: (1) relying on CSG for the selection of the ESOP's financial advisor; (2) failing to engage in due diligence with respect to Maran's projections or its dependence on Wal-Mart; and (3) failing to question or negotiate the transaction price.  Accordingly, Greenberg and Huang should have refused to engage in the stock purchase transaction until they had taken action to correct these known flaws in First Bankers' investigation of Maran's fair market value as required under ERISA.

## The Indemnification Agreements

86.     Maran and First Bankers have two separate indemnification agreements. One is contained in Maran's Engagement Agreement with First Bankers, and the second is contained in the Trust Agreement.  The indemnification agreement in the Engagement Agreement requires Maran to indemnify First Bankers as follows:

> Subject to the relevant provisions of [ERISA], the Company hereby agrees to discharge, indemnify and hold First Bankers and its shareholders, directors, officers, employees, representatives and agents (hereinafter collectively referred to as the "Indemnitees") harmless from and against . . . any and present or future losses, claims, damages, expenses, or liabilities including, but not limited to, court costs, judgments, fines, excise taxes, time charges for First Bankers personnel time related to litigation or threatened litigation and the aggregate amount paid in reasonable settlement of any actions, suits, proceedings, or more of the Indemnitees in connection with actions, proceedings, or suits of any kind or nature whatsoever . . . arising from or in any way related to actions (including, but not limited to, past acts) taken, or omitted to be taken, by, one or more of the Indemnitees in connection with the engagement of First Bankers as the Trustee of the Trust . . . ."

87.     The indemnification agreement in the Engagement Agreement contains an exception relieving Maran from having to indemnify First Bankers, as follows:

> [T]he provisions of this Section 3 shall not apply to the extent that any Loss: (i) is found, in a final judgment by a court of competent jurisdiction from which no appeal is taken, to have resulted from the negligent actions or willful misconduct of one or more Indemnitees; or (ii) is found to be one for which, pursuant to restrictions or limitations under ERISA, the Indemnitees cannot be lawfully indemnified.

88.     Pursuant to the terms of the indemnification agreement in Maran's Engagement Agreement with First Bankers, Maran must indemnify First Bankers even if First Bankers violates ERISA, unless First Bankers is found by a court in a final judgment to have been negligent or to have committed willful misconduct, or unless a court finds that Maran's indemnification of First Bankers would violate ERISA.

89.     The Trust Agreement between Maran and First Bankers also contains an

indemnification agreement, which requires Maran to indemnify First Bankers as follows:

> 9.1     Indemnification.  For purposes of this Section 9.1, the term
> "Indemnitees" shall mean the Trustee and its affiliates and their officers,
> directors, employees, and agents.  Subject to the applicable provisions of
> ERISA, the Company and all Employers shall indemnify the Indemnitees
> for any loss, cost, expense, or other damage, including reasonable
> attorney's fees, suffered by any of the Indemnitees resulting from or
> incurred with respect to any legal proceedings related in any way to the
> performance of services by any one or more of the Indemnitees pursuant to
> the provisions of this Trust Agreement.

90.     The indemnification agreement in the Trust Agreement contains an

exception relieving Maran from having to indemnify First Bankers, as follows:

> However, these indemnification provisions shall not apply to the extent any
> loss, cost, expense, or damage with respect to which any of the Indemnitees
> shall seek indemnification is held *by a court of competent jurisdiction, in a
> final judgment from which no appeal is taken*, to have resulted from the
> gross negligence of one or more of the Indemnitees, from the willful
> misconduct of one or more of the Indemnitees or from the material
> violation or breach of any fiduciary duty imposed under ERISA by any one
> or more of the Indemnitees.

(Emphasis added).

91.     Pursuant to the terms of the indemnification agreement in the Trust

Agreement, Maran must indemnify First Bankers unless a court issues a final

unappealable judgment that First Bankers breached its fiduciary duties under ERISA or

engaged in gross negligence or willful misconduct.  Thus, Maran and therefore the ESOP

(and Maran's employees) would be obligated to indemnify First Bankers in the event that

First Bankers settles this action, even if First Bankers violated ERISA.

92.     As the 49% shareholder of Maran stock, the ESOP would bear a significant

portion of the burden of Maran's indemnification obligation if these indemnification

agreements were enforced.

## CLAIMS FOR RELIEF

### COUNT I
### (Against Defendant First Bankers for Violations of ERISA § 404(a)(1))

93.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 92 inclusive.

