UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THOMAS E. PEREZ, | ) | No. 1:12-cv-08648-GBD |
| Secretary of the United States | ) | |
| Department of Labor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST BANKERS TRUST SERVICES, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' JOINT RULE 56.1 RESPONSIVE STATEMENT OF MATERIAL
FACTS IN OPPOSITION TO THE SECRETARY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1(b), Defendants First Bankers Trust Services, Inc., and

David Greenberg and Richard Huang, by and through their counsel, hereby submit this joint

responsive statement of material facts ("Joint Responsive Statement") addressing each paragraph

of the Statements of Material Facts in Support of the Motion for Partial Summary Judgment

submitted by the Secretary of Labor (the "Secretary").[1]

**A.    The Parties**

1.    Defendant First Bankers Trust Services, Inc. ("FBTS") bills itself on its website

as "an institutional fiduciary with a strong history and reputation of providing the highest quality

fiduciary services for ESOPs."  https://www.fbtservices.com/employee-benefit/esop/ (last visited

Oct. 27, 2015).

---

[1] In accordance with Local Civil Rule 56.1(b), Defendants Greenberg and Huang and Defendant
First Bankers Trust Services, Inc. each simultaneously submit a statement of additional material
facts as to which it is contended that there exists a genuine issue to be tried.

**Response**: Defendants deny that the characterization of FBTS "billing itself" is accurate, but admit that the quoted language appears on the FBTS website. Defendants rely on the FBTS website to speak for itself, rather than on the Secretary's partial quotation and characterization thereof.

2.      FBTS served as trustee to the Maran, Inc. Employee Stock Ownership ("Maran ESOP") for purposes of its purchase of Maran, Inc. ("Maran") stock on November 30, 2006, from David Greenberg and Richard Huang (the "Maran ESOP Transaction"). FBTS Answer ¶¶ 5, 7-8, 60 [Dkt. No. 49].

**Response**: Defendants admit that FBTS served as the independent transactional trustee to the Maran ESOP in connection with the Maran ESOP Transaction.

3.      An employee stock ownership plan (ESOP) is a retirement plan that "is designed to invest primarily in qualifying employer securities." See 29 U.S.C. §1107(d)(6).

**Response**: The Secretary improperly presents a legal conclusion in paragraph 3 when he states that an ESOP "is designed to invest primarily in qualifying employer securities." Defendants do not respond to this legal conclusion. Defendants rely on 29 U.S.C. § 1107(d)(6) to speak for itself, rather than on the Secretary's partial quotation and characterization thereof.

4.      ESOPs carry substantial tax incentives for selling shareholders. See 26 U.S.C. §§ 402(e)(4), 404(k), 1042.

**Response**: The Secretary improperly presents a legal conclusion in paragraph 4 when he states that ESOPs "carry substantial tax incentives for selling shareholders." Defendants do not respond to this legal conclusion. Defendants rely on 26 U.S.C. §§ 402(e)(4),

2

404(k), 1042 to speak for themselves, rather than on the Secretary's partial quotation and characterization thereof.

5.        At all relevant times, FBTS, by virtue of its authority as the ESOP's Trustee, was a fiduciary of the ESOP pursuant to ERISA Sections 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii).  FBTS Answer ¶ 69 [Dkt. No. 49].

**Response**: The Secretary improperly presents a legal conclusion in paragraph 5 when he states that FBTS "by virtue of its authority as the ESOP's Trustee, was a fiduciary of the ESOP pursuant to ERISA Sections 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii)."  Defendants do not respond to this legal conclusion.

6.        Among the members of FBTS's employee benefits committee at the time of the Maran ESOP Transaction were Ashley Melton, Kimberly Serbin, Brian Ippensen, and Merri Ash.  Ippensen Dep. at 22:10-24 [Ex. 1 to Declaration of Jeffrey M. Hahn ("Hahn Dec.")].

**Response**: Admitted.

7.        Among the functions of FBTS's employee benefits committee at the time of the Maran ESOP Transaction was to decide whether to accept or reject employee stock ownership plan ("ESOP") transactions. Ippensen Dep. at 17:2-19, 18:6-18, 40:16-20 [Ex. 1 to Hahn Dec.].

**Response**: Admitted.

8.        Defendant David Greenberg was, in 2006, the President and Chief Executive Officer of Maran and a member of Maran's board of directors. Greenberg and Huang's Answer ¶ 7 [Dkt. No. 50].

**Response:**  Admitted.  Defendants further respond that Greenberg and Huang's operative Answer is the Amended Answer they filed on July 22, 2013.  (Dkt. No. 82.)

3

9.     Defendant Richard Huang wa s, in 2006, Maran's Executive Vice President, Chief Financial Officer, Chief Operating Officer, and, a member of its board of directors. Greenberg and Huang's Answer ¶ 8 [Dkt. No. 50].

**Response:**  Admitted.  Defendants further respond that Greenberg and Huang's operative Answer is the Amended Answer they filed on July 22, 2013.  (Dkt. No. 82.)

10.     From approximately January 2001 until November 30, 2006, Greenberg owned approximately 90% of Maran's outstanding stock. Greenberg Dep. at 33:17-36:16 [Ex. 2 to Hahn Dec]; MHP Valuation Report of Maran, Inc., Nov. 30, 2006, at 8 [Ex 3 to Hahn Dec.]; Stock Purchase Agreement dated Jan. 5, 2001 [Ex. 4 to Hahn Dec.].

**Response:**  Admitted.

11.     From approximately January 2001 through November 30, 2006, Huang owned approximately 10% of Maran's outstanding stock. Huang Dep. at 36:18-39:14 [Ex. 5 to Hahn Dec.]; MHP Valuation Report of Maran, Inc., Nov. 30, 2006, at 8 [Ex. 3 to Hahn Dec.]; Stock Purchase Agreement dated Jan. 5, 2001 [Ex. 4 to Hahn Dec.].

**Response:**  Admitted.

12.     Greenberg and Huang were members of the employee stock ownership plan Committee of Maran, Inc. (the "Maran ESOP Committee") effective January 1, 2006. Joint Written Consent of Shareholders, Nov. 28, 2006, at MOCO0006075 [Ex. 6 to Hahn Dec.].

**Response:**  Denied.  Defendants admit that Greenberg and Huang became members of the Maran ESOP Committee simultaneous with the closing of the Maran ESOP Transaction on November 30, 2006, but deny that Greenberg and Huang were Maran ESOP Committee members prior to that time, and further deny that the Maran ESOP Committee existed prior to that time.

13.     In an "Acceptance of Designation By Committee Members," Greenberg and Huang "acknowledge[d] the status of the [Maran ESOP] Committee as a 'named fiduciary' of the Maran, Inc., Employee Stock Ownership Plan under the Employee Retirement Income Security Act of 1974 as amended and the status of each of them an ERISA fiduciary of the Plan." Acceptance of Designation by Committee Members at DOL0000000903 [Ex. 7 to Hahn Dec.].

> **Response:**  Defendants admit that Greenberg and Huang executed a document titled "Acceptance of Designation by Committee Members," but rely on that document to speak for itself, rather than on the Secretary's partial quotation thereof.  Defendants further state that the Maran ESOP Committee did not exist prior to the closing of the Maran ESOP Transaction on November 30, 2006.

14.     As members of the Maran ESOP Committee, Greenberg and Huang had authority "[t]o call meetings in order to provide recommendations to the Trustee on all matters affecting the Plan and/or Trust" and "[t]o complete a performance evaluation of the Trustee of the Trust, and recommend to the Board of Directors on an annual basis either the continuance or removal of such Trustee") (emphasis added).  Guidelines for the Employee Stock Ownership Plan Committee of Maran, Inc., at §§ 4.02, 4.04 [Ex. 7 to Hahn Dec.].

> **Response:**  Defendants admit that Greenberg and Huang became members of the Maran ESOP Committee simultaneous with the closing of the Maran ESOP Transaction on November 30, 2006.  Defendants admit that the Guidelines for the Employee Stock Ownership Plan Committee of Maran, Inc. ("Guidelines") include the language quoted in paragraph 14, but rely on the Guidelines to speak for themselves, rather than on the Secretary's partial quotation thereof.

B.     **Maran Background**

15.     At all relevant times, Maran was a wholesaler of apparel. Huang Dep. at 40:2-4 [Ex. 5 to Hahn Dec.].

> **Response:**  Denied.  Defendants admit that, since 1977, Maran has been "a manufacturer, designer, and marketer of fashion denim apparel."  (Hahn Decl. Ex. 3 at 6, DOLMHP 000517.)  Defendants further state that Maran offers "various merchandise" including corduroy, knit, and twill, "not just denim alone."  (Huang Tr. 98:7-12.)[2]

16.     For the year ended August 31, 2006, Maran's sales to Wal-Mart represented approximately 56% of Maran total sales. MHP Valuation Report of Maran, Inc., Nov. 30, 2006, at DOLMHP000421 [Ex. 3 to Hahn Dec.].

> **Response**:  Admitted.  (Hahn Decl. Ex. 3 at 16, DOLMHP 000527.)  Defendants further state that Exhibit 3 to the Declaration of Jeffrey Hahn does not contain a page Bates labeled DOLMHP000421.

---

[2] Relevant excerpts from any deposition transcript cited in any of Defendants' responses are attached to the Declaration of Lars C. Golumbic filed simultaneously with this Joint Responsive Statement of Facts.

**C.**      **Greenberg and Huang Fail in Their Efforts to Sell Maran to a Third Party**

17.      On or about April 6, 2005, Greenberg and Huang retained Citigroup Geneva Capital Strategies ("Citigroup") to facilitate the sale or other disposition of Maran.  Greenberg and Huang's Response to Sec's Requests for Admission No. 3 [Ex. 8 to Hahn Dec.].

> **Response:**  Defendants admit that, on or about April 6, 2005, Greenberg and Huang retained Citigroup to provide certain services to Maran.  Defendants deny that on April 6, 2005, or at any time, Greenberg and Huang had definitively decided to proceed with a sale or other disposition of Maran.  (Greenberg Tr. 59:16-60:4.)  Defendants further deny the bold, underlined heading above paragraph 17.

18.      In or around June 2005, Citigroup identified Starboard Capital Partners ("Starboard") as a potential buyer of Maran. Greenberg and Huang's Response to Sec's Requests for Admission No. 4 [Ex. 8 to Hahn Dec.].

> **Response:**  Admitted.

19.      On or around October 20, 2005, Starboard and Angelo Gordon & Co. ("Angelo Gordon") sent Greenberg a letter of intent to purchase a 100% equity interest in Maran from Greenberg and Huang for $47.5 million in cash and a $17.5 million junior preferred interest in the new Maran entity, plus a 20% equity interest in the new Maran entity.  Starboard Letter of Intent, Oct. 20, 2005 [Ex. 9 to Hahn Dec.]; Greenberg Dep. at 80:17-83:18 [Ex. 2 to Hahn Dec.].

> **Response:**  Admitted.

20.      Starboard and Angelo Gordon's Letter of Intent stated that it was "based upon . . . future satisfactory completion of due diligence by Buyer . . . ." Starboard Letter of Intent, Oct. 20, 2005, at CSG004978 [Ex. 9 to Hahn Dec.].

**Response:** Defendants admit that the Letter of Intent includes the language quoted in Paragraph 20, but rely on the Letter of Intent to speak for itself, rather than on the Secretary's partial quotation thereof.

21.     On or around October 23, 2005, Angelo Gordon retained Clear Thinking Group ("CTG") to perform a due diligence of Maran.  CTG Letter to Angelo Gordon, Oct. 23, 2005 [Ex. 10 to Hahn Dec.]; Greenberg Dep. at 84:6-11 [Ex. 2 to Hahn Dec.].

**Response:**  Defendants admit that Angelo Gordon retained CTG to perform due diligence.  (Greenberg Tr. 84:6-11.)  Defendants lack sufficient information and knowledge regarding when Angelo Gordon retained CTG, what the scope of CTG's engagement was, whether the letter the Secretary references in paragraph 21 is a true and accurate copy, and whether or when the letter was executed.  Defendants further state that the Secretary has not authenticated the letter he references in paragraph 21, nor is it a document from either FBTS' or Maran's files.

22.     On or around December 2005, CTG issued a draft due diligence report.  [Ex. 13 to Hahn Dec.].

**Response:** Defendants lack sufficient information and knowledge regarding whether the draft due diligence report the Secretary references in paragraph 22 is a true and accurate copy of a CTG draft due diligence report or of any CTG report, and whether CTG actually issued a draft or final due diligence report. (Greenberg Tr. 93:15-94:5; Huang Tr. 81:7-19.)  Defendants therefore deny the statements in paragraph 22.  Defendants further state that the Secretary has not authenticated the report he references in paragraph 22, nor is it a document from either FBTS' or Maran's files.

23.     The CTG draft report stated:

[T]he Maran business plan reviewed by CTG is very aggressive.  The key elements of top line sales (average of 12% annual growth through 2010), maintained gross margin and continual leverage of operating costs appears to be optimistic.  Investments in new (such as likely mandated RFID capabilities) technology and facility expansion are understated. Each of these financial elements should move in a positive direction, but likely not at the rate/levels identified in the business plan.

[Ex. 13 to Hahn Dec. at STAR 00618].