94.   As a fiduciary of the ESOP, Defendant First Bankers has a duty to act prudently and solely in the interests of the ESOP and its participants and beneficiaries, and further to act in accordance with the documents and instruments governing the ESOP.  29 U.S.C. § 1104(a)(1)(A), (B), and (D).  To satisfy its fiduciary duties, First Bankers was required to appropriately select an appraiser, to thoroughly and objectively review and analyze any valuation of Maran stock upon which the ESOP's purchase price would be based, including the financial information provided to the appraiser, question the appraiser regarding any flaws and inaccuracies, to re-appraise Maran in light of more reasonable and accurate information, and to negotiate the transaction price in light of a thorough and objective review of Maran's fair market value.

95.     The Appraisal Report had significant flaws and inaccuracies that would have been uncovered and addressed during a thorough and objective review and analysis by a prudent ESOP fiduciary.  The Appraisal Report's flaws and inaccuracies include, but are not limited to, the following:

(a)     The use of aggressive and overly optimistic projections of Maran's future earnings and profitability;

(b)      The failure to adequately account for Maran's historically inconsistent revenue figures;

(c)      The failure to adequately account for Maran's dependence on Wal-Mart and the lack of a legally assured contractual relationship;

(d)      The improper use of businesses in the branded apparel market as benchmarks to value Maran, which was primarily in the private-label market;

(e)      The failure to adequately account for Maran's lower profit margins and market segment than the companies to which Maran was compared;

(f)      The erroneous conclusion that the price the ESOP paid for Maran's stock did not exceed the fair market value of the stock;

(g)      The difference between the value placed on Maran by CSG and the value assigned by MHP.

96.      Defendant First Bankers further violated its duties when it failed to protect the ESOP and its participants' and beneficiaries' interests by, among other things:

(a)      Failing to appropriately and independently select the ESOP's appraiser by deferring to the Sellers' agent, who had already chosen MHP.

(b)      Failing to investigate the credibility of Maran's aggressive and unrealistic projections of its future earnings and profitability in light of Maran's erratic historical earnings;

(c)      Failing to investigate Maran's dependence on Wal-Mart as its dominant customer and the risks to Maran's business should it lose Wal-Mart as a customer;

(d)      Failing to investigate the credibility of comparing Maran to companies with materially different product lines and risk profiles;

(e)     Failing to investigate MHP's reliance on a valuation provided by CSG, the sellers' agent, and failing to question MHP as to why its valuation of the 2006 Transaction exceeded even CSG's valuation;

(f)     Failing to require MHP to re-appraise Maran by using financial projections more in line with Maran's actual historical performance, the risks posed by Maran's dependence on Wal-Mart, and to use a more comparable set of Guideline Companies, which First Bankers should have known because it specifically represented that it had extensive knowledge of the fashion industry;

(g)     Relying on the unsound Appraisal Report and improperly causing or permitting the ESOP to purchase Maran stock from Huang and Greenberg, who were parties-in-interest to the ESOP, at a price in excess of its fair market value without any negotiation over the price; and

(h)     Accepting a percentage of the fair market value of the ESOP's assets as fees for its services to the ESOP, while at the same time having discretion to determine their value.

97.     By its actions and failures to act as described above, Defendant First Bankers:

(a)     failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

31

(b)     failed to act with the care, skill, prudence and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of

a like character and with like aims, in violation of ERISA § 404(a)(1)(B),

29 U.S.C. § 1104(a)(1)(B);

(c)     failed to act in accordance with the documents and instruments governing

the Plan insofar as such documents and instruments are consistent with

ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

98.     As a result of the conduct as described above, Defendant First Bankers

caused losses to the ESOP for which it is liable pursuant to ERISA § 409(a), 29 U.S.C. §

1109(a).


### COUNT II
**(Against Defendant First Bankers for Violations of ERISA § 406(a)(1)-(2))**

99.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the

Secretary adopts and incorporates by reference the averments and allegations of

paragraphs 1 through 98 inclusive.

100.    As a fiduciary to the ESOP, Defendant First Bankers was prohibited from

causing the ESOP to engage in a transaction that constitutes the sale or exchange of

property between the ESOP and a "party in interest" to the ESOP, and further was

prohibited from transferring any assets of the ESOP to a party in interest.   ERISA §

406(a)(1)(A) & (D), 29 U.S.C. § 1106(a)(1)(A) & (D).

101.    A "party in interest" to an ERISA plan includes, *inter alia*, any fiduciary of

the plan, and any officer, director, or 10% or more shareholder of an employer whose

employees are covered by the plan.  ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14)(A) and (H).  As fiduciaries to the ESOP by virtue of their status as the ESOP's Administrators with the power to remove the ESOP's Trustee, and as officers of Maran and owners of 10% or more of Maran common stock at the time of the 2006 Transaction, Greenberg and Huang, at the time of the 2006 Transaction, were "parties in interest" to the ESOP under ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14)(A) and (H).