**Response:**  Defendants lack sufficient information and knowledge regarding whether the draft due diligence report the Secretary references in paragraph 23 is a true and accurate copy of a CTG draft due diligence report or of any CTG report, and whether CTG actually issued a draft or final due diligence report. (Greenberg Tr. 93:15-94:5; Huang Tr. 81:7-19.)  Defendants therefore deny the statements in paragraph 23.  Defendants further state that the Secretary has not authenticated the report he references in paragraph 23, nor is it a document from either FBTS' or Maran's files.

24.     CTG's draft report described as a "weakness" Maran's "heavy reliance on Wal-Mart."  [Ex. 13 to Hahn Dec. at STAR 00620].

**Response:**  Defendants lack sufficient information and knowledge regarding whether the draft due diligence report the Secretary references in paragraph 24 is a true and accurate copy of a CTG draft due diligence report or of any CTG report, and whether CTG actually issued a draft or final due diligence report. (Greenberg Tr. 93:15-94:5; Huang Tr. 81:7-19.)  Defendants therefore deny the statements in paragraph 24.  Defendants further state that the Secretary has not authenticated the report he references in paragraph 24, nor is it a document from either FBTS' or Maran's files.

25.     Starboard and Angelo Gordon subsequently proposed to Greenberg and Huang a "revised" deal that lowered the proposed purchase price from $65 million (inclusive of cash and junior preferred stock) to $38 million (inclusive of cash and junior preferred stock). Maran, Inc. Recapitalization Alternatives, March 2006, at STAR 00600 [Ex. 14 to Hahn Dec.]; Greenberg Dep. at 112:11-113:22 [Ex. 2 to Hahn Dec.]; Huang Dep. at 124:2-126:21 [Ex. 5 to Hahn Dec.].

> **Response:**  Denied.  Defendants admit that, regarding the draft document titled "Maran, Inc. Recapitalization Alternatives," Greenberg testified that Angelo Gordon "was trying to resuscitate some kind of a deal," and "sent us all kinds of different alternatives, and we probably threw this in the garbage . . . . This was, at this point, meaningless to us. We were finished with Angelo, Gordon."  (Greenberg Tr. 112:11-113:3.)  Defendants rely on Greenberg's testimony to speak for itself, rather than the Secretary's characterization thereof.  Defendants admit that, regarding the draft document titled "Maran, Inc. Recapitalization Alternatives," Huang testified, "I think this is after January 31st, I think they got the indication that we give the indication we don't want to call the deal, we don't want to go forward . . . . at that point, I don't think we even pay attention to interest of continue working with them."  (Huang Tr. 124:2-126:11.)  Defendants rely on Huang's testimony to speak for itself, rather than on the Secretary's characterization thereof.

26.     By March 31, 2006, Angelo Gordon and Starboard's proposed purchase of Maran had fallen apart.  Letter from Mr. Bergschneider to D. Greenberg, Mar. 31, 2006 [Ex. 15 to Hahn Dec.].

> **Response:**  Denied.  Defendants admit that Greenberg and Huang declined to accept Starboard and Angelo Gordon's offer because, although the cash component was

attractive, they did not like certain aspects of the proposed deal.  (*See, e.g.*, Greenberg Tr. 99:9-100:12.)

**D.**   **Greenberg and Huang Explore an ESOP Sale and Retain MHP to Provide an Initial Valuation of Maran**

27.    In January 2006, David Greenberg was referred to Harvey Granat of CSG Capital Partners LLC, formerly known as Corporate Solutions Group (under either name, "CSG"). Greenberg Dep. at 128:5-8 [Ex. 2 to Hahn Dec.].

> **Response**:  Admitted.  With respect to the bold, underlined text preceding paragraph 27, Defendants admit that the Committee for the Formation of the Maran Inc./Amica Apparel Corporation ESOP ("ESOP Formation Committee") explored the possibility of forming an ESOP and retained MHP to provide a preliminary valuation of Maran.

28.    CSG billed itself on its website as having "the nation's preeminent ESOP investment banking practice" and having "extensive experience structuring ESOP transactions for middle-market companies."  See  http://www.csgpartners.com/services/esop/index.php (last visited Nov. 3, 2015).

> **Response**: Defendants deny that the characterization of CSG "billing itself," is accurate. Defendants rely on the CSG website to speak for itself, rather than on the Secretary's characterization thereof.

29.    In or around January 2006, CSG made a presentation to Greenberg and Huang titled "Comparative ESOP Analysis Presentation." Greenberg and Huang's Response to Sec's Requests for Admission No. 14 [Ex. 8 to Hahn Dec.].

> **Response**:  Admitted.

30.    CSG's "Comparative ESOP Analysis Presentation" compared the relative merits of Huang and Greenberg selling their Maran stock to an ESOP versus a sale to a third-party buyer. Comparative ESOP Analysis Presentation, Jan. 2006 [Ex. 16 to Hahn Dec.].

**Response**: Admitted.

31.    CSG's "Comparative ESOP Analysis Presentation" concluded that a sale to an ESOP as compared to a sale to a 3rd party would "dramatically increase the after-tax cash flow to the selling shareholders." Id. at CSG 005051 [Ex. 16 to Hahn Dec.].

**Response**: Defendants admit that the document titled, "Comparative ESOP Analysis Presentation" includes the language quoted in paragraph 31.  Defendants rely on the document titled, "Comparative ESOP Analysis Presentation" to speak for itself, rather than on the Secretary's partial quotation and characterization thereof.

32.    CSG's "Comparative ESOP Analysis Presentation" concluded that the "best estimate" of a value for Maran was $115 million. Id. at CSG 005062 [Ex. 16 to Hahn Dec.].

**Response**: Defendants rely on CSG's Comparative ESOP Analysis Presentation to speak for itself, rather than on the Secretary's characterization thereof.  Defendants admit that CSG determined that the midpoint of its discounted cash flow analysis of $115 million was the best estimate of a value for Maran.  However, the presentation did not contain a formal valuation, but only a rough estimate as to the value of Maran.  (Meshechok Tr. 32:20-25) (the Comparative ESOP Analysis Presentation "is not a formal valuation").)  For purposes of the presentation, CSG did a rough discounted cash flow analysis without having completed full diligence or utilizing fully-developed projections from Maran.  (Meshechok Tr. 33:6-12) (the Comparative ESOP Analysis Presentation "is not . . . at the level of detail that a full valuation would be").)  The presentation was merely a feasibility

12

study that did not contain the level of detail or analysis of a full valuation.  (Meshechok

Tr. 32:20-33:16); (Meshechok Tr. 174:3-175:19) (CSG "hadn't done any valuation" of

Maran—it "had done a short feasibility analysis").)

33.     On January 20, 2006, Alex Mumblat of CSG sent an email to Rob Lesser of the

law firm Epstein, Becker, & Green ("Epstein Becker") and stated: "Per your conversation with

Larry, please see attached Maran's contract with Geneva and their executed LOI that we need to

help them get out of."  Email from A. Mumblat to R. Lesser, Jan. 20, 2006, at CSG 024037 [Ex.

17 to Hahn Dec.].

> **Response:**  Defendants admit that the email the Secretary references in paragraph 33
>
> contains the language quoted in paragraph 33, but rely on the email to speak for itself,
>
> rather than on the Secretary's partial quotation thereof.

34.     On or about July 11, 2006, Maran engaged CSG to render certain financial and/or

consulting services in connection with the design and installation of an ESOP for Maran.

Greenberg and Huang's Response to Sec's Requests for Admission No. 20 [Ex. 8 to Hahn Dec.];

Maran/CSG Engagement Agreement, July 11, 2006 [Ex. 18 to Hahn Dec.].

> **Response:**  Admitted.  Defendants further state that no particular transaction, including
>
> the Maran ESOP Transaction, was anticipated on or about July 11, 2006.

35.     Under its July 11, 2006 engagement agreement with Maran, CSG agreed to

"design a plan for the acquisition of stock by the ESOP."  Maran/CSG Engagement Agreement,

July 11, 2006 at CSG 014050 [Ex. 18 to Hahn Dec.].

> **Response:**  Defendants admit that the Maran/CSG Engagement Agreement the Secretary
>
> references in paragraph 35 contains the language quoted in paragraph 35, but rely on the
>
> Maran/CSG Engagement Agreement to speak for itself, rather than on the Secretary's

13

partial quotation and characterization thereof.  Defendants further state that no particular transaction, including the Maran ESOP Transaction, was anticipated on or about July 11, 2006.

36.     CSG also agreed to "[a]ct[] as a liaison between the Company, trustee, and the independent valuation firm in an effort to quantify and optimize the fair market value the Company." Id. [Ex. 18 to Hahn Dec.].

> **Response:**  Admit that the Maran/CSG Engagement Agreement contains such language but rely on the Agreement to speak for itself, rather than on the Secretary's partial quotation and characterization thereof.

37.     CSG's engagement agreement with Maran promised CSG, upon the closing of an ESOP transaction, a "success fee" consisting of $250,000 plus, among other incremental fees, 1% of Maran's value in excess of $100,000,000 as determined by the amount of the ESOP transaction.  Id. at CSG 014051-52 [Ex. 18 to Hahn Dec.].

> **Response:**  Defendants rely on the Maran/CSG Engagement Agreement dated July 11, 2006 to speak for itself, rather than on the Secretary's partial quotation and characterization thereof.  Defendants admit that CSG received "a closing fee" that was "reflective of the work and effort that [went] into the transaction."  (Meshechok Tr. 97:15-98:2.)

38.     Between January and November 2006, Huang provided CSG with projections of Maran's future financial performance. Greenberg and Huang's Response to Sec.'s Request for Admission No. 31 [Ex. 8 to Hahn Dec.].

> **Response**: Admitted that, between January 2006 and November 2006, Huang, in his capacity as a corporate officer of Maran, provided CSG with projections for Maran.

39.     On or around August 16, 2006, Maran retained Meyers, Harrison, & Pia ("MHP") to conduct a valuation of Maran for the purpose of assisting Greenberg and Huang in evaluating whether to form an ESOP. Maran/MHP Engagement Agreement, Aug. 16, 2007 [Ex. 19 to Hahn Dec.]; Huang Dep. at 161:14-162:9 [Ex. 5 to Hahn Dec.].

> **Response**:  Denied.  Defendants admit that, on or around August 16, 2006, the ESOP Formation Committee retained MHP to conduct a valuation of the equity in Maran. (Hahn Decl. Ex. 19 at 1, DOLMHP000016.)  Defendants further admit that the ESOP Formation Committee," want[ed] to know . . . what the valuation of the company going to be" before deciding whether to go forward with forming an ESOP.  (Huang Tr. 161:14-162:9.)  Defendants further admit that MHP's preliminary valuation conclusion was one factor, among others, that the ESOP Formation Committee considered in determining whether to form an ESOP.  (*See, e.g.*, (Greenberg Tr. 126:4-13) (Greenberg and Huang "wanted the [Maran] employees to share in something," and so they "wanted to investigate what an ESOP was really about.").)

40.     MHP was referred to Greenberg and Huang by CSG. Huang Dep. at 163:15-18 [Ex. 5 to Hahn Dec.].

> **Response**:  Admitted.  Defendants further state that the ESOP Formation Committee selected MHP from among other valuation firms to conduct the preliminary valuation, (Huang Tr. 163:15-22), and interviewed MHP before retaining it, (Greenberg Tr. 152:18-153:12).

41.     Huang testified that the purpose of the valuation was to help him and Greenberg determine whether they would go forward with an ESOP transaction.  Huang Dep. at 161:14-162:9 [Ex. 5 to Hahn Dec.].

**Response**:  Defendants admit that Huang testified as follows:

Q. And am I correct that you or Maran retained MHP to do a valuation so that you could determine what price you would offer the stock to the ESOP? Is that right?

* * *

A. Yes, okay. According to advice from CSG, it's one of the step that we need to get a valuation, but I don't know -- that have a future impact to the final price, I did not know.

Q. Do you know why they told you you have to get a valuation?

A. Not just he. We also want to know, you know, what the valuation of the company going to be.

Q. Why did you want to know what the valuation of the company was going to be?

A. Before we going to go forward or not.

Defendants rely on Huang's testimony to speak for itself, rather than on the Secretary's characterization thereof.  Defendants further state that MHP's preliminary valuation conclusion was one factor, among others, that the ESOP Formation Committee considered in determining whether to form an ESOP.  (*See, e.g.*, (Greenberg Tr. 126:4-13) (Greenberg and Huang "wanted the [Maran] employees to share in something," and so they "wanted to investigate what an ESOP was really about.").)

42.    According to Huang, he and Greenberg were hoping MHP would value Maran's total equity at around $100 million. Huang Dep. at 162:23-163:14 [Ex. 5 to Hahn Dec.].

**Response**:  Denied.  Defendants admit that Huang testified as follows:

Q. So was there a -- do you have in your mind a certain valuation threshold at which point you would not -- above which you would go forward and below which you would not go forward, before you were given this valuation by MHP?

A. I think at that time we did consider that. We considered all the number that put together was only from CSG, on their rough, you know, presentation. And we

don't know that -- what the valuation outside, the third party would view. So this the step that we went ahead and get a valuation.

Q. But I guess my question was: Was there -- had MHP come back with some valuation -- was there a valuation level, amount above which you would have gone ahead and done an ESOP transaction and below which you would have not done a transaction?