102.    By causing the ESOP to purchase Maran stock from Greenberg and Huang pursuant to the 2006 Transaction, First Bankers:

(a)    caused the ESOP to engage in transactions that it knew or should have known constituted the sale or exchange, or leasing, of any property between the plan and parties in interest, in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A); and

(b)    caused the ESOP to engage in transactions that that it knew or should have known constituted direct or indirect transfers of the ESOP's assets to, or use of the ESOP's assets by or for the benefit of, parties in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

103.    As a fiduciary to the ESOP, Defendant First Bankers was further prohibited from acting in any transaction involving the plan on behalf of a party whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries. ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

104.    As part of First Bankers' compensation arrangement with Maran, First Bankers was entitled to a percentage of the fair market value of the assets held by the ESOP as an "ongoing trustee fee," thus making it in First Bankers' interest that the Maran stock held by the ESOP be valued as high as possible.  In contrast, the ESOP's participants

had an interest in obtaining Maran stock for the lowest possible price.  By approving the transaction price of Maran stock on behalf of the ESOP for the 2006 Transaction when its interests were adverse to those of the ESOP's participants, First Bankers violated ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

105.    As a result of the conduct as described above, Defendant First Bankers caused the ESOP to enter into a transaction that is deemed illegal and voidable under ERISA § 406, 29 U.S.C. § 1106.

### COUNT III
**(Against Defendants Greenberg and Huang for violations of ERISA § 404(a)(1))**

106.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 105 inclusive.

107.    By virtue of their decision, as members of Maran's Board of Directors, to appoint First Bankers as the ESOP's Trustee, and by their authority, as ESOP Committee members, to remove First Bankers as Trustee, Greenberg and Huang had a fiduciary duty to monitor First Bankers.  As part of their duty to monitor First Bankers, Greenberg and Huang had a duty to ensure that First Bankers was not basing its decision to enter into the 2006 Transaction on information that Greenberg and Huang knew to be inaccurate.

108.    Greenberg and Huang knew, or should have known, that Maran and its agents provided inaccurate information about Maran to First Bankers and MHP, such as overly optimistic projections of Maran's future financial performance.   Greenberg and Huang also knew, or should have known, that First Bankers and MHP were going to consider that information in determining Maran's fair market value.  Nevertheless, Greenberg and Huang failed to inform First Bankers of the information's inaccuracy.

Greenberg and Huang knew or should have known that First Bankers' investigation of Maran's fair market value was flawed and that the transaction was illegal under ERISA. Greenberg and Huang should have declined to participate in the illegal transaction, fired or replaced the trustee in order to ensure that that the investigation of Maran's fair market value and the trustee's representation of the ESOP's interests had satisfied ERISA's requirements.  As a result, Greenberg and Huang failed to prudently and loyally fulfill their duty to monitor First Bankers, the ESOP's Trustee, in violation of ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B).

109.   Even apart from their fiduciary status, by their actions described in paragraph 108 above, Greenberg and Huang further violated ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), by knowingly participating in First Bankers' violation of those provisions.

## COUNT IV
### (Against Defendants Greenberg and Huang for violations of ERISA § 405(a))

110.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 109 inclusive.

111.   As the ESOP's Administrators with discretionary authority over the ESOP's management and administration, and further by virtue of their authority to appoint and remove First Bankers as the ESOP's Trustee, Greenberg and Huang were fiduciaries to the ESOP.  As fiduciaries, Greenberg and Huang are also liable under ERISA § 405(a), 29 U.S.C. § 1005(a), for the fiduciary breaches committed by their co-fiduciary First Bankers in the following ways.

112.    First, by failing in their duty to monitor First Bankers in violation of ERISA § 404(a)(1) (as described in paragraph 108 above), Greenberg and Huang enabled First Bankers to breach its fiduciary to the ESOP by causing the ESOP to purchase Maran stock for an amount in excess of fair market value and without an adequate investigation, in violation of ERISA § 405(a)(2), 29 U.S.C. § 1005(a)(2).

113.    Second, despite knowing that First Bankers breached its fiduciary duties by causing the ESOP to purchase Maran stock for an amount in excess of fair market value and without an adequate investigation, Greenberg and Huang engaged in a transaction that was imprudent and disloyal to the ESOP, and thereby in violation of ERISA §§ 404(a)(1)(A) & (B), 406.  Greenberg and Huang failed to make reasonable efforts to fully remedy the breach, in violation of ERISA § 405(a)(3), 29 U.S.C. § 1005(a)(3).