A. We didn't have a predetermined number. We have --

Q. Was there a range?

A. Range would be similar to what we were previously recommended by Citigroup valuation.

Q. And what was that range?

A. As I mentioned before, it was around 100, 100 million.

Q. For the total equity value of Maran?

A. Yeah, for total equity value.

Defendants rely on Huang's testimony to speak for itself, rather than on the Secretary's characterization thereof.

43.      On or around October 4, 2006, MHP issued to Maran an initial valuation of a 49% equity interest in Maran (the "Initial Valuation").  Greenberg and Huang's Response to Sec's Requests for Admission No. 34 [Ex. 8 to Hahn Dec.]; MHP Initial Valuation, Oct. 4, 2006 [Ex. 20 to Hahn Dec.].

**Response**:  Denied.  Defendants admit that, on or around October 4, 2006, MHP issued the Initial Valuation to the ESOP Formation Committee.

44.      Among the valuation methodologies employed by MHP in its Initial Valuation was the guideline public company method" (the "Guideline Method"). MHP Initial Valuation, Oct. 4, 2006, at DOLMHP000262 [Ex. 20 to Hahn Dec.].

17

**Response**: Admitted.

45.     The Guideline Method uses the market values of publicly traded companies to develop "multiples" to be used as a proxy for the multiples at which the subject company should trade. Id. at DOLMHP000265 [Ex. 20 to Hahn Dec.].

**Response**: Admitted.

46.     Proper application of the Guideline Method requires selecting companies that are similar to the company being valued.  Pia Dep. at 177:24-178:5 [Ex. 21 to Hahn Dec.].

**Response**: Defendants admit that Mr. Pia testified as follows:

Q. Would you agree that the proper application of the guideline public company method requires selecting similar companies to the one that you're valuing?

\* \* \*

A. Generally, yes.

Defendants rely on Mr. Pia's testimony to speak for itself, rather than on the Secretary's characterization thereof.

47.     In its Initial Valuation, MHP chose three guideline companies (the "Guideline Companies") to value Maran: Guess! Inc., True Religion Apparel Corp. ("True Religion"), and Blue Holdings, Inc. ("Blue Holdings").   MHP Initial Valuation, Oct. 4, 2006, at DOLMHP000265 [Ex. 20 to Hahn Dec.].

**Response**: Admitted.

48.     On October 4, 2006, Alex Meshechok of CSG sent the Initial Valuation to Greenberg and Huang.  Email from A. Meshechok to D. Greenberg and R. Huang, Oct. 4, 2006 [Ex. 22 to Hahn Dec.]; Huang Dep. at 173:11-174:6 [Ex. 5 to Hahn Dec.]; Greenberg Dep. at 157:2-161:9 [Ex. 2 to Hahn Dec.].

18

**Response**:  Admitted.

49.     Greenberg testified that did not know who Blue Holdings was at the time he received MHP's Initial Valuation, and further believed that True Religion was not comparable to Maran.  Greenberg Dep. at 169:4-171:9 [Ex. 2 to Hahn Dec.].

**Response:**  Defendants admit that Greenberg testified as follows:

Q. Are you familiar with [Guess, Inc., True Religion Apparel Corp., and Blue Holdings Corp.]

A. I'm not familiar with Blue Holdings.  I've never heard of that.

Q. Are you familiar with the other two?

A. Yes.

Q. Are these companies Maran's closest competitors?

A. No.

* * *

Q. Are these the companies that are most comparable to your company?

A. There's only one.

Q. There's only one that is comparable to yours?

A Well, Guess was in the moderate business for a very long time. And then they stepped it up when they went into their own stores at, I guess, about that time. The other two -- True Religion is not.  And I don't know who Blue Holdings is.

(Greenberg Tr. 169:4-171:9.)  Defendants further admit that, regarding True Religion, Greenberg testified: "I know True Religion; [Maran] cop[ies] them."   (Greenberg Tr. 171:21-23.)  Defendants rely on Greenberg's testimony to speak for itself, rather than on the Secretary's characterization thereof.  Defendants further state that Greenberg is not a valuation expert qualified to opine on the reasonableness of MHP's guideline company selection.

19

50.     After receiving the Initial Valuation, Huang had a conversation with CSG in which he communicated that the Guideline Companies selected by MHP were "not really similar."  Huang Dep. at 177:19-178:9 [Ex. 5 to Hahn Dec.].

> **Response:**  Admitted.  Defendants further admit that Huang recognized that MHP "had to chose from public companies, not privately owned company" in selecting guideline companies.  (Huang Tr. 178:10-19.)  Defendants further state that Huang is not a valuation expert qualified to opine on the reasonableness of MHP's guideline company selection.

51.     The Initial Valuation reflected Huang's projections, according to which Maran's sales for the year ending August 31, 2006 (the year preceding the forecast period) were "projected" to be $107,248,000.  MHP Initial Valuation, Oct. 4, 2006, at 19 [Ex. 20 to Hahn Dec.].

> **Response:**   Defendants admit that the Initial Valuation includes projections which Huang, in his capacity as a corporate officer of Maran, provided to CSG, and which CSG in turn provided to MHP.  (Huang Tr. 174:7-23.)  Defendants further admit that the sales for the period ended August 31, 2006 were projected to be $107,248,000.  (Hahn Decl. Ex. 20 at 19, DOLMHP 000276.)  Defendants deny that the Secretary's characterization of the period ended August 31, 2006 as "the year preceding the forecast period" is accurate.

52.     In its Initial Valuation, MHP opined that Maran's total equity value as of August 31, 2006, was $115,750,000.  MHP Initial Valuation, Oct. 4, 2006, at DOLMHP000268 [Ex. 20 to Hahn Dec.].

> **Response:** Admitted.

20

53.     MHP further opined in its Initial Valuation that a 49% preferred equity interest in Maran, as of August 31, 2006, had a fair market value of $70,961,000.  Id. at DOLMHP000269 [Ex. 20 to Hahn Dec.]; Greenberg and Huang's Response to Sec's Requests for Admission No. 36 [Ex. 8 to Hahn Dec.].

**Response:** Admitted.

**E.     FBTS Reduces Its Fee to Serve as the ESOP's Transactional Trustee to Cultivate CSG as a Future Referral Source**

54.     Soon after receiving MHP's Initial Valuation, Greenberg and Huang decided to proceed with forming an ESOP.  Huang Dep. at 194:10-19 [Ex. 5 to Hahn Dec.].

**Response:**  Defendants admit that, after receiving MHP's Initial Valuation, the ESOP Formation Committee decided to proceed with forming an ESOP.  Defendants further admit that MHP's preliminary valuation conclusion was one factor, among others, that the ESOP Formation Committee considered in determining whether to form an ESOP. (*See, e.g.*, (Greenberg Tr. 126:4-13) (Greenberg and Huang "wanted the [Maran] employees to share in something," and so they "wanted to investigate what an ESOP was really about.").)  Defendants deny the bold, underlined heading preceding paragraph 54.

55.     CSG referred FBTS to Maran to serve as the ESOP's trustee for the Maran ESOP Transaction, and FBTS was hired.  Greenberg and Huang's Answer ¶ 25 [Dkt. No. 50].

**Response:**  Denied.  Defendants admit that CSG introduced Maran to at least two independent trustees who could represent the ESOP in connection with the Maran ESOP Transaction: FBTS and GreatBanc.  (Meshechok Tr. 202:11-14.)  Defendants further admit that Huang independently found another trustee candidate for Maran to consider. (Greenberg 193:22-194:7.)  Defendants further admit that Greenberg and Huang, in their capacity as Maran Board members, researched FBTS, determined that "they were really

21

versed in ESOP transactions" and ultimately selected FBTS because they "felt that [FBTS] could probably handle the responsibility." (Greenberg Tr. 194:10-195:20.) Defendants further admit that Maran entered into an engagement agreement with FBTS, retaining it to represent the ESOP as the independent transactional trustee in the proposed transaction. (Hahn Decl. Ex. 32.)

56.     On or before October 5, 2006, FBTS initially quoted a fee of $57,000 to act as the ESOP's transactional trustee. FBTS Response to Sec.'s Request for Admission Nos. 1 and 3 [Ex. 23 to Hahn Dec.]; Melton Dep. at 69:14-22 [Ex. 24 to Hahn Dec.].

**Response**: Admitted

57.     On October 6, 2006, Melton sent an email to Meshechok attaching FBTS's proposal to serve as the ESOP's transactional trustee. FBTS Response to Sec.'s Request for Admission Nos. 4 and 5 [Ex. 23 to Hahn Dec.]; Email from A. Melton to A. Meshechok, Oct. 6, 2006 [Ex. 25 to Hahn Dec.].

**Response**: Admitted.

58.     In its October 6, 2006 proposal, FBTS reduced its transaction fee to $50,000. FBTS Trustee Proposal, Oct. 6, 2006, at 3 [Ex. 26 to Hahn Dec.]; FBTS Response to Sec.'s Request for Admission No. 6 [Ex. 23 to Hahn Dec.].

**Response**: Admitted.

59.     FBTS lowered its fee to $50,000 in part due to a "commitment" that Meshechok of CSG made to Melton regarding FBTS's potential service as the ESOP's ongoing trustee. Email from A. Melton to M. Ash and K. Serbin, Oct. 6, 2006 [Ex. 27 to Hahn Dec.]; Melton Dep. at 106:5-21 [Ex. 24 to Hahn Dec.].

**Response**: Denied.  As set forth in the email, FBTS adjusted its proposed transaction fee as a result of a competing bid from GreatBanc estimated at between $45,000 and $50,000.  Merri Ash reiterated the reason behind FBTS' lowering of its fee due to the competing, lower bid from GreatBanc.  (Ash Tr. 58:6-16.)  In addition, the "commitment" mentioned in the October 6 email was nothing more than a reference to FBTS being permitted to bid on the opportunity to serve as ongoing trustee.

60.    In her October 6, 2006 email to Meschechok attaching FBTS's proposal, Melton wrote that FBTS "would love the opportunity to serve in the role of a Transactional Trustee and subsequently in an Ongoing role."  Email from A. Melton to A. Meshechok, Oct. 6, 2006 [Ex. 25 to Hahn Dec.].

**Response**: Admitted.

61.    In FBTS's October 6, 2006 proposal, Melton wrote:

I would be remiss if I did not mention that we have a keen interest in working with any clients that come our way via Corporate Solutions Group, LLC. CSG's work is impeccable, the transactions they do are clean and the care they provide to their clients is nothing short of paternal. While we will still go through an extensive Due Diligence Process, it provides us with some comfort that a comprehensive Due Diligence Process has already been undertaken and that the prospective client is fully aware and educated as to the world which surrounds an ESOP.

FBTS Trustee Proposal, Oct. 6, 2006, at 1 [Ex. 26 to Hahn Dec.].

**Response**: Admitted.

62.    Melton was trying to cultivate CSG as a referral source.  Melton Dep. at 88:14-23 [Ex. 24 to Hahn Dec.].

**Response**: Paragraph 62 does not accurately reflect Ms. Melton's testimony.  Ms. Melton testified that the language in the October 6 proposal ("CSG's work is impeccable.  The transactions they do are clean and the care they provide to their clients is nothing short of

paternal.") was based on feedback provided to Ms. Melton.  Ms. Melton provided further context to the language, stating that she wrote it from the perspective of a business development officer complimenting a referral source.  (Melton Tr. 88:14-23.)

63.    FBTS represented in its October 6 proposal that it would "help ensure that the transaction closes within six weeks."  FBTS Trustee Proposal, Oct. 6, 2006, at 3 [Ex. 26 to Hahn Dec.].

**Response**: Admitted.  Defendants further respond that four to six weeks is a typical time frame for the closing of an ESOP transaction.  (Meshechok Tr. 219:4-10.)  Defendants further respond that the six weeks was a "suggested time frame" and that it did not mean that the potential transaction would close within six weeks.  (Ash Tr. 49:16-25.)

64.    Greenberg and Huang wanted the transaction to close before the end of the year for tax purposes.  Huang Dep. at 196:12-22 [Ex. 5 to Hahn Dec.].

**Response**:  Denied.  Defendants admit that Huang testified as follows:

Q. Do you recall having any desire that this ESOP transaction close within a roughly six-week period of time, as of October 20, 2006?

A. We have discussion and we would prefer to have the transaction conclude before the end of that year.

Q. The year-end of that year being the calendar year-end?

A. Calendar year-end.

Q. And why was that?

A. For -- easy to handle on a tax purpose.

(Huang Tr. 196:12-22.)  Defendants rely on Huang's testimony to speak for itself, rather than on the Secretary's characterization thereof.

65.     On October 12, 2006, Meshechok of CSG sent an email to Melton of FBTS asking her to resend a proposal for FBTS to serve as the ESOP's transactional trustee, but this time for a transaction fee of $45,000.  Email from A. Meshechok to A. Melton and R. Lesser, Oct. 12, 2006 [Ex. 28 to Hahn Dec.].

> **Response**:  Defendants admit that, on October 12, 2006, Alex Meshechok sent an email to Ashley Melton and Robert E. Lesser, with a copy to Lawrence C. Kaplan and Merri Ash, saying the following: "Ashley.... Assuming rob is fine with the legal content pls resend us a proposal at 45k (I believe merri spoke to larry about this).  That's the same a GB and as much as the company is willing to pay."  (Hahn Decl. Ex. 28.)  Defendants rely on the October 12, 2006 email to speak for itself, rather than on the Secretary's characterization thereof.