### COUNT V
**(Against Defendants Greenberg and Huang for violations of ERISA § 406(a)(1))**

114.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 113 inclusive.

115.    As fiduciaries to the ESOP, Greenberg and Huang, by their actions described in paragraph 108 above, caused the ESOP to engage in a prohibited transaction, in violation of ERISA §§ 406(a)(1)(A) & (D), 29 U.S.C. §§ 1106(a)(1)(A) & (D).

116.    Even apart from their fiduciary status, Greenberg and Huang, by their actions described in paragraph 108 above, further violated ERISA §§ 406(a)(1)(A) & (D), 29 U.S.C. §§ 1106(a)(1)(A) & (D) by knowingly participating in First Bankers' violation of those provisions.

36

**COUNT VI**
**(Against Defendants First Bankers and Maran, Inc., for Entering Into**
**Indemnification Agreements Void Under ERISA § 410)**

117.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the

Secretary adopts and incorporates by reference the averments and allegations of

paragraphs 1 through 116 inclusive.

118.    ERISA § 410(a) provides that "any provision in an agreement or instrument

which purports to relieve a fiduciary from responsibility or liability for any responsibility,

obligation or duty under this part shall be void as against public policy[.]"  29 U.S.C. §

1110(a).  A fiduciary is impermissibly relieved of responsibility or liability for its ERISA

fiduciary duties when an ERISA plan itself bears some of the burden of indemnifying a

fiduciary for its fiduciary breaches.  See 29 C.F.R. § 2509.75–4.

119.    As set forth in paragraphs 86-92 above, Maran's indemnification

agreements with First Bankers could require Maran to pay all of First Bankers' losses,

costs, expenses and damages incurred in connection with any legal proceeding relating to

First Bankers' performance as the ESOP's Trustee in circumstances in which First Bankers

has violated its fiduciary duties under ERISA.  As the 49% shareholder of Maran, the

ESOP and, therefore, Maran's employees would bear a significant portion of Maran's

indemnification obligation.

120.    To the extent First Bankers is permitted to recover any money from Maran

pursuant to an indemnification agreement in light of the violations set forth above, any

such payments would be in violation of ERISA.

121.    By its actions described above, First Bankers should not gain any benefits

from Maran should First Bankers' actions on behalf of the Maran ESOP be declared in

violation of ERISA under the anti-exculpatory provisions set forth in ERISA § 410(a), 29 U.S.C. § 1110(a).

## PRAYER FOR RELIEF

WHEREFORE, the Secretary of Labor prays that this Court enter an Order:

1.    Requiring First Bankers, Greenberg, and Huang to restore all losses caused to the ESOP as a result of First Bankers' fiduciary breaches, plus interest.

2.    Voiding any agreement or any provision of any agreement that authorized and/or obligated the ESOP to purchase Maran stock from Greenberg and Huang.

3.    Requiring First Bankers, Greenberg, and Huang to pay back the total amount of money the ESOP expended in payment for Maran stock plus pre-judgment interest.

4.    Requiring First Bankers to disgorge, and restore to the ESOP, all fees earned from the 2006 Transaction and its subsequent management of the ESOP's assets.

5.    Requiring Greenberg and Huang to disgorge, and restore to the ESOP, all profits realized from the 2006 Transaction.

6.    Enjoining First Bankers from acting as a trustee, fiduciary or service provider in any ESOP transaction.

7.    Enjoining Huang and Greenberg from acting as a trustee or fiduciary to any ERISA Plan.

8.    Declaring that First Bankers violated ERISA and then enjoining First Bankers from receiving any benefits from its indemnification agreements with Maran.

9.    Granting such other relief as may be equitable, just and proper.

Respectfully submitted:

Dated:  April 1, 2013

For the Secretary:

M. PATRICIA SMITH
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor
Plan Benefits Security Division

LESLIE CANFIELD PERLMAN
Counsel for General Litigation
Plan Benefits Security Division
Perlman.leslie@dol.gov
NY Bar No. 1106475
S.D.N.Y. No. LC1967

JEFFREY HAHN
Trial Attorney
DC Bar No. 975576
THOMAS TSO
Senior Trial Attorney
MA Bar No. 666100
Office of the Solicitor
Plan Benefits Security Division
U.S. Department of Labor
P.O. Box 1914
Washington, DC  20013
Tel: (202) 693-5600
Fax: (202) 693-5610
Hahn.Jeffrey.M@dol.gov
Tso.Thomas@dol.gov

Attorneys for Plaintiff