66.     In response to Meshechok's October 12, 2006 email, Melton wrote to Mesheshok, Larry Kaplan of CSG, and Rob Lesser of Epstein Becker explaining that FBTS could not reduce its fee to $45,000, particularly for a deal that FBTS would need to close within what Melton described as a "compressed timeframe" of six weeks.  Email from A. Melton to A. Meshechok, Oct. 12, 2006 (5:26 pm) [Ex. 29 to Hahn Dec.].

> **Response**: Defendants admit that Ms. Melton's October 12, 2006 email contains the language quoted in paragraph 66, but rely on the email to speak for itself, rather than on the Secretary's partial quotation and characterization thereof.  Defendants further respond that four-to-six weeks is a typical time frame for the closing of an ESOP transaction. (Meshechok Tr. 219:4-10.)

67.     Melton further wrote:

As I have mentioned before, I really do enjoy working with you and Larry and the rest of the team at CSG. Gentlemen - I think the world of you. I know Merri feels the same. What makes working with the both of you, notwithstanding the fact that you are both wise, endearing, quixotic, ethical and delightful is that you surround yourselves with people like Rob Lesser and Brian Snarr, equally magnanimous and practical professionals. The level of clientele you bring to the table is top notch and your work product is superior to many that I have seen out on the street.

Id. [Ex. 28 to Hahn Dec.].

      **Response**: Admitted.

      68.    Merri Ash of FBTS testified, of that the typical time between when FBTS is retained as an ESOP's transactional trustee and when the transaction closes, 60 days is "on the short side." Ash Dep. at 28:24-29:18 [Ex. 30 to Hahn Dec.].

      **Response**: Admitted but further stated that the duration of the period between retention of FBTS as transactional trustee and when the transaction closes varies.  (Ash Tr. at 28:24-29:14.)  Defendants further respond that four-to-six weeks is a typical time frame for the closing of an ESOP transaction.  (Meshechok Tr. 219:4-10.)

      69.    Melton also proposed to Meshechok in her October 12, 2006 email a "Corporate Solutions Group fee schedule that will be discounted from what [FBTS] normally charge[s] . . . because of the fact that you bring nice, clean opportunities to the table."  Email from A. Melton to A. Meshechok, Oct. 12, 2006 (5:26 pm) [Ex. 29 to Hahn Dec.].

      **Response**: Denied.  The Secretary has excluded relevant portions of the email indicating FBTS' confidence in the quality of CSG's services.  The full sentence reads: "To go one step further, both Merri and I have such confidence in the quality of your work that we are willing to come up with an agreed upon 'Corporate Solutions Fee Schedule' that will be discounted from what we normally charge, because of the fact that you bring nice, clean opportunities to the table that have already been under a microscope."  Defendants

rely on the email to speak for itself, rather than on the Secretary's partial quotation thereof.

70.     Melton further "pledge[d]" in her October 12, 2006 email that if FBTS were selected as the ESOP's trustee, FBTS "will work diligently to ensure that the Maran, Inc. ESOP Transaction closes within six weeks." Id. [Ex. 29 to Hahn Dec.].

**Response**: Admitted.

71.     Melton informed Meshechok in that email that, FBTS "regrettably can't meet what Great Banc will charge on this assignment (the $45,000) and at this juncture must remain firm on our $50,000 proposed fee."  Id. [Ex. 29 to Hahn Dec.].

**Response**: Admitted.

72.     In an October 16, 2006 email to Meshechok, Melton informed Meshechok that FBTS had agreed to match GreatBanc's $45,000 transaction fee, and attached a revised proposal reflecting a $45,000 transaction fee.  Email from A. Melton to A. Meshechok, Oct. 16, 2006, at CSG015383 [Ex. 31 to Hahn Dec.].

**Response**: Admitted.

73.     In her October 16, 2006 email, Melton told Meshechok that FBTS's ability to match GreatBanc's $45,000 fee was "a testament to the entire Committee's value on building a relationship with CSG and its respect for the business you have bought to the table in the past." Id. [Ex. 31 to Hahn Dec.].

**Response**: Admitted.

74.     In her dealings with Meshechok in connection with the Maran ESOP transaction, Melton testified that it was her "attempt was to build a relationship with Alex Meshechok as a referral source."  Melton Dep. at 71:13-23 [Ex. 24 to Hahn Dec.].

**Response**: Denied.  Paragraph 74 does not accurately reflect Ms. Melton's testimony.  At her deposition, Ms. Melton was specifically asked what the following sentence in the October 16 email meant: "Our ability to do this is a testament to the entire Committee's value on building a relationship with CSG."  Ms. Melton testified—as to that specific sentence—that, as a salesperson for FBTS, she was attempting to build a relationship with Alex Meshechok as a referral source.  Ms. Melton's testimony on building a relationship with Alex Meshechok is far narrower than the Secretary attempts to portray.

75.     Pursuant to an agreement signed on October 24, 2006, by and between FBTS and Maran (the "FBTS Engagement Agreement"), FBTS was appointed the Maran ESOP's trustee. FBTS Answer ¶ 23 [Dkt. No. 49]; FBTS Engagement Agreement, Oct. 24, 2006 [Ex. 32 to Hahn Dec.].

**Response**: Admitted that, pursuant to the FBTS Engagement Agreement, FBTS was appointed as independent transactional trustee to the Maran ESOP.

76.     The FBTS Engagement Agreement was signed by Greenberg on behalf of Maran. Greenberg and Huang's Answer ¶ 23 [Dkt. No. 50].

**Response**:  Admitted.  Defendants further respond that Greenberg and Huang's operative Answer is the Amended Answer they filed on July 22, 2013.  (Dkt. No. 82.)

77.     The FBTS Engagement Agreement stated: "After the completion of its initial engagement, the Trustee will continue to serve as the Trustee of the Trust until it resigns or it is removed by the Company."  FBTS Engagement Agreement, ¶ 17 [Ex. 32 to Hahn Dec.]; Serbin Dep. at 67:7-68:7 [Ex. 33 to Hahn Dec.].

**Response**: Denied.  Paragraph 17 of the Engagement Agreement states: "By entering [sic] into this Agreement, the Company has elected to retain the Trustee after the

completion of its initial engagement.  The Trustee will continue to serve as the Trustee of the Trust until it resigns or it is removed by the Company."  Brian Ippensen testified that this provision permitted the Company to retain the trustee on an ongoing basis, but that it was not an automatic assumption.  (Ippensen Tr. 65:6-25.)  Kim Serbin testified that if the Company did not want to retain FBTS as ongoing trustee, the Company could have FBTS removed and replaced.  (Serbin Tr. 67:7-68:7.)

78.     The FBTS Engagement Agreement promised FBTS an ongoing trustee fee based on a percentage of the ESOP's assets, subject to a minimum of $20,000 per year.  FBTS Engagement Agreement, at 13 [Ex. 32 to Hahn Dec.]

**Response**: Admitted.

79.     FBTS could not have earned any ongoing trustee fees unless if it first approved an ESOP transaction.  Serbin Dep. at 71:15-20 [Ex. 33 to Hahn Dec.].

**Response**: Admitted.  Defendants further state that, although Maran could retain FBTS on an ongoing basis following the Maran ESOP Transaction, it was not an automatic assumption that Maran would do so.  (Ippensen Tr. 65:6-25.)  Kim Serbin testified that if Maran did not want to retain FBTS as ongoing trustee, the Company could have FBTS removed and replaced.  (Serbin Tr. 67:7-68:7.)

80.     The Maran, Inc. Employee Stock Ownership Trust (the "Trust Agreement") vested the ESOP Committee with the power to remove FBTS as trustee, subject to the consent of the Company.  Maran, Inc. Employee Stock Ownership Trust Agreement, at DOL0000006495 [Ex. 34 to Hahn Dec.].

**Response**: Denied.  Defendants admit that the Trust Agreement gave the Maran ESOP Committee the authority to remove FBTS from its ongoing trustee role with the

Company's consent, but deny that the Maran ESOP Committee existed prior to the closing of the Maran ESOP Transaction on November 30, 2006.  Defendants further state that any removal would be subject to providing the removed trustee with advanced written notice, satisfactory written evidence of the appointment of a successor trustee and of the successor trustee's acceptance of the trusteeship.

81.   Greenberg and Huang were members of the ESOP Committee effective January 1, 2006. Joint Written Consent of the Directors and Shareholders, Oct. 28, 2006, at MOCO000607 [Ex. 6 to Hahn Dec.].

> **Response:** Defendants admit that Greenberg and Huang became members of the Maran ESOP Committee simultaneous with the closing of the Maran ESOP Transaction on November 30, 2006, but deny that Greenberg and Huang were Maran ESOP Committee members prior to that time, and further deny that the Maran ESOP Committee existed prior to that time.

82.   The ESOP Committee was also the Maran ESOP's "administrator" under the terms of the Maran ESOP plan document. Maran, Inc. Employee Stock Ownership Plan, at MOCO0000309 [Ex. 35 to Hahn Dec.].

> **Response:**  Defendants admit that the Maran ESOP Committee became the Maran ESOP's administrator simultaneous with the closing of the Maran ESOP Transaction on November 30, 2006, and that the Maran ESOP Committee did not exist prior to that time.

83.   The ESOP Committee thus had the power, among other things, to "act as plan administrator of the Plan and as an ERISA 'named fiduciary," to "construe and enforce the terms of the Plan," to "determine eligibility of any Employee to participate," and to "review and render decisions respecting claims for (or denials of claims for) benefits under the Plan."  Guidelines for

the Employee Stock Ownership Plan Committee of Maran, Inc., at DOL0000000898-899 [Ex. 36 to Hahn Dec.].

> **Response:**   Defendants admit that the Guidelines include the language quoted in paragraph 83, but rely on the Guidelines to speak for themselves, rather than on the Secretary's partial quotation thereof.   Defendants further state that the Maran ESOP Committee did not exist prior to the closing of the Maran ESOP Transaction on November 30, 2006.

84.     Both Greenberg and Huang signed a document "[a]cknowledg[ing] the status the [ESOP] Committee as a 'named fiduciary' of the Maran, Inc. Employee Stock Ownership Plan . . . under the Employee Retirement Income Security Act of 1974 as amended . . . and the status of each of them an ERISA fiduciary of the Plan." Id. at DOL0000000903 [Ex. 36 to Hahn Dec.].

> **Response:**   Defendants deny that Exhibit 36 to the Hahn Declaration contains the language quoted in paragraph 84. Defendants admit that Greenberg and Huang executed a document titled "Acceptance of Designation by Committee Members" that includes the language quoted in paragraph 84, but rely on that document to speak for itself, rather than on the Secretary's partial quotation thereof.   Defendants further state that the Maran ESOP Committee did not exist prior to the closing of the Maran ESOP Transaction on November 30, 2006.

**F.     On CSG's Recommendation, FBTS Retains Epstein Becker as its Legal Counsel on the Maran ESOP Transaction**

85.     In her October 6, 2006 email to Meshechok attaching FBTS's proposal to serve as the ESOP's transactional trustee, Melton wrote that "[a]s always, we would enjoy the ability to work with you in addition to Brian Snarr and Rob Lesser (inclusive of their respective teams) on

this engagement. It would be an honor to be surrounded by such noble company." Email from A. Melton to A. Meshechok, Oct. 6, 2006 [Ex. 25 to Hahn Dec.].

    **Response**: Admitted. Defendants deny the bold, underlined heading preceding paragraph

    86.    As of October 2006, Lesser worked for the law firm of Epstein Becker. Epstein Becker Engagement Agreement [Ex. 36 to Hahn Dec.].

    **Response**: Admitted.

    87.    On October 12, 2006, Melton sent an email to Lesser, copying Meshechok and Kaplan of CSG, which attached FBTS's draft engagement letter to serve as trustee for the Maran ESOP on the Maran ESOP Transaction. Email from A. Melton to R. Lesser, Oct, 12, 2006 (10:13 am) [Ex. 28 to Hahn Dec.].

    **Response**: Admitted.

    88.    In her October 12, 2006 email to Lesser, Melton wrote that "[w]e have been asked to send to you via email FBTS's Engagement Letter for the contemplated Maran, Inc. ESOP Transaction. Please review this and make sure that it meets with your approval." Id. [Ex. 28 to Hahn Dec.].

    **Response**: Admitted.

    89.    On October 18, 2006, Lesser sent an email to Melton that began: "Ashley, I understand that First Bankers will be the trustee in this transaction. Congratulations on your appointment. I was told to give a fee quote for our proposed representation of First Bankers." Email from R. Lesser to A. Melton, Oct. 18, 2006 (1:47 pm) [Ex. 29 to Hahn Dec.].

    **Response**: Admitted.

90.     Melton responded to Lesser that same day, writing: "If the Company and CSG
have no objections, please feel free to move forward in preparing Epstein Becker's Engagement
Letter." Email from A. Melton to R. Lesser, Oct. 18, 2006 (5:26 pm) [Ex. 29 to Hahn Dec.].

> **Response**: Admitted.  Defendants further respond that, "In no way, shape or form [was
> CSG] ever able to instruct the trustee or . . . dictate[] to them who they should hire. They
> are significant institutions and would make independent decisions and always did and
> always have."  (Meshechok Tr. 215:9-19.)

**G.     On CSG's Recommendation, FBTS Retains MHP as Its Valuation Advisor   and
Fails to Inquire About MHP's Prior Work for Greenberg and Huang**

91.     On October 18, 2006, Alex Mumblat of CSG sent an email to Pia of MHP,
writing, "First Bankers Trust Services Inc. has been engaged as trustee on the Maran deal. Please
amend your engagement letter as appropriate and forward it to them at your earliest
convenience."  Email from A. Mumblat to K. Pia, Oct. 18, 2006 [Ex. 37 to Hahn Dec.].

> **Response:** Admitted.  Defendants further respond that, "In no way, shape or form [was
> CSG] ever able to instruct the trustee or . . . dictate[] to them who they should hire. They
> are significant institutions and would make independent decisions and always did and
> always have."  (Meshechok Tr. 215:9-19.)  Defendants further respond that Merri Ash
> testified that "…we ultimately decide who it is we hire as our financial [advisor].
> Nobody is telling us who we hire, I don't want to give you that opinion." (Ash Tr. 34:23-
> 35:2.)  Defendants deny the bold, underlined heading preceding paragraph 91.

92.     On October 23, 2006, John Gilson of the law firm Morrison Cohen, which served
as counsel to Maran on the Maran ESOP transaction, sent an email to a number of individuals --
including Pia of MHP and Melton of FBTS -- attaching a confidential transaction memo (the

"Confidential Transaction Memo").  Email from J. Gilson to A. Melton, M. Ash, and others, Oct. 23, 2006 (6:08 pm) [Ex. 38 to Hahn Dec.].

> **Response:** Admitted.

93.     In the Confidential Transaction Memo, Epstein Becker is listed as "Counsel for Trustee" and MHP is listed as "Trustee Financial Advisor." Maran, Inc. Confidential Transaction Memo, Oct. 19, 2006, at CSG 02297-98 [Ex. 39 to Hahn Dec.].

> **Response:** Admitted.

94.     An hour later, Melton forwarded Gilson's email to Ash, copying Serbin and Jennifer Gordley of FBTS, and wrote the following:

> I thought Empire Valuation was going to be our Financial Advisor on this case (you had indicated Andrea Houck). It now appears to be Ken Pia from MHP.  I like Ken and have no issues in his representing us on this transaction - I think MHP does good work. I trust Kim and Jenn will have no problems either.  Just curious as to why the last minute change.

Email from A. Melton to M. Ash and K. Serbin, Oct. 23, 2006 (9:01 pm) [Ex. 38 to Hahn Dec.].

> **Response**: Denied.  Defendants admit that the email from Mr. Gilson was sent at 6:08 pm on October 23, 2006 and the email from Ms. Melton was sent at 9:01 pm on October 23, 2006.  Defendants admit that Ms. Melton's email includes the language quoted in paragraph 94, but rely on the email to speak for itself, rather than on the Secretary's characterization thereof.  Defendants deny that the time Ms. Melton sent the email is a material fact.

95.     On October 24, 2006, Ash replied to Melton's October 23 email inquiring about the "last minute change" to MHP by stating "Ask Alex."  Email from M. Ash to A. Melton, Oct. 23, 2006 [Ex. 40 to Hahn Dec.].

**Response**: Denied.  Defendants respond that the exhibit cited by the Secretary indicates that Ms. Ash's email is not in response to any other email.  Further, Ms. Ash could not affirmatively confirm at her deposition that this email was in response to Ms. Melton's October 23 email.  (Ash Tr. 76:17-23.)

96.    The "Alex" referred to by Ash in her reply to Melton's October 23 email was Alex Meshechok of CSG.  Ash Dep. at 76:24-77:6 [Ex. 30 to Hahn Dec.].

**Response**: Admitted.

97.    On October 24, 2006 -- approximately two hours after Ash told Melton to "[a]sk Alex" -- Pia sent Melton a draft of MHP's engagement letter to serve as valuation advisor to FBTS on the Maran ESOP transaction.  Email from K. Pia to A. Melton attaching engagement letter, Oct. 24, 2006 [Ex. 41 to Hahn Dec.].

**Response**: Admitted that, on October 24, 2006, Pia sent Melton a draft of MHP's engagement letter to serve as valuation advisor to FBTS in connection with the Maran ESOP Transaction.  Defendants deny that there is a relationship between Ash's October 24, 2006 email and Pia's October 24, 2006, or that that "approximately two hours" that elapsed in between the time the two emails were sent establishes such a relationship.  Defendants further deny that the fact that the two emails were sent "approximately two hours apart" is material.

98.    In an engagement letter dated October 23, 2006, FBTS engaged MHP to serve as its valuation advisor on the Maran ESOP Transaction (the "MHP Engagement Agreement").  MHP/FBTS Engagement Agreement, dated Oct. 23, 2006 [Ex. 42 to Hahn Dec.].

**Response**: Admitted.

99.     The FBTS Engagement Agreement, however, provided that FBTS could "retain [an] . . . independent financial advisor of its choosing to assist in the evaluation of the proposed transactions."  FBTS/Maran Engagement Agreement, Oct. 24, 2006, at 4 [Ex. 32 to Hahn Dec.].

**Response**: Admitted that the FBTS Engagement Agreement includes the language quoted in paragraph 99.  Defendants rely on the FBTS Engagement Agreement to speak for itself, rather than on the Secretary's partial quotation and characterization thereof. Defendants further state that Greenberg testified that he did not recall when he signed the FBTS Engagement Agreement on behalf of Maran (Greenberg Tr. 196:19-197:5), and that "it was probably October 15th that [Maran] gave [FBTS] the go ahead" to undertake its appointment as independent transactional trustee of the ESOP.   (Greenberg Tr. 212:16-214:20.)    Defendants further state that at least two members of FBTS' Employment Benefits Committee had worked with MHP on a prior transaction and were independently familiar with the high quality of its work.  (Melton Tr. 120:21-121:3; Hahn Decl. Ex. 38.)

100.    The ESOP Trust Agreement similarly allowed FBTS to "employ and to reasonably rely upon information and advice furnished by . . . Independent Appraisers . . . for such purposes as the Trustee considers reasonably necessary. Maran, Inc. Employee Stock Ownership Trust Agreement, at DOL0000006488 [Ex. 34 to Hahn Dec.].

**Response**: Admitted that the ESOP Trust Agreement includes the language quoted in paragraph 100.  Defendants rely on the ESOP Trust Agreement to speak for itself, rather than on the Secretary's partial quotation and characterization thereof.  Defendants further state that the ESOP Trust Agreement governed FBTS's appointment as ongoing trustee

following the closing of the Maran ESOP Transaction, and not its appointment as independent transactional trustee in connection with the Maran ESOP Transaction.

101.    The MHP Engagement Agreement provided: "In performing our Engagement [MHP will] be relying on the accuracy and reliability of the historical financial statements, forecasted future operations or other financial data of the business." MHP/FBTS Engagement Agreement, at DOLMHP 000050 [Ex. 42 to Hahn Dec.].

> **Response:** Defendants respond that the Secretary has excluded relevant portions of the MHP Engagement Agreement.  The quoted provision continues: "We will not audit, compile, or review those financial statements, forecasts, or financial data.  We will not express an opinion or any form of assurance on them.  **However, we will not rely upon information that we determine to be incomplete or inadequate.**  Our engagement cannot be relied on to disclose errors, irregularities, or illegal acts, including fraud or defalcations that may exist."  (emphasis added).  Defendants rely on the MHP Engagement Agreement to speak for itself, rather than on the Secretary's partial quotation thereof.

102.    At the time of the MHP Engagement Agreement, Pia understood that, per the terms of the Agreement, MHP was entitled to assume that the forecasts of Maran's future financial performance that it received in connection with its engagement were accurate. Pia Dep. at 48:24-49:8 [Ex. 21 to Hahn Dec.].

> **Response**: Defendants respond that Mr. Pia testified that the terms of the MHP Engagement Agreement stated that MHP was entitled to assume that the forecasts of Maran's future financial performance were accurate and reliable.  (Pia Tr. 48:24-49:8.)

37

103.    At the time of the MHP Engagement Agreement, Serbin also understood that, per the terms of the Agreement, MHP was entitled to assume that the forecasts of Maran's future financial performance that it received in connection with its engagement were accurate.  Serbin Dep. at 190:22-191:12 [Ex. 33 to Hahn Dec.].

> **Response**: Defendants respond that Ms. Serbin testified that per the terms of the MHP Engagement Agreement, MHP was entitled to assume that the projections of Maran's future financial performance that it received in connection with its engagement were accurate.

104.    At the time of the FBTS Engagement Agreement, neither Ippensen, Serbin, Ash, nor Melton was aware that MHP had performed a preliminary valuation for the selling shareholders just weeks earlier. Ippensen Dep. at 99:17-100:3 [Ex. 1 to Hahn Dec.]; Serbin Dep. at 90:16-21 [Ex. 33 to Hahn Dec.]; Ash Dep. at 77:12-18 [Ex. 30 to Hahn Dec.]; Melton Dep. at 198:23-199:4 [Ex. 24 to Hahn Dec.].

> **Response**: Denied.  Defendants respond that MHP performed the preliminary valuation for the ESOP Formation Committee.  (Cosgrove Tr. at 34:14-19, 42:15-43:3; Pia Tr. at 29:18-30:3; 51:12-52:11; Hahn Decl. Ex. 19.)

105.    Prior to the FBTS Engagement Agreement, Ash did not ask MHP if it had performed a preliminary valuation for Maran and the selling shareholders.  Ash Dep. at 77:22-78:2 [Ex. 30 to Hahn Dec.].

> **Response**: Admitted that paragraph 105 accurately summarizes Ash's testimony, but Defendants further respond that MHP performed the preliminary valuation for the ESOP Formation Committee.  (Cosgrove Tr. at 34:14-19, 42:15-43:3; Pia Tr. at 29:18-30:3; 51:12-52:11; Hahn Decl. Ex. 19.)

106.    Melton testified that, prior to the Maran ESOP Transaction, she would not have asked MHP whether it had performed a preliminary valuation for Maran, Greenberg, and Huang. Melton Dep. at 199:5-10 [Ex. 24 to Hahn Dec.].

> **Response**: Admitted, but Defendants further respond that Ms. Melton had a sales role and was not involved in the substantive evaluation of the Maran ESOP Transaction.  (Ash Tr.  78:14-22.)    Defendants  further  respond  that  MHP  performed  the  preliminary valuation  for  the  ESOP  Formation  Committee.   (Cosgrove  Tr.  at  34:14-19,  42:15-43:3; Pia Tr. at 29:18-30:3; 51:12-52:11; Hahn Decl. Ex. 19.)

107.    Ash  testified  that  FBTS  would  not  have  used  MHP  had  it  known  of  its  prior valuation for Maran, Greenberg, and Huang.  Ash Dep. at 81:17-82:11 [Ex. 30 to Hahn Dec.].

> **Response**: Defendants deny that paragraph 107 accurately summarizes the portion of Ms. Ash's testimony cited.   Defendants further state that Ms. Ash gave the testimony cited in response  to  the  Secretary's  mischaracterization  of  the  work  MHP  performed  in connection  with  its  preliminary  valuation.   Defendants  further  respond  that  MHP performed the preliminary valuation for the ESOP Formation Committee.  (Cosgrove Tr. at 34:14-19, 42:15-43:3; Pia Tr.. at 29:18-30:3; 51:12-52:11; Hahn Decl. Ex. 19.)

108.    When  asked  whether  a  valuation  advisor,  "prior  to  being  retained  by  First Bankers, performed an initial valuation for the sellers and the company of the stock being sold to the ESOP to be independent,"  Ash testified that "the answer is no." Ash Dep. at 81:17-82:11 [Ex. 30 to Hahn Dec.].

> **Response**:  Admitted that paragraph 108 accurately summarizes Ms. Ash's testimony, but Defendants further state that Ms. Ash gave the testimony cited in response to the Secretary's  mischaracterization  of  the  work  MHP  performed  in  connection  with  its

preliminary valuation.   Defendants further state that the Secretary's valuation expert, Marc Brown, contradicted Ash's opinion when he testified that, as a valuation professional, when he and/or his valuation firm perform a valuation, they provide their honest opinion of value no matter who hires them and no matter who pays them.   (Brown Tr. 18:23-20:16.)   Defendants further respond that MHP performed the preliminary valuation for the ESOP Formation Committee.   (Cosgrove Tr. at 34:14-19, 42:15-43:3; Pia Tr. at 29:18-30:3; 51:12-52:11; Hahn Decl. Ex. 19.)

109.   Ippensen testified that he was "surprised" to find out two weeks before his deposition that MHP had performed a preliminary valuation for Maran and the selling shareholders prior to being retained by FBTS, and that an ESOP trustee's use of a valuation firm that had previously performed a valuation for the selling shareholders is "not a common practice."  Ippensen Dep. at 99:17-100:9 [Ex. 1 to Hahn Dec.].

**Response**:  Denied.  Defendants respond that MHP performed the preliminary valuation for the ESOP Formation Committee.  (Cosgrove Tr. at 34:14-19, 42:15-43:3; Pia Tr. at 29:18-30:3;  51:12-52:11;  Hahn Decl., Ex. 19.).   Defendants further state that Mr. Ippensen gave the testimony cited in response to the Secretary's mischaracterization of the work MHP performed in connection with its preliminary valuation.

## H.   FBTS and MHP Conduct a Limited Due Diligence of Maran and Fail to  Contact Wal-Mart

110.   On November 1, 2006, representatives from MHP and FBTS met with Greenberg and Huang, among others, at Maran's office in New York. FBTS Answer ¶ 38 [Dkt. No. 49].

**Response**: Admitted.  Defendants deny the bold, underlined heading preceding paragraph

111.   Ash alone represented FBTS at the November 1 meeting.  Ash Dep. at 91:8-12 [Ex. 30 to Hahn Dec.].

40

**Response**: Admitted.  Defendants further state that Ash testified that Robert Lesser of Epstein Becker & Green, P.C. ("EBG"), FBTS' counsel, would have been in attendance at the meeting, and that another EBG lawyer – Preston Delashmit – may have been there as well.  (Ash Tr. 91:18-24.)

112.    Ash testified that she is "not a valuation person" and "not a numbers person." Ash Dep. at 121:9 and 134:2-3 [Ex. 30 to Hahn Dec.].

**Response**: Defendants admit that Ms. Ash testified as follows:

Q. Right, but the relationship of Page 57 versus Page 38 is reversed, Page 38 is talking about revenues to working capital whereas Page 57 is talking about working capital to revenues; isn't that right?

A. I am not a valuation person, I'm not going to try to get into valuation methodologies.

\* \* \*

Q. Well, I believe the 2.4 percent on Page 57, would you agree that represents the growth rate between the prior year 2005 and 2006?

A. We don't know that, do we?

Q. I was asking specifically about the –

A. You're asking the wrong person.  Let's put it that way. I am not a number's person, okay, that's why we have a committee of nine people.

(Ash Tr. 121:4-1; 133:18-134:4.)  Defendants rely on Ms. Ash's testimony to speak for itself, rather than on the Secretary's partial quotation thereof.  Defendants further state that that the facts contained in the above-quoted testimony are not material.

113.    Ash's primary role at FBTS, both today and at the time of the Maran ESOP Transaction, is and was as a "salesperson."  Ash Dep. at 10:3-11:6 [Ex. 30 to Hahn Dec.].

**Response**: Defendants admit that, regarding her responsibilities as vice president of new business development and as trust officer, Ms. Ash testified: "I'm a salesperson

41

basically."  Defendants rely on Ms. Ash's testimony to speak for itself, rather than on the Secretary's partial quotation and characterization thereof.  Defendants further state that Ms. Ash held the title of trust officer from 2002 to 2006 and vice president of business development from 2006 to the present.

114.    Other than at the November 1, 2006 meeting and a follow up email to Huang on November 2, 2006, Pia does not recall having any other conversations with Maran officials in connection with MHP's preparation of a valuation report for FBTS.  Pia Dep. at 92:11-17.

**Response**: Admitted.

115.    Prior to the Maran ESOP Transaction, Serbin and Ash do not recall asking Greenberg, Huang, or CSG any questions about the proposal by Angelo Gordon and Starboard in October 2005 to purchase 80% of Maran.  Serbin Dep. at 152:12-16 [Ex. 33 to Hahn Dec.]; Ash Dep. at 109:7-11 [Ex. 30 to Hahn Dec.].

**Response**: Admitted that paragraph 115 accurately summarizes Ms. Serbin and Ms. Ash's testimony.   Defendants deny that paragraph 115 accurately describes Angelo Gordon and Starboard's offer.

116.    Serbin testified that recent offers by a third party to purchase an interest in ESOP sponsor "could be taken into consideration[] as a relevant, relevant factor" to determining the fair market value of the sponsor for purposes of an ESOP transaction.  Serbin Dep. at 152:21-154:18 [Ex. 33 to Hahn Dec.].

**Response**: Denied.  Defendants respond that the Secretary has excluded portions of Ms. Serbin's testimony that provides further context to her answer.  Ms. Serbin initially testified that previous offers to purchase a company would be "interesting information to have and to look at in the context that it's in…I can't say that they always provide a

determining factor of what the current fair market value of the company is." (Serbin Tr. 152:21-153:12.) Ms. Serbin stated that an offer may be relevant "depending [on] the context and…a number of other details of that particular offer." (Serbin Tr. 154:23-25.) Defendants rely on Ms. Serbin's testimony to speak for itself, rather than on the Secretary's partial quotation thereof.

117.   Pia testified that previous offers by a third party to purchase a company that MHP is valuing are "sometimes" relevant to MHP's valuation. Pia Dep. at 94:16-21 [Ex. 21 to Hahn Dec.].

**Response:** Admitted.

118.   Maureen Cosgrove of MHP testified that previous arms-length offers to purchase a company MHP is valuing would be relevant in some way to MHP's valuation. Cosgrove Dep. at 111:2-5 [Ex. 43 to Hahn Dec.].

**Response:** Denied.  Defendants respond that the Secretary has excluded portions of Ms. Cosgrove's testimony that provides further context to her answer.  Ms. Cosgrove stated that offers to purchase a company are relevant to a valuation of the company depending on certain circumstances.  (Cosgrove Tr. 110:13-25.)  If the offer was not arms-length or not strategic, then it "wouldn't really be important" to the valuation. *Id*.  Defendants rely on Ms. Cosgrove's testimony to speak for itself, rather than on the Secretary's characterization thereof.  Defendants further state that the Starboard/Angelo Gordon offer was not arms-length.  (A. Meshechok Tr. 70:7-19) ("[Private] equity firms will try to get away with paying as little as humanly possible.").)

119.   Maran was required to have a supplier agreement with Wal-Mart in order to ship merchandise to Wal-Mart.  Huang Dep. at 238:14-18 [Ex. 5 to Hahn Dec.].

**Response:**   Defendants admit that the supplier agreement in place with Wal-Mart "outlined a lot of details" regarding "how [Wal-Mart] operate[s]." (Greenberg Tr. 47:12-16.)  Defendants further respond that it is industry practice for Wal-Mart to set forth the general terms and conditions for future shipment of orders if they are placed by Wal-Mart with a supplier, but "Actual orders which are to be shipped are based on invoices received, orders received . . . . The contract to actually purchase and ship is a function of actual orders received and is not a function of the supply agreement."  (H. Greenberg Tr. 149:18-23, 150:15-17; *see also* H. Greenberg Tr. 34:17-20; 145:3-18.)

120.    At the time of the Maran ESOP Transaction on November 30, 2006, Maran's most recent supplier agreement with Wal-Mart had an effective date of August 7, 2004 and a term that ended "one year after the Effective Date."   Maran/Wal-Mart Supplier Agreement, at DOLMHP 001946 and 001951 [Ex. 44 to Hahn Dec.].

**Response:**   Defendants deny that Maran's "most recent supplier agreement with Wal-Mart" "ended" in 2005, and further state that the fact that Greenberg and Huang were unable to locate any more recent supplier agreement in Maran's files does not establish that the supplier agreement the Secretary points to is Maran's "most recent supplier agreement" with Wal-Mart.  Defendants further state that Greenberg testified that he presumed the Supplier Agreement had to have been renewed because Maran had "just shipped" to Wal-Mart in 2014.  (Greenberg Tr. 47:4-9.)  Defendants further state that a supplier agreement sets forth the buyer's terms, rules, and regulations, and is "a document that would only be generated when they changed their terms, as with all retailers.  They all have a document that you sign.  And when they change their terms of engagement, they reissue a document for you to sign."  (Greenberg Tr. 45:6-11; 145:3-

18.)  ("The supplier agreement was an agreement with Wal-Mart that laid out the terms and conditions of doing business with Wal-Mart, such as how soon you would get collection, what were the delivery terms, how to invoice them. It was a road map for doing business with Wal-Mart.")  Defendants further state that "there was no practical meaning for the one-year term in the [supplier] agreement."  (H. Greenberg Tr. 147:14-19.)  "Compliance with the rules and conditions of Wal-Mart are defined by the supplier agreement," whereas "Actual orders which are to be shipped are based on invoices received, orders received . . . . The contract to actually purchase and ship is a function of actual orders received and is not a function of the supply agreement."  (H. Greenberg Tr. 149:18-23, 150:15-17.)    Defendants further state that Maran had "no agreements or contractual agreements with Wal-Mart or any other retailers . . . . Ever."  (Greenberg Tr. 44:18-23.)

121.    Serbin and Ash did not contact anyone at Wal-Mart regarding Maran's contractual relationship with Wal-Mart prior to the Maran ESOP Transaction.  Serbin Dep. at 137:17-22 [Ex. 33 to Hahn Dec.]; Ash Dep. at 97:21-98:5 [Ex. 30 to Hahn Dec.].

**Response**: Admitted.  Defendants further respond that Greenberg and Huang, in their capacity as Maran Board members, did not generally permit contact with Maran customers by outside service providers.  (Greenberg Tr. 87:9-23.)

122.    Maureen Cosgrove of MHP did not contact anyone at Wal-Mart prior to MHP issuing its valuation report to FBTS, and Pia does not recall whether or not he contacted Wal-Mart.  Cosgrove Dep. at 108:5-7 [Ex. 43 to Hahn Dec.]; Pia Dep. at 92:2393:3 [Ex. 21 to Hahn Dec.].

**Response:** Admitted.   Defendants further respond that Greenberg and Huang, in their capacity as Maran Board members, did not generally permit contact with Maran customers by outside service providers.  (Greenberg Tr. 87:9-23.)

123.   Prior to the Maran ESOP Transaction, Huang was not told by FBTS or its advisors of any concerns they had about Maran's contractual status with Wal-Mart.  Huang Dep. at 236:22-237:3 [Ex. 5 to Hahn Dec.].

**Response**:  Denied.  Defendants admit that Huang testified as follows:

Q. Do you recall hearing any concern from anyone on the ESOP side of the deal - - so anyone at First Bankers or Epstein Becker and Green or MHP -- about Maran's contractual status with Wal-Mart as of November of 2006?

A. From those, no.

Defendants rely on Huang's testimony to speak for itself, rather than on the Secretary's characterization thereof.  Defendants further state that this fact is not material because Maran had "no agreements or contractual agreements with Wal-Mart or any other retailers . . . . Ever."  (Greenberg Tr. 44:18-23.)

I.   **FBTS Hastily Approves the ESOP Transaction Shortly After Receiving Lengthy Legal Due Diligence and Valuation Reports**

124.   On November 21, 2006, at 10:55 a.m., Randolph Smith of Epstein Becker sent an email to Serbin, Ash, Melton, Ippensen, and others at FBTS that included two memoranda as attachments: (1) a Legal Due Diligence Memorandum, and (2) a Legal Due Diligence Summary Memorandum.  Email from R. Smith to K. Serbin, Nov. 21, 2006 [Ex. 45 to Hahn Dec.].

**Response:** Admitted.  Defendants deny the bold, underlined text immediately preceding paragraph 124.

125.   Epstein Becker's full Legal Due Diligence Memorandum was 36 pages.  Maran Inc., Legal Due Diligence Memorandum, Nov. 21, 2006 [Ex. 46 to Hahn Dec.].

**Response**: Admitted.

126.     On November 21, 2006, at approximately 3 PM central time, FBTS held a legal due diligence meeting with Epstein Becker regarding the proposed Maran ESOP Transaction. Email from K. Serbin to R. Lesser, Nov. 20, 2006 [Ex. 47 to Hahn Dec.].

**Response**: Admitted.

127.     Ash testified that "usually there's more time" between FBTS's receipt of the legal due diligence memoranda and the legal due diligence meeting with counsel, but that in the case of the Maran ESOP transaction it was "right around Thanksgiving, so I imagine that's . . . why it was crunched a little bit."  Ash Dep. at 103:3-104:4.

> **Response**: Admitted that Ms. Ash's testimony includes the language quoted in paragraph 127, but states that the Secretary has taken her statements out of context and excluded other parts of her testimony.  Ms. Ash further testified that it was not "unusual" to receive legal due diligence memoranda on the same day as the legal due diligence meeting.  (Ash Tr. 103:18-104:7.)  In addition, the November 21 meeting was not the only instance in which FBTS held a meeting with and had the opportunity to ask questions of members its legal team.  FBTS held an additional meeting on November 22, attended by Preston Delashmit and Denning Rodriguez of Epstein Becker.  (Ash Tr. 104:8-16; Schnapp Decl., Ex. 12).  The transaction would not have been approved if FBTS had not gotten all of its questions answered.  (Ash Tr. 105:10-19.)

128.     Those present at the meeting included Lesser and Smith of Epstein Becker (among others), and Melton, Serbin, Blake Mock, Gordley, and Kjersti Cory of FBTS.  FBTS notes of legal due diligence conference call, Nov. 21, 2006 [Ex. 48 to Hahn Dec.].

**Response**: Admitted, but further respond that those present from Epstein Becker at the November 21 meeting were Rob Lesser, Randy Smith, Danielle Doerhoff, Denning Rodriguez, and Preston Delashmit.

129.   The full Legal Due Diligence Memorandum referred to a November 4, 2005 Maran shareholders meeting where the shareholders considered an offer to sell 80% of Maran to Angelo Gordon. Maran Inc., Legal Due Diligence Memorandum, Nov. 21, 2006 at 1-2 [Ex. 48 to Hahn Dec.].

**Response**: Admitted only that full Legal Due Diligence Memorandum states "review and consideration of offer to sell eighty (80%) percent of ownership to Angelo Gordon & Co." [Ex. 46 at 1-2]  Defendant rely on the Legal Due Diligence Memorandum to speak for itself, rather than on the Secretary's characterization thereof.  Defendants deny that paragraph 129 accurately describes Angelo Gordon and Starboard's offer.

130.   The notes of the October 21, 2006 legal due diligence meeting did not list Angelo Gordon's October 2005 proposal to purchase 80% of Maran as among the topics discussed. FBTS notes of conference call, Nov. 21, 2006 [Ex. 48 to Hahn Dec.].

**Response**: Denied.  No meeting took place on October 21, 2006.

131.   Neither Melton nor Ippensen recalls discussing Angelo Gordon's October 2005 proposal to purchase 80% of Maran.  Melton Dep. at 200:17-20 [Ex. 24 to Hahn Dec.]; Ippensen Dep. at 160:24-161:3 [Ex. 1 to Hahn Dec.].

**Response**: Admitted that paragraph 131 accurately summarizes Ms. Melton and Mr. Ippensen's testimony, but further state that the facts contained in their testimony are not material.  Defendants deny that paragraph 131 accurately describes Angelo Gordon and Starboard's offer.

132.    Ippensen testified that previous offers to buy a company in which an ESOP is considering purchasing an interest are relevant to assessing the company's value.  Ippensen Dep. at 161:4:7 [Ex. 1 to Hahn Dec.].

> **Response**: Admitted.   Defendants further state that Mr. Ippensen's testimony was in response to a general question and not specific to the assessment of Maran's value that was performed in connection with the Maran ESOP Transaction.

133.    The Legal Due Diligence Summary Memorandum explained that "Maran entered into three separate supplier agreements with Wal-Mart on December 20, 2002, May 3, 2004, and August 7, 2004. The term of each agreement was a period of one year.  The Company represents that each supplier agreement is presently in force, by automatic renewal.  We have requested from the Company documentation of the renewal agreements."  Maran, Inc. Legal Due Diligence Summary Memorandum, Nov. 21, 2006, at 2 [Ex. 49 to Hahn Dec.].

> **Response**: Admitted that the Legal Due Diligence Summary Memorandum includes the language quoted in paragraph 133.

134.    The notes of the October 21, 2006 legal due diligence meeting attribute the following discussion of Maran's contractual relationship with Wal-Mart to Randolph Smith of Epstein Becker: "Randy said that we are also asking to see the renewal of Wal-Mart's contracts. The Company needs Wal-Mart, more than Wal-Mart needs the Company.  This will be buttoned up before we close.  Wal-Mart makes up about 60% of Maran's business.  We've also asked this to be a carve out as well, if we can't get the documentation."  FBTS notes of conference call, Nov. 21, 2006, at DOL0000004043 [Ex. 48 to Hahn Dec.]; Serbin Dep. at 148:15-24 [Ex. 33 to Hahn Dec.].

**Response**: Defendants admit that the exhibit cited in paragraph 134 contains the language quoted in paragraph 134, but deny that a legal due diligence meeting took place on October 21, 2006.  Defendants further state that Maran had "no agreements or contractual agreements with Wal-Mart or any other retailers . . . . Ever."  (Greenberg Tr. 44:18-23.)

135.    Serbin understood the notes' reference to Smith's asking for a "carve out" if he could not obtain Maran's renewal agreements with Wal-Mart to "mean that if we cannot get that specific documentation that there will have to be some protective language entered into the Stock Purchase Agreement in some way, shape or form."  Serbin Dep. at 149:25150:10 [Ex. 33 to Hahn Dec.].

**Response**: Admitted that Ms. Serbin made this statement, but further stated that the Secretary has excluded a portion of Ms. Serbin's testimony indicating that Ms. Serbin was not certain as to the possible meaning of "carve out."  She testified that "*that typical statement would* mean that if we cannot get that specific documentation that there will have to be some protective language entered into the Stock Purchase Agreement in some way, shape or form."  (Serbin Tr. 149:25-150:10) (emphasis added).  It is evident from Ms. Serbin's full testimony that she was unsure as to the meaning of "carve out."

136.    On November 20, 2006, Maureen Cosgrove of MHP emailed to Ashley Melton a copy of MHP's draft valuation report (the "Draft Valuation Report") of a 49% preferred equity interest in Maran.  Email from M. Cosgrove to M. Ash et al, Nov. 20, 2006 [Ex. 50 to Hahn Dec.].

**Response**: Admitted.

137.    MHP's draft valuation report, excluding appendices, was 87 pages.  MHP Draft Valuation Report, Nov. 2006 [Ex. 51 to Hahn Dec.].

**Response**: Admitted.

138.    In its Draft Valuation Report, MHP stated, "Information supplied by the management of Maran, Inc., has been accepted as correct without further verification, and we express no opinion on that information." Id. at DOLMHP 000319 [Ex. 51 to Hahn Dec.].

>   **Response**: Admitted.   Defendants further state that MHP's engagement agreement provides: "In performing our engagement, we will be relying on the accuracy and reliability of the historical financial statements, forecasts of future operations, or other financial data of the business.   We will not audit, compile, or review those financial statements, forecasts, or financial data.   We will not express an opinion or any form of assurance on them. ***However, we will not rely upon information that we determine to be incomplete or inadequate***."   (Hahn Decl. Ex. 42 at 2, DOLMHP 000050) (emphasis added).

139.    MHP's Draft Valuation Report used the Guideline Method and Discounted Cash Flow method to value Maran.  Id. [Ex. 51 to Hahn Dec.].

>   **Response**: Admitted.

140.    The Discounted Cash Flow method values a company by determining the present value of future net cash flows discounted at a rate of return that reflects the risks associated with the identified net cash flows.  Pia Dep. at 70:24-71:13 [Ex. 21 to Hahn Dec.].

>   **Response**: Admitted.

141.    A key element of the Discounted Cash Flow Method is determining a forecast for the company's future financial performance.  Pia Dep. at 72:10-18 [Ex. 21 to Hahn Dec.].

>   **Response**: Admitted, but further respond that the "forecast" is further defined as one of a company's earnings and cash flows.  (Ex. 20 to Hahn Dec., DOLMHP000264.)

51

142.    By the time of MHP's Draft Valuation Report, Maran's sales for the year ending August 31, 2006 were now "actual" numbers, and they were $102,386,000, roughly $5 million less than what had previously projected in the Initial Valuation; yet the forecast or out years did not change one iota from the Initial Valuation's forecast.  MHP Draft Valuation Report, Nov. 2006, at 57 [Ex. 51 to Hahn Dec.].

> **Response**:  Defendants admit that Maran's actual sales for the period ending August 31, 2006, as reported in MHP's Draft Valuation Report, were $102,386,000, roughly $5 million less than the $107,248,000 that was projected for that period in MHP's Initial Valuation.  Defendants further admit that the projected sales for years 2007 – 2011 are the same in both MHP's Draft Valuation Report and its Initial Valuation.  Defendants further state that Maran missed its sales projection for the period ending August 31, 2006 due to Wal-Mart pushing off orders, which did not give rise to a need to revise the projections.  (Huang Tr. 211:8-214:24) ("The pushoff is not an act of causing a future reduction of projected sale. It's just a timing that they want to delay one month or a couple days at the end of the month, from one period to the next period.  So there's no reason for me to revise the following year's projection.").)

143.    MHP's Draft Valuation Report used the same three Guideline Companies that MHP had previously used in its preliminary valuation for Maran and the selling shareholders: Guess!, True Religion, and Blue Holdings.  MHP Draft Valuation Report, Nov. 2006, at DOLMHP 000385 [Ex. 51 to Hahn Dec.].

> **Response**: Admitted.

144.    MHP's Draft Valuation Report made no mention of a letter of Angelo Gordon and Starboard's letter of intent to purchase Maran.  <u>See</u> generally MHP Draft Valuation Report, Nov. 2006 [Ex. 51 to Hahn Dec.].

> **Response**: Admitted, but further respond that this fact is not material.  The offer by Angelo Gordon to purchase a percentage of Maran was referenced in the Legal Due Diligence Memorandum.  (Schnapp Decl. Ex. 15.)  Further, the Angelo Gordon offer was not relevant to the fair market value of Maran for the purposes of the Maran ESOP Transaction because, among other reasons, it was a cash offer from a private equity firm looking to pay less than fair market value for Maran.  (*See, e.g.*, A. Meshechok Tr. 70:7-19) ("[Private] equity firms will try to get away with paying as little as humanly possible."); Greenberg Tr. 99:9-100:11.)

145.    MHP's Draft Valuation Report estimated the fair market value of a 49% preferred equity interest in Maran as between $65 million and $73 million.  <u>Id.</u> at DOLMHP 000320. [Ex. 51 to Hahn Dec.].

> **Response**: Admitted.

146.    MHP's Draft Valuation Report described the "transaction price" as $71,000,000.  <u>Id.</u> [Ex. 51 to Hahn Dec.].

> **Response**: Admitted.

147.    MHP's draft valuation report did not mention the letter of intent sent by Angelo Gordon and Starboard.  <u>See</u> <u>generally</u> MHP Draft Valuation Report, Nov. 2006 [Ex. 51 to Hahn Dec.].

> **Response**: Admitted, but further respond that this fact is not material.  The offer by Angelo Gordon to purchase a percentage of Maran was referenced in the Legal Due

Diligence Memorandum.  (Schnapp Decl. Ex. 15.)  Further, the Angelo Gordon offer was not relevant to the fair market value of Maran for the purposes of the Maran ESOP Transaction because, among other reasons, it was a cash offer from a private equity firm looking to pay less than fair market value for Maran.  (*See, e.g.*, A. Meshechok Tr. 70:7-19) ("[Private] equity firms will try to get away with paying as little as humanly possible."); Greenberg Tr. 99:9-100:11.)

148.    On November 22, 2006, FBTS's Employee Benefits Committee met to discuss MHP's draft valuation report. FBTS Response to Sec.'s Request for Admission No. 32 [Ex. 23 to Hahn Dec.].

**Response**: Admitted.

149.    The notes of FBTS's November 22, 2006 Employee Benefits Committee meeting at which MHP's draft valuation report was discussed do not contain any reference to the proposal by Angelo Gordon and Starboard in October 2005 to purchase 80% of Maran.  Notes of FBTS Employee Benefits Committee meeting with MHP, Nov. 22, 2006 [Ex. 52 to Hahn Dec.].

**Response**: Admitted, but further respond that this fact is not material.  The offer by Angelo Gordon to purchase a percentage of Maran was referenced in the Legal Due Diligence Memorandum.  (Schnapp Decl. Ex. 15.)  Further, the Angelo Gordon offer was not relevant to the fair market value of Maran for the purposes of the Maran ESOP Transaction because, among other reasons, it was a cash offer from a private equity firm looking to pay less than fair market value for Maran.  (A. Meshechok Tr. 70:7-19) ("[Private] equity firms will try to get away with paying as little as humanly possible."); Greenberg Tr. 99:9-100:11.  Defendants deny that paragraph 149 accurately describes Angelo Gordon and Starboard's offer.

150.    The notes of FBTS's November 22, 2006 Employee Benefits Committee meeting at which MHP's draft valuation report was discussed do not contain any reference to the projections of Maran's future financial performance contained in the draft valuation report.  Id. [Ex. 52 to Hahn Dec.].

>    **Response**: Denied.  Defendants respond that a number of topics related to Maran's future financial performance were referenced in the notes from the November 22, 2006 meeting. For example, the notes indicate that Private Label gross sales on page 8 of the draft valuation report were discussed. DOL0000002680.  The Private Label gross sales chart includes financial projections for 2007.  The notes also reference a discussion about Maran's new expansion line into home products, such as linens and towels. DOL0000002680.

151.    On November 22, 2006, FBTS's Employee Benefits Committee voted to approve the Transaction.  FBTS Response to Sec.'s Request for Admission No. 33 [Ex. 23 to Hahn Dec.].

>    **Response**: Admitted.

152.    The members of FBTS's Employee Benefits Committee who voted to approve the Maran ESOP Transaction on November 22, 2006, were Serbin, Melton, Ash, Ippensen, Cory, and Mock.  FBTS Response to Sec.'s Request for Admission No. 34 [Ex. 23 to Hahn Dec.]; Serbin Dep. at 169:22-170:9 [Ex. 33 to Hahn Dec.].

>    **Response**: Denied.  Ms. Melton was a non-voting member of the Employee Benefits Committee.  (Melton Tr. at 72:18-23; 78:8-22.)

153.    Prior to voting to approve the Maran ESOP Transaction, Melton did not review MHP's draft valuation report for its substance.  Melton Dep. at 159:16-18 [Ex. 24 to Hahn Dec.].

55

Response: Defendants deny that paragraph 153 accurately summarizes Ms. Melton's testimony regarding her review of MHP's draft valuation, and rely on Ms. Melton's testimony to speak for itself, rather than on the Secretary's characterization thereof. Defendants further state that Ms. Melton was a non-voting member of the Employee Benefits Committee, (Melton Tr. at 72:18-23; 78:8-22), and that her involvement with the Maran ESOP Transaction following FBTS's engagement as independent transactional trustee was limited to a "cursory level." (Melton Tr. 160:15-161:2.)

154.    Melton reviewed MHP's draft valuation report "for more demographic information as opposed to the specifics of the actual valuation itself."  Melton Dep. at 158:24-159:6 [Ex. 24 to Hahn Dec.].

Response: FBTS admits that Ms. Melton's testimony includes the language quoted in paragraph 154, but states that it is not material as Ms. Melton was a non-voting member of the Employee Benefits Committee.  (Melton Tr. at 72:18-23; 78:8-22.)

**J.    FBTS Fails to Negotiate Over the Transaction Price**

155.    In its October 6, 2006 proposal to serve as the ESOP's transactional trustee, FBTS noted the "ESOP transaction size" as being $70,000,000. FBTS Trustee Proposal, Oct. 6, 2006, at 3 [Ex. 26 to Hahn Dec.].

Response: Admitted.   Defendants deny the bold, underlined heading preceding paragraph.

156.    The Confidential Transaction Memo that Morrison Cohen sent to FBTS on October 23, 2006 (see ¶ 96, supra) -- the date of MHP's engagement agreement with FBTS -- stated that ESOP "will purchase all 49,000 outstanding shares of Class B ESOP Stock, constituting [49]% of the issued and outstanding shares of capital stock of the Company, from

56

the Sellers for an estimated purchase price of $71,000,000 . . . ." Maran, Inc.  Confidential

Transaction Memo, Oct. 19, 2006, at CSG 02301-02302 [Ex. 39 to Hahn Dec.].

> **Response**: Admit that the Confidential Transaction Memo the Secretary references in
>
> paragraph 33 contains the language quoted in paragraph 33, but rely on the Confidential
>
> Transaction Memo to speak for itself, rather than on the Secretary's partial quotation and
>
> characterization thereof.   Defendants further admit that Morrison Cohen's email
>
> transmitting the Confidential Transaction Memo indicates that it is a draft document,
>
> (Hahn Decl. Ex. 39 at CSG 02296), and that the Confidential Transaction Memo listed
>
> the   $71,000,000 "estimated purchase price" in placeholder brackets, (CSG 02302).
>
> Defendants further state that no transaction was final until the closing of the Maran ESOP
>
> Transaction on November 30, 2006.

157.    The draft valuation report that MHP sent to FBTS on November 20, 2006 also

described the "transaction price" as $71,000,000.  MHP Draft Valuation Report, Nov. 2006, at

DOLMHP at 000320 [Ex. 51 to Hahn Dec.].

> **Response**: Admitted.  Defendants further state that no transaction was final until the
>
> closing of the Maran ESOP Transaction on November 30, 2006.

158.    The notes of FBTS's employee Benefits Committee meeting on November 22,

2006 -- at which FBTS voted to approved the Maran ESOP Transaction -- attribute the following

statement to Kim Serbin: "Kim: They changed what they want to $70,961,000."  Notes of FBTS

Employee Benefits Committee meeting with MHP, Nov. 22, 2006, at DOL0000002684 [Ex. 52

to Hahn Dec.]; Serbin Dep. at 107:21-108:9 [Ex. 33 to Hahn Dec.].

> **Response**: Admitted that the November 22, 2006 Employee Benefits Committee meeting
>
> notes state "Kim: They changed what they want to $70,961,000."   However, the

Secretary has left out the context in which Ms. Serbin explained this statement.  In her deposition, Ms. Serbin stated that "[t]he other side" reduced the amount at which they wanted to sell the stock from $71 million to $70,961,000.  (Serbin Tr. 108:23-109:2.)

159.   As of November 22, 2006, Serbin understood Greenberg and Huang to have changed what they wanted for their Maran shares from $71,000,000 to $70,961,000.  Serbin Dep. at 108:23-109:2 [Ex. 33 to Hahn Dec.].

**Response**: Denied.  Admitted that Ms. Serbin testified as follows:

Q. Okay. And this says again, this says they change what they want to $70,961,000. Do you know who they is?

A. No. I don't, I don't recall now. Sorry.

Q. And then below, below that --

A. The other side. Sorry.

Q. Is it --

A. They would be the other side.

Q. So you --

A. I mean.

Q. So you understand they to be the other side?

A. Yes.

Q. Okay. And you understand the other side to have changed what they want from 71 million dollars to $70,961,000?

A. Yes.

(Serbin Tr. 108:10-109:2.)  Defendants rely on Ms. Serbin's testimony to speak for itself, rather than on the Secretary's characterization thereof.  Defendants further respond  that

no transaction was final until the closing of the Maran ESOP Transaction on November 30, 2006.

160.    Serbin does not recall FBTS or its advisors negotiating over the price of the Maran ESOP Transaction. Serbin Dep. at 160:12-19 [Ex. 33 to Hahn Dec.].

**Response**: Admitted.    Defendants further state that Maureen Cosgrove specifically testified that MHP's role was to negotiate on behalf of FBTS.    (Cosgrove Tr. 32:23-33:10; 89:11-23.)

161.    Huang did not receive a counter-offer from FBTS or any of its advisors regarding the price of the Maran ESOP Transaction. Huang Dep. at 236:7-14 [Ex. 5 to Hahn Dec.].

**Response:**    Denied.    Defendants admit that Huang testified that he did not recall receiving a counter-offer, as follows:

Q. Mr. Huang, do you recall ever receiving from First Bankers or any of its advisers -- financial advisers like MHP or legal advisers like Epstein Becker and Green -- any counteroffer to the purchase price that ultimately was agreed upon, the $70,961,000 purchase price?

A. No.

Defendants rely on Huang's testimony to speak for itself, rather than on the Secretary's characterization thereof.

162.    Huang does not recall any negotiations taking place between anyone on the side of the selling shareholders and anyone on the side of the ESOP. Huang Dep. at 236:15-21 [Ex. 5 to Hahn Dec.].

**Response:**  Admitted.

163.    On November 30, 2006, MHP issued its final valuation report for the Maran ESOP Transaction ("Final Valuation Report").  MHP Final Valuation Report, Nov. 30, 2006 [Ex. 3 to Hahn Dec.].

**Response:** Admitted.

164.    The forecast of Maran's future financial performance that MHP used in its draft valuation report was the same forecast it used in the Final Valuation Report.  Compare MHP Draft Valuation Report, Nov. 2006, at DOLMHP 000372 [Ex. 52 to Hahn Aff] with MHP Final Valuation Report, Nov. 30, 2006, at DOL0000002749 [Ex. 3 to Hahn Dec.].

**Response**:  Denied.  Ex. 3 to the Hahn Dec. does not contain DOL0000002749.

165.    That forecast was developed by Richard Huang.  Huang Dep. at 207:3-25 [Ex. 5 to Hahn Dec.].

**Response:**  Admitted.

166.    MHP in fact assumed that the forecasts of Maran's future financial performance that it received in connection with its Final Valuation Report were accurate and reliable.  Pia Dep. at 48:24-49:13 [Ex. 21 to Hahn Dec.].

**Response**: Defendants admit that paragraph 166 accurately summarizes the portion of Mr. Pia's testimony cited.

167.    The Final Valuation Report made no mention of Angelo Gordon and Starboard's letter of intent to purchase Maran.  See generally MHP Final Valuation Report, Nov. 30, 2006 [Ex. 3 to Hahn Dec.].

**Response**: Admitted, but denied that Angelo Gordon and Starboard's letter of intent to purchase Maran was relevant to the fair market value of Maran at the time of the Maran ESOP Transaction because, among other reasons, it was a cash offer from a private

equity firm looking to pay less than fair market value for Maran.  (A. Meshechok. Tr. 70:7-19) ("[Private] equity firms will try to get away with paying as little as humanly possible."); Greenberg Tr. 99:9-100:11).

168.    The Final Valuation Report estimated the fair market value of a 49% preferred equity interest in Maran as between $65 million and $73 million.  Id. at DOL0000002697 [Ex. 3 to Hahn Dec.].

**Response**: Admitted.

169.    On November 30, 2006, FBTS, on behalf of the Maran ESOP, agreed to purchase a 49% preferred equity interest in Maran from Greenberg and Huang for $70,961,000.  Stock Purchase Agreement, Nov. 30, 2006 [Ex. 53 to Hahn Dec.].

**Response**: Admitted.

170.    The stock purchase agreement dated November 30, 2006 did not have a provision or any other carve out concerning Maran's contractual relationship with Wal-Mart.  Id. [Ex. 53 to Hahn Dec.].

**Response**: Admitted, but Defendants deny any assertion by the Secretary that FBTS did not perform an adequate investigation into Maran's relationship with Wal-Mart. Defendants further state that Maran had "no agreements or contractual agreements with Wal-Mart or any other retailers . . . . Ever." (Greenberg Tr. 44:18-23.)  Consistent with standard industry practice, they had a supplier agreement with Wal-Mart "that laid out the terms and conditions of doing business with Wal-Mart, such as how soon you would get collection, what were the delivery terms, how to invoice them. It was a road map for doing business with Wal-Mart."  (H. Greenberg Tr. 145:3-18; H. Greenberg Tr. 34:17-20) ("The way Maran dealt with Wal-Mart is the traditional way that Wal-Mart deals

with suppliers.").)  Defendants further state that the supplier agreement "would only be generated when [Wal-Mart] changed their terms, as with all retailers . . . And when they change their terms of engagement, they reissue a document for you to sign."  (Greenberg Tr. 45:6-11.)  Defendants further state that "there was no practical meaning for the one-year term in the [supplier] agreement."  (H. Greenberg Tr. 147:14-19.)  "Compliance with the rules and conditions of Wal-Mart are defined by the supplier agreement," whereas "Actual orders which are to be shipped are based on invoices received, orders received . . . . The contract to actually purchase and ship is a function of actual orders received and is not a function of the supply agreement."  (H. Greenberg Tr. 149:18-23, 150:15-17.)

## K.    Relevant Post-Transaction Events

171.    On May 30, 2007, MHP issued to FBTS a valuation of Maran as of December 31, 2006 (the "2006 Annual Valuation").   MHP 2006 Annual Valuation, May 30, 2007, at DOL0000002790 [Ex. 11 to Hahn Dec.].

Response: Defendants admit that the date on the Submittal Letter is May 30, 2007, but state that the received stamp on the first page (DOL0000002787) indicates that FBTS did not receive the 2006 Annual Valuation until June 25, 2007.  Defendants deny the bold, underlined heading preceding paragraph 171, and further deny that the events described in paragraphs 171 through 174 are relevant to the above-captioned litigation.

172.    MHP's 2006 Annual Valuation, however, used the Guideline Public Company method only as a "reasonableness check" of the fair market value of Maran.  MHP did not accord the Guideline Method any weighting in its 2006 Annual Valuation "[d]ue to the limited

availability of publicly-traded companies which we deemed to be similar to Maran."   Id. at DOL0000002863 [Ex. 11 to Hahn Dec.].

> **Response:** Admitted.

173.   By 2009, Maran had lost all of its Wal-Mart business.   Greenberg Dep. at 50:19-51:4 [Ex. 2 to Hahn Dec.].

> **Response:**   Defendants admit that by 2009 Wal-Mart no longer was placing orders with Maran.   Defendants further state that, since 2009, Wal-Mart has resumed placement of orders with Maran.   (*See, e.g.*, Greenberg Tr. 49:5-50:18.)

174.   By 2009, the value of Maran's stock had declined to $0.00.   MHP 2010 Valuation Report [Ex. 12 to Hahn Dec.].

> **Response:**   Denied.   The MHP 2010 Valuation Report provides the value of Maran's stock as of December 31, 2010.   Defendants further state that, as of December 31, 2014, MHP valued a 49% Common Equity Interest in Maran at $8,260,000.   (Golumbic Decl. Ex. L at vi, MRN 0033527.)

Dated:  February 5, 2016                    Respectfully submitted,


Daniel A. Schnapp, Esq.                    Lars C. Golumbic (*pro hac vice*)
Elizabeth C. Viele, Esq.                   Edward A. Scallet (*pro hac vice*)
FOX ROTHSCHILD LLP                         Mark C. Nielsen (*pro hac vice*)
100 Park Avenue                            Natasha S. Fedder (*pro hac vice*)
Suite 1500                                 Katherine S. Kamen
New York, NY 10017                         Groom Law Group, Chartered
(212) 878-7900 (phone)                     1701 Pennsylvania Avenue NW
(212) 692-0940 (facsimile)                 Washington, DC 20006
E-Mail: dschnapp@foxrothschild.com         Telephone: (202) 861-5429
E-Mail: eviele@foxrothschild.com           Facsimile: (202) 659-4503
                                           E-Mail: lcg@groom.com
*Attorneys for Defendant First Bankers Trust*   E-Mail: eas@groom.com
*Services, Inc.*                           E-Mail: mcn@groom.com
                                           E-Mail: nfedder@groom.com
                                           E-Mail: kkamen@groom.com

                                           *Attorneys for Defendants*
                                           *David Greenberg and Richard Huang*

64

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on February 5, 2016, I filed in this action the foregoing **DEFENDANTS'**

**JOINT RULE 56.1 RESPONSIVE STATEMENT OF MATERIAL FACTS IN**

**OPPOSITION TO THE SECRETARY'S MOTION FOR PARTIAL SUMMARY**

**JUDGMENT** electronically via the Court's ECF System.  Notice of this filing will be sent in

this action by operation of the Court's electronic system to all counsel of record in the ECF

System.

By: <u>*/s/ Lars C. Golumbic*</u>
Lars C. Golumbic (*pro hac vice*)
Groom Law Group
1701 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 861-5429
Fax: (202) 659-4503
Email: lcg@groom.com