**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                     .

THOMAS E. PEREZ, *Secretary of Labor, U.S.*     .
*Department of Labor*,

                 Plaintiff,

           -v-

FIRST BANKERS TRUST SERVICES, INC.,

                 Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

OPINION

12-cv-8648 (GBD)

GEORGE B. DANIELS, United States District Judge:

    Plaintiff, the Secretary of the United States Department of Labor, brought this action alleging that Defendant First Bankers Trust Services, Inc. ("FBTS") violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, by approving the sale of 49% of Maran, Inc., a private label denim manufacturer, to the Maran Employee Stock Ownership Plan ("ESOP"), for whom it served as independent trustee.[1] The Secretary seeks, *inter alia*, to void the Transaction, restore all losses to the ESOP stemming therefrom, and an injunction barring FBTS from acting as a trustee, fiduciary or service provider in any future ESOP transaction. (Amended Complaint for ERISA Violations (29 U.S.C. §§ 1001, et seq.), (ECF No. 37), at 38.) Pending before this Court are the parties' cross-motions for summary judgment. (First Bankers Trust Services, Inc. Motion for Summary Judgment, (ECF No. 161); Thomas E. Perez Motion for Summary Judgment, (ECF No. 165).) After reviewing the parties' briefs, the record,

---

[1] The Secretary of Labor is vested with authority to enforce the provisions of Title I of ERISA by, among other things, filing and prosecuting claims against fiduciaries and other parties who violate ERISA. ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5). This action was initially filed on November 28, 2012, by then-Secretary of Labor Hilda L. Solis. An amended complaint was filed by then-Acting Secretary of Labor Seth D. Harris on April 1, 2013. Secretary of Labor Thomas Perez was added as a party and took over this litigation on April 6, 2015.

and with the benefit of oral argument, this Court has concluded that there are several material facts in dispute and that neither party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Accordingly, both parties' motions for summary judgment are DENIED.

## I.  Background[2]

### A.  The Parties

Maran, Inc. is a closely held corporation that designs, manufactures, markets and imports branded and private label fashion denim.[3]  (Secretary of Labor's Response to First Bankers Trust Services, Inc.'s Statement of Uncontested Facts Pursuant to Fed. R. Civ. P. 56.1 and Local Rule 56.1 ("Sec'y Resp."), (ECF No. 200), ¶ 4.)  In 2006, Maran's biggest customer was Walmart, which accounted for 56% of Maran's sales for the year ended August 31, 2006.  (Defendants' Joint Rule 56.1 Responsive Statement of Material Facts in Opposition to the Secretary's Motion for Partial Summary Judgment ("FBTS Resp."), (ECF No. 207), at ¶ 16.)

From approximately January 2001 until November 30, 2006, David Greenberg, Maran's President and Chief Executive Officer, owned approximately 90% of Maran's outstanding stock.  (*Id.* at ¶¶ 8, 10.)  During that same time period, Richard Huang, Maran's Executive Vice President, Chief Financial Officer and Chief Operating Officer, owned the remaining 10%.  (*Id.* at ¶¶ 9, 11.)  Additionally, during that time, Greenberg and Huang were the sole members of Maran's Board of Directors.[4]  (*See id.* at ¶¶ 8-9.)

---

[2] The following facts have been compiled primarily from the party's respective Rule 56.1 Counter Statements of Material Facts.  Citations to paragraphs within the respective Counter Statements encompass both the original statement and the opposing party's response, as well as the exhibits cited therein for support.

[3] Maran was initially named as a defendant, but was dismissed from the action by Consent Order on September 20, 2013.  (Consent Order Dismissing Count VI of the Amended Complaint and Maran, Inc., (ECF No. 88).)

[4] Greenberg and Huang were both originally named as defendants, as well, but were terminated from the action by Consent Order and Judgment on August 5, 2016.  (Consent Order and Judgment as to Defendants Greenberg and Huang, (ECF No. 251).)  Defendants' Joint Rule 56.1 Responsive Statement of Material

First Bankers Trust Services, Inc. ("FBTS") is a stand-alone trust company that serves as trustee and custodian for employee benefit and personal trust accounts, and also provides fiduciary services for ESOPs.[5] (*Id.* at ¶ 1; Sec'y Resp. at ¶ 3.) In 2006, FBTS maintained an Employee Benefits Committee ("EBC") dedicated to the review and investigation of proposed ESOP transactions. (Sec'y Resp. at ¶ 17.) Ten FBTS employees served on the EBC. (Declaration of Brian Ippensen ("Ippensen Decl."), (ECF No. 210), at ¶ 4.) Two members were Certified Public Accountants, two members had Masters of Business Administration degrees, and two members were licensed attorneys. (*Id.* at ¶ 5.) Members of the EBC held Bachelors of Science degrees in accounting, finance, business and marketing. (*Id.*) Collectively, the EBC had more than one-hundred years of experience related to employee benefits and ESOPs. (*Id.* at ¶ 6.) Several FBTS employees had worked on transactions in the garment or fashion industries prior to working on the Maran ESOP Transaction. (Sec'y Resp. at ¶ 9.)

*B. Greenberg and Huang Explore Selling Maran*

In April 2005, Greenberg and Huang contemplated selling Maran and retained Citigroup Geneva Capital Strategies ("Citigroup") to value the company. (FBTS Resp. at ¶ 17.) In June 2005, as part of its work on behalf of Greenberg and Huang, Citigroup identified Starboard Capital Partners ("Starboard") as a potential purchaser of Maran. (*Id.* at ¶ 18.) On October 20, 2005, Starboard and its partner, Angelo Gordon & Co., sent Greenberg a letter of intent to purchase a 100% equity interest in Maran from Greenberg and Huang for $47.5 million in cash and a $17.5 million junior preferred interest in the new Maran entity, plus a 20% equity interest in the new

Facts in Opposition to the Secretary's Motion for Partial Summary Judgment ("FBTS Resp."), (ECF No. 207), was originally submitted on behalf of not only FBTS, but Greenberg and Huang, as well.
[5] An ESOP is "a type of pension plan that invests primarily in the stock of the company that employs the plan participants." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014); *see* 29 U.S.C. § 1007(d)(6).

Maran entity. (*Id.* at ¶ 19.) The offer was contingent upon the completion of due diligence. (*Id.* at ¶ 20.) Angelo Gordon then retained Clear Thinking Group ("CTG") to perform due diligence on Maran.[6] (*Id.* at ¶ 21.) In March 2006, Angelo Gordon sent a revised offer for the company to Greenberg and Huang in which the purchase price was characterized as $38,135,000 in total value with $27,883,000 in cash (as compared to the initial offer which was characterized as $65 million in total value with $47.5 million in cash) (the "Angelo Gordon offer"). (*Id.* at ¶ 25.) Ultimately, Greenberg and Huang declined to sell the company to Starboard and Angelo Gordon. (*Id.* at ¶ 26.)

   *C.   CSG and MHP Retained to Explore ESOP*

   Meanwhile, in January 2006, a friend referred Greenberg to CSG Capital Partners, LLC, formerly known as Corporate Solutions Group (under either name, "CSG"), an investment bank with experience structuring ESOP transactions for middle-market companies. (*Id.* at ¶¶ 27-28.) In a presentation that same month to Greenberg and Huang, CSG stated that a sale of Maran to an ESOP as opposed to a third party would "dramatically increase the after-tax cash flow to the selling shareholders." (*Id.* at ¶¶ 29-31.) Based on an initial discounted cash flow analysis, CSG estimated Maran's total enterprise value was $115 million. (*Id.* at ¶ 32.)

   On or around July 11, 2006, Maran engaged CSG to render certain financial and/or consulting services related to the design and installation of a possible Maran ESOP. (*Id.* at ¶ 34.) The terms of the engagement were set forth in an agreement signed by Huang and a Managing Director at CSG. (Hahn Decl., Exhibit 18, (ECF No. 175-18), at 1.) The agreement specified that CSG would "design a plan for the acquisition of stock by the ESOP," and "[a]ct[] as a liaison between the Company, trustee, and the independent valuation firm in an effort to quantify and

---

[6] Plaintiffs submitted what purports to be a draft due diligence report prepared by CTG. (*See* Declaration of Jeffrey Hahn in Support of Secretary's Motion for Partial Summary Judgment, ("Hahn Decl."), (ECF No. 175), Exhibit 13, (ECF No. 175-13).). Defendants dispute the authenticity of the report. (FBTS Resp. at ¶ 22.)

optimize the fair market value [of] the Company." (*See* FBTS Resp. at ¶¶ 35-36.) Additionally, the agreement specified that upon the closing of an ESOP transaction, CSG would receive an additional $250,000 fee, plus 1% of Maran's value in excess of $100,000,000 (*i.e.*, if the ESOP transaction valued the Company at $107,140,000, CSG would receive an additional $71,400). (*Id.* at ¶ 37.)

Presumably at some point after engaging CSG, Maran created a Committee for the Formation of the Maran Inc./Amica Apparel Corporation ESOP ("ESOP Formation Committee") to explore the possibility of forming an ESOP.[7] (*See id.* at ¶ 27.) Huang was a member of the ESOP Formation Committee.[8] (*See* Hahn Decl., Exhibit 19 (ECF No. 175-19), at 1, 8 (letterhead indicating that Huang represented the ESOP Formation Committee).)

On or around August 16, 2006, the ESOP Formation Committee[9] retained Meyers, Harrison & Pia ("MHP"), which had been recommended by CSG, to conduct an initial valuation of Maran to help the Committee decide whether to form an ESOP. (FBTS Resp. at ¶¶ 39-41.)

MHP primarily utilized two methodologies to value Maran. It referred to the first methodology as "The Discounted Debt-Free Cash Flow (Earnings Based) Method." (Hahn Decl., Exhibit 20 ("Initial Valuation"), (ECF No. 175-20), at 9-10.) This method relied on financial projections provided by Huang, including that Maran's sales for the period ended August 31, 2006 would be $107,248,000. (*See* FBTS Resp. at ¶ 51.) Based on this method, MHP concluded that

---

[7] FBTS's responses to the Secretary's Rule 56.1 Statement of Facts suggests that the ESOP Formation Committee was created during this timeframe. (*Compare id.* at ¶ 34 (FBTS response not disputing that "Maran" engaged CSG), *with id.* at ¶ 39 (FBTS disputing that "Maran" took action and claiming instead that action was taken by ESOP Formation Committee).)

[8] The parties have not affirmatively directed this Court to any other portion of the record (should it exist) related to the creation of the ESOP Formation Committee or its members.

[9] The agreement retaining MHP was signed by Huang. Because Huang was a member of both Maran and the ESOP Formation Committee, the parties dispute whether Maran or the ESOP Formation Committee retained MHP. (FBTS Resp. at ¶¶ 39-40, 104-09.) Although the entity that retained MHP is a fact in dispute, for purposes of this motion, this Court refers to that entity as the "ESOP Formation Committee."

the indicated value of the aggregate marketable, controlling equity value of Maran was $110,933,000. (Initial Valuation at 13.)

MHP referred to the second methodology used to value Maran as the "Guideline Public Company (Market-Based) Method." (*Id.* at 11-12.) The Guideline Method utilizes the market values of publicly traded companies to develop multiples that can be used as a proxy for the multiples the subject company should trade at. (*See* FBTS Resp. at ¶¶ 45-46.) Proper application of the Guideline Method generally requires selecting publicly traded companies that are similar to the company being valued. (*Id.* at ¶ 46.) The three publicly traded companies MHP relied upon to perform this analysis were: Guess! Inc., True Religion Apparel Corp., and Blue Holdings, Inc.[10] (*Id.* at ¶ 47.)   Based on this method, MHP concluded that the indicated value of the aggregate marketable, controlling equity value of Maran was $120,573,000. (Initial Valuation at 13.) MHP weighted the results of each method equally to arrive at its opinion that the fair market value of the aggregate marketable, controlling equity value of Maran was $115,750,000. (*Id.*) MHP further opined that a 49% preferred equity interest had a fair market value of $70,961,000. (FBTS Resp. ¶¶ 52-53.) After receiving the initial valuation, the ESOP Formation Committee decided to form an ESOP. (*Id.* at ¶ 54.)

*D.  FBTS is Hired as ESOP Trustee and Subsequently Retains Epstein Becker and MHP*

CSG introduced Maran to FBTS and another company, referred to as "GreatBanc," as potential candidates to serve as the ESOP's independent trustee for the Maran ESOP Transaction.[11]

---

[10] The parties dispute whether Guess!, Inc., True Religion and Blue Holdings were appropriate companies to use in the application of the Guideline Method. (*See id.* at ¶¶ 48-50; *cf. id.* at ¶ 172.)

[11] A member of the EBC that reviewed and approved the Maran ESOP Transaction stated in a sworn deposition that FBTS was initially contacted about serving as the trustee for the Transaction in August 2006. (Ippensen Decl. at ¶7.) He further indicated that prior to accepting the appointment of trustee for the Transaction, "the EBC conducted a pre-acceptance review process examining Maran and its business as well as the nature of the proposed Maran ESOP Transaction." (*Id.* at ¶ 8.) He did not elaborate any further on the EBC's pre-acceptance review process.

(FBTS Resp. at ¶ 55.)  On October 5, 2006, FBTS initially quoted a fee of $57,000 to serve as the

ESOP's trustee.  (*Id.* at ¶ 56.) .)  Its proposal also indicated that FBTS would "help ensure that the

transaction [would] close[] within six weeks."[12]  (*Id.* at ¶ 63.)  The next day FBTS reduced the

transaction fee requested to $50,000, and then a few days later, reduced it again, this time to

$45,000.[13]  (*Id.* at ¶¶ 72-74.)  On October 17, 2006, CSG informed FBTS that its revised proposal

to serve as the independent trustee for the Maran ESOP Transaction had been accepted.  (*See* Hahn

Decl., Exhibit 31, (ECF No. 175-31), at 3.)  On October 24, 2006, the FBTS formally executed an

engagement agreement to serve as the Maran ESOP trustee.  (*See* FBTS Resp. at ¶¶ 75-76.)  In

addition to setting forth FBTS's responsibilities as trustee, the engagement agreement stated that

if the Maran ESOP Transaction closed, FBTS would continue to serve as the ESOP's trustee, and

accordingly, would continue to earn a fee based on a percentage of the ESOP's assets, subject to a

minimum of $20,000 per year, until it resigned or was replaced by Maran. (Id. at ¶¶ 77-79.)

    After being notified that it had been selected as trustee, FBTS retained MHP to serve as its

independent financial advisor, and Epstein, Becker & Green, P.C. ("Epstein Becker")[14] to serve as

its legal counsel with respect to the Maran ESOP Transaction.[15]  Before retaining MHP, FBTS did

---

[12] The parties dispute whether the six-week timeframe was sufficient to properly evaluate the proposed transaction. For instance, Plaintiff submits a six-week timeframe was not enough time for FBTS to properly review the transaction, while FBTS submits that six weeks is a typical timeframe in which to close such transactions. (*See id.* at ¶¶ 63, 66, 68.)

[13] The parties dispute the reason for the price reduction. Plaintiff submits that the fee was lowered in part due to a commitment that CSG had made to FBTS regarding the hiring of FBTS as the ESOP's ongoing trustee should the Maran ESOP Transaction close. (*Id.* at ¶ 59-60.) FBTS submits that the reduction was triggered by GreatBanc's competing bid to serve as the Maran ESOP Transaction trustee. (*See id.* at ¶ 59.)

[14] Epstein Becker had been previously approached by CSG to help Maran "get out of" its agreement with Citigroup. (*Id.* at ¶ 33.)

[15] The parties dispute FBTS's motivation for retaining MHP and Epstein Becker, and the role that CSG played in the decision. The Secretary submits that FBTS selected both at CSG's behest to curry favor with CSG so that FBTS would be selected as the ongoing trustee should the Maran ESOP Transaction close, as well as to win additional referral business from CSG going forward. (*See* Secretary of Labor's Memorandum of Law in Support of Motion for Partial Summary Judgment ("Sec'y Memo"), (ECF No. 173), at 6-7; FBTS Resp. at ¶¶ 88-97.) FBTS submits that although CSG may have recommended FBTS retain MHP, FBTS's decision to do so was made independently based on its previous work with MHP,

not inquire into whether MHP had any prior interaction or connection with Maran, Greenberg, Huang, or the ESOP Formation Committee; FBTS was therefore unaware that MHP had issued an initial valuation of Maran approximately three weeks earlier. (FBTS Resp. at ¶¶ 38-39, 104-06.)

*E. Due Diligence and Maran ESOP Transaction Closes*

FBTS's engagement letter with MHP specified that MHP would rely on information supplied by Greenberg and Huang as presumptively accurate without further verification.[16] (Sec'y Resp. at ¶ 47.) Accordingly, FBTS and MHP received financial information from both Maran and CSG.[17] (*Id.* at ¶¶ 41-42.)

On November 1, 2006, representatives from both FBTS and MHP met with Greenberg and Huang at Maran's office in New York.[18] (FBTS Resp. at ¶ 110.) MHP's representative took eight pages of handwritten notes, which indicate that the attendees discussed Maran's financial projections and its relationship with Walmart. (Declaration of Daniel A. Schnapp, Esq., ("Schnapp Opp. Decl."), (ECF No. 209), Exhibit A, (ECF No. 209-1).) Additionally, the representative's notes listed several types of financial and other types of information that MHP sought to obtain, including audit results for the August 2006 fiscal year profit margins, purchases by suppliers, and the budget for the August 2006 fiscal year. (*Id.*) The next day, MHP sent an email to Huang to follow-up on the items that were discussed during the November 1 meeting. (*Id.*, Exhibit I, (ECF No. 209-9).)

---

MHP's location, and the fact that MHP also had accounting expertise. (First Bankers Trust Services, Inc's Memorandum of Law in Opposition to the Secretary's Motion for Partial Summary Judgment, (ECF No. 212), at 12-13, 17-18 (referencing deposition testimony excerpts and Ippensen's Declaration). Likewise, FBTS submits its selection of Epstein Becker was based on its experience of having worked with several Epstein Becker attorneys. (*Id.* at 13.)

[16] The parties dispute whether such a provision is typical in such contracts. (Sec'y Resp. at ¶ 46.)

[17] The parties dispute whether FBTS cross-checked the information provided by Maran against the information provided by CSG to confirm that the information was consistent. (*Id.* at ¶ 43.)

[18] The parties dispute whether one of FBTS's representatives was an appropriate person to attend the meeting. (*Compare id.* at ¶¶ 111-13 (FBTS attendee, a sales representative, testifying that she is "not a valuation person" and "not a numbers person"), *with* Ippensen Decl. at ¶¶ 10-12.)

On November 20, 2006, FBTS received MHP's valuation of Maran ("Valuation Report"), which was eighty-seven pages, excluding appendices. (FBTS Resp. at ¶¶ 136-37.) In the Valuation Report, MHP again relied on "The Discounted Debt-Free Cash Flow (Earnings Based) Method" and the "Guideline Public Company (Market-Based) Method," just as it had when it prepared the initial valuation. (*Id.* at ¶¶ 139-41.) With regard to "The Discounted Debt-Free Cash Flow (Earnings Based) Method," MHP again relied on Huang's financial projections, including that Maran's sales for the period ended August 31, 2006 would be $107,248,000, even though by the time MHP issued the Valuation Report, Maran already knew that its actual sales for the period ended August 31, 2006 were $102,386,000.[19] (*See id.* at ¶ 142). With regard to the "Guideline Public Company Method," MHP again selected Guess! Inc., True Religion Apparel Corp., and Blue Holdings, Inc. to perform its analysis. (*Id.* at ¶ 143) MHP's Valuation Report estimated the fair market value of a 49% preferred equity interest in Maran as between $65 million and $73 million, which encompassed what the Valuation Report referred to as the $71 million "transaction price." (*Id.* at ¶¶ 145-46.) The Valuation Report did not mention the Angelo Gordon offer.[20] (*Id.* at ¶¶ 144, 147.)

The next day, on November 21, 2006, Epstein Becker sent an email with two memoranda attached: (1) a thirty-six page Legal Due Diligence Memorandum ("Due Diligence Memo"); and (2) a seven page Legal Due Diligence Summary. (FBTS Resp. at ¶ 124.) The email was sent to representatives at FBTS. (Hahn Decl., Exhibit 45, (ECF No. 175-45).) Representatives at MHP were carbon copied ("cc'd"). (*Id.*) At the bottom of the first page of the Due Diligence Memo,

---

[19] The parties dispute whether it was nevertheless appropriate to use the $107,248,000 figure. (*Id.* at ¶ 142.)
[20] The parties dispute whether the terms of the Angelo Gordon offer were material to determining the fair market value of Maran. (*See id.* ¶¶ 115-18.) Notably, the Secretary's valuation expert did not consider the Angelo Gordon offer when calculating what he believes to be Maran's fair market value at the time of the Transaction. (Oral Argument Transcript, dated August 10, 2016, at 72:17-22.)

9

and continuing onto the second, under a subsection titled "C. Minutes of shareholder meetings including consents," the a bulleted paragraph reads: "

- November 4, 2005: David Greenberg and Richard Huang appointed to Board of Directors. $8 mil. dividend declared. Review and consideration of offer to sell eighty (80%) of ownership to Angelo Gordon & Co.

(Hahn Decl., Exhibit 46, (ECF No. 175-46), at 1-2.)

Later that day, five members of the EBC participated in a conference call with Epstein Becker to discuss the contents of the Epstein Becker memoranda.[21]   (*See* Sec'y Resp. at ¶ 59.) The meeting notes indicate that numerous aspects of the Transaction were discussed, such as the addition of a non-employee, non-shareholder member to the Board of Directors post-Transaction, current litigation in which Maran was involved at the time, and a loan between the ESOP and Greenberg and Huang.  (*Id.* at ¶ 61.)  The notes indicate that Epstein Becker hoped to see "the renewal of Wal-Mart's contracts," before signing off on the Transaction, and that, if it couldn't, it would seek "a carve out . . ."[22]  (FBTS Resp. at ¶ 134.)  The meeting notes indicate that the FBTS representatives actively participated and asked several questions.  (Sec'y Resp. at ¶ 61.)  The notes do not reference the Angelo Gordon offer.  (FBTS Resp. at ¶ 130.)

On November 22, 2006, FBTS held a meeting with representatives from FBTS, MHP and Epstein Becker to discuss MHP's Valuation Report.  (*Id.* at ¶ 147.)  The meeting notes indicate that the attendees discussed a number of topics covered in the Valuation Report, including the ownership of Maran, Maran's branded label denim business, Maran's relationship with Walmart, and the Guideline Company Method of valuation, including the selection of Guess! Inc., True

---

[21] The parties dispute whether FBTS had enough time to properly review the Due Diligence Memo before the conference call with Epstein Becker. (*See* FBTS Resp. ¶¶ 126-27.)

[22] Greenberg testified that Maran had "no agreements or contractual agreements with Wal-Mart or any other retailers . . . . Ever." (FBTS Resp. at ¶ 134.) Additionally, FBTS disputes the interpretation of the quoted passage suggested by the Secretary. (*Id.* at ¶ 135.)

Religion Apparel Corp., and Blue Holdings, Inc. as the companies used to perform the analysis.[23] (Sec'y Resp. at ¶ 64, 82.) The notes do not reference the Angelo Gordon offer. (FBTS Resp. at ¶ 149.) At the end of the meeting, FBTS voted to move forward with the Maran ESOP Transaction at the slightly lower price of $70,961,000, (Hahn Decl., Exhibit 52, (ECF No. 175-52), at. 7; Sec'y Resp. at ¶ 65), apparently because Greenberg and Huang had lowered their asking price from $71,000,000. (FBTS Resp. at ¶¶ 158-59.)

On November 27, 2006, the EBC held an internal meeting. (Declaration of Daniel A. Schnapp, Exhibit 13, (ECF No. 164-13).) The meeting notes refer to the November 21, 2006 meeting with Epstein Becker and the November 22, 2006 meeting with MHP. (*Id.* at 2.) The meeting notes also indicate that FBTS discussed resigning from a separate ESOP transaction in which it was serving as trustee because of problems with the valuation related to that transaction.[24] (*Id.*; Sec'y Resp. at ¶ 67.)

On November 30, 2006, FBTS, on behalf of the Maran ESOP, formally agreed to purchase a 49% preferred equity interest in Maran from Greenberg and Huang for $70,961,000. (FBTS Resp. at ¶ 169.)

*F.  Post-Transaction Events*

FBTS received the ongoing trustee business for the Maran ESOP, earning a fee based on the value of Maran's stock, and continued to retain MHP as its valuation firm to value the stock annually. (FBTS at ¶¶ 171-74.) In its "2006 Annual Valuation," dated May 30, 2007, MHP declined to use the Guideline Public Company Method to calculate the fair market value of Maran "[d]ue to the limited availability of publicly-traded companies which [it] deemed to be similar to

---

[23] The parties dispute the extent to which FBTS discussed the companies selected for inclusion in the Guideline Company Method. (Sec'y Resp. at ¶¶ 82-83.)
[24] The parties dispute whether the Maran ESOP Transaction was discussed substantively at the November 27, 2006 meeting. (Sec'y Resp. at ¶ 66.)

Maran."[25] (*Id.* at ¶ 172.) By 2009, Walmart had stopped placing orders with Maran, (*Id.* at ¶ 173), and on December 31, 2010, the Maran stock that had been purchased by the ESOP was valued at $0.00, (Hahn Decl., Exhibit 12, (ECF No. 175-12), at 8.) Since 2009, Walmart resumed placing orders with Maran, and as of December 31, 2014, MHP valued a 49% common equity interest in Maran at $8,260,000. (FBTS Resp. at ¶¶ 173-74.)

## II.   Applicable Law

### A.  Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'" *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir.2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir.2008)). When determining whether there is a genuine issue of material fact, courts must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997). The moving party bears the initial burden of establishing that a material factual dispute does not exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party carries this initial burden, it shifts: the nonmoving party must then cite admissible evidence showing that there is a genuine issue for trial related to each claim on which summary judgment is sought. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); Fed. R. Civ. P. 56(a), (c).

---

[25] MHP did, however, use the Guideline Public Company Method as a "reasonableness check." (*Id.*. at ¶ 172.)

"The standard to be applied when deciding cross-motions for summary judgment is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other.'" *McCabe v. Capital Mercury Apparel*, 752 F. Supp. 2d 396, 404 (S.D.N.Y. 2010) (quoting *Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y.2004)). "[E]ven when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

### B.  Fiduciary Duty under ERISA

ERISA is a remedial statute designed to promote and protect the interests of participants and beneficiaries in employee benefit plans. *Burgio & Campofelice, Inc. v. New York State Dep't of Labor*, 107 F.3d 1000, 1007 (2d Cir. 1997).  Section 404 sets forth the general obligations of an ERISA fiduciary, which include the general duties of loyalty and care that are firmly rooted in the common law of trusts. *See Central States, Se. & Sw. Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 570 (1985); 29 U.S.C. § 1104(a)(1)(A)-(B).

The duty of loyalty requires a fiduciary to act "solely in the interests of the participants and beneficiaries," and "for the exclusive purpose" of providing benefits to them.  29 U.S.C. § 1104(a)(1)(A).  So long as a fiduciary makes decisions "with an eye single to the interests of the participants and beneficiaries," it will satisfy its duty of loyalty even if its decisions "incidentally benefit[]" itself, as well. *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

The duty of care requires a fiduciary to investigate potential transactions with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  "In determining whether a fiduciary

has satisfied this requirement, '[t]he court's task is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006) (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)) (alteration in original).

"Section 406 of ERISA supplements the general fiduciary obligations set forth in § 404 by prohibiting certain categories of transactions believed to pose a high risk of fiduciary self-dealing." *Id.* Thus, § 406 prohibits transactions involving the "sale or exchange . . . of any property between the plan and a party in interest," including the "acquisition, on behalf of the plan, of any employer security." 29 U.S.C. § 1106(a)(1)(A). However, Congress created an exception to this general prohibition "[t]o encourage employees' ownership of their employer company" by "permit[ing] the sale of employer stock by a party in interest to an ESOP if the purchase is made for 'adequate consideration.'" *Champlain Enters.*, 445 F.3d at 618 (quoting 29 U.S.C. § 1108(e)). "In transactions involving securities with no known market value, as is the case here, ERISA defines 'adequate consideration' as 'the fair market value of the asset as determined in good faith by the trustee or named fiduciary . . . .'" *Id.* (quoting 29 U.S.C. § 1002(18)(B)). "The role of courts in reviewing the adequacy of consideration in an ERISA case is to determine whether the fiduciary can show that the price paid represented a good faith determination of the fair market value of the asset, 'not to redetermine the appropriate amount for itself *de novo*.'" *Id.* at 619 (quoting *Chao v. Hall Holding Co, Inc.*, 285 F.3d 415, 437 (6th Cir. 2002)). "Although fair market value and good faith are often stated as distinct requirements, they are closely intertwined." *Id.* "Whether a fiduciary has made a proper determination of 'fair market value' depends on whether the parties 'are well-informed about the asset and the market for that asset.'" *Id.* "Thus, . . . both [inquiries]

are 'expressly focused on the *conduct* of the fiduciaries.'" *Id.* (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) (emphasis in original)). Evaluating whether a fiduciary has acted in "good faith" to determine an asset's fair market value overlaps substantially with the duty of care inquiry. *See Eyler v. Comm'r*, 88 F.3d 445, 455 (7th Cir. 1996) ("ESOP fiduciaries will carry the burden of proving that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a *prudent investigation in the circumstances then prevailing.*" (Emphasis added)).

When a fiduciary does not itself possess the requisite education, experience and skill to determine the fair market value of an asset, it has a duty to seek independent advice from experts that do. *Bierwrith*, 680 F.2d at 272-73. Simply engaging an expert and following its advice, however, will not necessarily "operate as a complete whitewash" and insulate the fiduciary from liability. *Id.* at 272; *Cunningham*, 716 F.2d at 1476 ("An independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are filled."). Courts have routinely held, however, that fiduciaries satisfy their duty to determine the fair market value of an asset in good faith by engaging independent experts when they also: "(1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300-01 (5th Cir. 2000); *accord Chao*, 285 F.3d at 430; *Howard v. Shay*, 100 F.3d 1484 (9th Cir. 2002).

### III.   The Present Motions

*A.  The Secretary's Motion*

      *a.  Did FBTS Determine Maran's Fair Market Value in Good Faith?*

The Secretary argues that FBTS's reliance on MHP's valuation was insufficient to determine the fair market value of Maran in good faith as a matter of law for three independent reasons: (1) FBTS failed to properly investigate MHP's qualifications because it was unaware that MHP had prepared the initial valuation before it was retained on behalf of the ESOP; (2) FBTS did not provide MHP with complete and accurate information because it did not provide MHP with the Angelo-Gordon offer details; and (3) FBTS's reliance on MHP's report was not reasonably justified given: (a) it was unaware of the initial valuation, (b) it stipulated that MHP could rely on the financial projections provided by Huang, a party interested in the transaction, and (c) it did not review MHP's Valuation Report with the required level of rigor.  The Secretary also argues that FBTS's failure to negotiate over the purchase price is further evidence that it did not determine the fair market value of Maran in good faith.

      *i.  Did FBTS Properly Investigate MHP's Qualifications?*

The Secretary does not argue that FBTS failed to investigate whether MHP possessed the requisite technical expertise to value a closely held corporation.  Instead, the Secretary argues that an expert's ability to provide "independent advice that is uncorrupted by adverse loyalties" is relevant to whether the expert is qualified to provide advice on a particular transaction; he argues further that FBTS's failure to inquire into and uncover the initial valuation prepared by MHP meant that its reliance on MHP's Report was necessarily, as a matter of law, not in good faith.  (*See* Sec'y Memo at 16.)

The record is clear that FBTS did not inquire into MHP's prior connection to Maran, and therefore was unaware of it. The Secretary does not offer any authority for the proposition that the required investigation into an expert's "qualifications" also requires investigation into the expert's "independence." Rather, the case law suggests that an expert's "independence" is an independent pre-requisite to relying on that expert's advice. *See Montgomery v. Aetna Playwood, Inc.*, 39 F. Supp. 2d 915, 937 (N.D. Ill. 1998) ("The 'good faith' standard also requires that . . . the appraiser on whose report the fiduciary relies . . . be independent of all parties to the transaction other than the plan."); *cf. Shay*, 100 F.3d at 1489 ("Although securing an *independent* assessment from a financial advisor or legal counsel is evidence of a thorough investigation, it is not a complete defense to a charge of imprudence." (Emphasis added)). Even if this Court were to conclude that an expert's "independence" is part and parcel of its "qualifications," the Secretary has failed to cite authority holding that a fiduciary who fails to investigate an expert's qualifications fails to satisfy its "good faith" obligation by relying on the expert's advice even if the expert was, in fact, qualified. Thus, the Secretary's argument that FBTS's investigation of MHP's qualifications was so deficient that it precludes a reasonable fact-finder from concluding that FBTS was entitled to rely on MHP's report in good faith appears to hinge almost entirely on whether MHP is deemed to have been "independent."

FBTS argues that MHP was an "independent" appraiser based on the Department of Labor's Proposed Regulations, which provide, in relevant part, that:

> [a] person is not independent if that person is directly or indirectly under the control of any party to the transaction. Control is further defined to mean the power to exercise a controlling influence over the management or policies of that person.

*Montgomery*, 39 F. Supp. 2d at 937 (citing Proposed Regulation § 2510.3-18(b)(3)(iii)). There is nothing in the record to suggest that MHP was "under the control" of the Selling Shareholders, or

that the Selling Shareholders exercised a controlling influence over the management or policies of MHP when it was retained by FBTS to prepare a valuation and fairness opinion on behalf of the Maran ESOP.  Thus, on this record, this Court cannot conclude that MHP was not independent— or, stated another way, was conflicted—on this basis.

Despite the definition set forth in his Department's own Proposed Regulations,[26] the Secretary relies on *Chesemore v. Alliance Holdings, Inc.*—which concluded that "[h]aving been hired for years by [a counterparty] and for this transaction . . . ., [the ESOP trustee's valuation advisor] was not independent with respect to the . . . . ESOP."  886 F. Supp. 2d 1007, 1048 (W.D. Wisc. 2012).  *Chesemore* is distinguishable, however, because the valuation expert there had been hired "for years" by the counterparty.  One could argue that a years-long ongoing relationship might even constitute "the power to exercise a controlling influence over the management or policies" of the hired advisor, and therefore that *Chesemore*'s conclusion accords with the definition set forth in the Department of Labor's Proposed Regulations.  In any case, the Secretary has not offered any evidence to suggest that MHP had any contact with Maran or the Selling Shareholders outside of the single-shot engagement to prepare the initial valuation.  Furthermore, the record evidence submitted by the Secretary is insufficient to conclude as a matter of law that a single-shot engagement creates a conflict in all circumstances under prevailing industry norms.[27]

Additionally, there is a factual dispute regarding whether MHP was even retained by a "counterparty" when it prepared the initial valuation.  The Secretary contends that MHP was

---

[26] It is worth noting that the Department of Labor's "[p]roposed regualtions have no legal effect . . . ." *Champlain Enters.*, 445 F.3d at 619.

[27] For instance, the Secretary's valuation expert testified at his deposition that he and his firm provide their honest opinion of value when valuing an asset no matter who hires and pays them.  (FBTS Reply at ¶ 108.) On the other hand, an FBTS employee testified at her deposition that "if [FBTS] knew that prior work had been done for the company, [FBTS] wouldn't have used them." (Hahn Decl., Exhibit 30, (175-30), at 82:9-11.)

retained by Maran and the Selling Shareholders, while FBTS counters that MHP was retained by

the "ESOP Formation Committee," which stood on the same side of the transaction as FBTS since

both were fiduciaries to the Maran ESOP.  The record, however, is relatively barren with regard

to the ESOP Formation Committee's creation, members, responsibilities, practices and procedures.

Whether the Selling Shareholders or the ESOP Formation Committee retained MHP, and whether

this distinction is meaningful or semantic is a determination which would benefit from additional

evidence adduced at trial. [28]

Ultimately, even the Secretary concedes that on this record, "whether MHP was

'independent' for purposes of conducting another valuation of the same stock mere weeks [after

preparing the initial valuation], and determining for the ESOP, whether the sellers' offer was,

comparatively, a fair one," is merely "highly questionable," not clear cut.  (Sec'y Memo at 19.)

Consequently, the Secretary has failed to carry its burden to demonstrate as a matter of law that

FBTS's reliance on MHP's valuation without first discovering that MHP had prepared the initial

valuation necessarily violated its duty to determine the fair market value of Maran in good faith.

### ii.   Did FBTS Provide MHP with Complete and Accurate Information?

The Secretary argues next that FBTS could not have relied in good faith on MHP's

Valuation Report to determine the fair market value of Maran because it did not provide MHP

with complete and accurate information.  Specifically, the Secretary argues that FBTS neglected

to tell MHP about the letter of intent from Starboard and Angelo Gordon that proposed a price of

$65 million for 80% of Maran, which was lowered to $38 million in a subsequent offer.  To support

its position, the Secretary again relies on *Chesemore*, where the court highlighted the failure to

---

[28] Additional evidence regarding the ESOP Formation Committee would also help determine the
significance of and weight to be afforded to the FBTS's employee's testimony when she stated that "if
[FBTS] knew that prior work had been done for *the company*, [FBTS] wouldn't have used them." (Hahn
Decl., Exhibit 30, (175-30), at 82:9-11 (emphasis added).)

"consider prior offers for [the target] because [the valuation advisor] was not made aware of . . .
failed efforts to sell to an arms-length buyer"—even though the valuation advisor specifically
requested information about prior offers—when considering whether the fiduciary's reliance on
the valuation advisor's advice was in good faith. 886 F. Supp. 2d at 1027. FBTS responds,
however, that the Secretary's contention that MHP was not "made aware of" information regarding
the Angelo Gordon offer is erroneous because Epstein Becker's Due Diligence Memo, attached to
an email on which MHP was cc'd, explicitly referenced the Angelo Gordon offer.

Before deciding whether the reference to the Angelo Gordon offer contained within the
Due Diligence Memo attached to an email sent by Epstein Becker and on which MHP was cc'd
satisfied FBTS's obligation to provide MHP with "complete and accurate information," a threshold
question exists regarding the relevance of the offer to MHP's valuation of Maran. It is axiomatic
that a fiduciary is not required to provide its valuation advisor with *irrelevant* information. The
parties dispute whether the Angelo Gordon offer was relevant to the valuation prepared by MHP.
(*See* FBTS Resp. at ¶¶ 116-18.) Because this factual dispute is material to the determination of
whether FBTS satisfied its obligation to provide MHP with "complete and accurate information,"
the Secretary is not entitled to judgment as a matter of law on this ground.

### iii.   Was FBTS's Reliance on MHP's Report Reasonably Justified?

Finally, the Secretary argues that FBTS cannot demonstrate that its reliance on MHP's
Valuation Report was reasonable under the circumstances. First, it argues that such reliance was
unreasonable without first assuring itself that MHP was free of conflicts or other improper biases
that might influence its valuation. The Secretary has not cited any authority standing for the
proposition that a fiduciary who fails to assure itself that its valuation advisor is free of conflicts
or other improper biases may not rely on the expert's advice even when the expert was, in fact,

completely free of conflicts or improper biases. As already discussed, whether MHP was free of conflicts or improper biases is still an open question, and therefore, at this time, this is an inappropriate basis on which to enter judgment.

The Secretary also argues that FBTS's reliance on MHP's report was unreasonable because FBTS's engagement agreement with MHP allowed MHP to treat as presumptively accurate any information supplied by Maran, including projections of Maran's future financial performance, even if provided by Huang, a self-interested Selling Shareholder. FBTS responds that such provisions are consistent with industry standards and practice. Additionally, FBTS argues, and the record demonstrates, that it discussed Maran's projections and concluded that they were reasonable. Whether the provision allowing MHP to treat as presumptively accurate any information provided by Maran, notwithstanding Huang's involvement, is consistent with industry standards and practice is a disputed issue of fact. Additionally, whether FBTS's reliance on Maran's projections was reasonable will be substantially aided by expert testimony.[29] Accordingly, the provision allowing MHP to treat the financial information provided by Maran as presumptively accurate is, at this time, and on this record, an inappropriate basis on which to hold that MHP failed to determine Maran's fair market value in good faith.

The Secretary also argues that FBTS's reliance on MHP's report was unreasonable because it did not review the valuation report with particular rigor and skepticism. Indeed, a fiduciary reviewing a valuation report "is required to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense." *Shay*, 100 F.3d at 1490. The Secretary contends that FBTS cannot demonstrate that it made such an effort

---

[29] Indeed, the parties have submitted numerous expert reports and intend to call these experts to testify should this action proceed to trial. (*See, e.g.*, Secretary's Motion to Exclude Rebuttal Expert Reports and Testimony of Brad Van Horn, (ECF No. 155); FBTS's Motion to Preclude the Report and Testimony of Richard Puntillo, (ECF No. 158).)

primarily because it received the report two days before meeting with MHP to review it.  However,

there is no authority which draws a bright line requiring that a fiduciary receive an expert's report

a particular amount of time prior to meeting with an expert to review its report.[30]   The record

demonstrates that FBTS was engaged in the November 22, 2016 discussion with MHP regarding

its report.  At this time, on this record, this Court is unable to conclude, as a matter of law, that

FBTS's review of the report did not constitute "an honest, objective effort," or that it failed to

adequately "question the methods and assumptions that [might] not [have] ma[d]e sense."  *See id.*

### iv.   Did FBTS's Failure to Negotiate Mean its Determination of Fair Market Value was made in Bad Faith?

Finally, the Secretary argues that FBTS cannot demonstrate that it acted in good faith to

determine the fair market value of Maran because it did not attempt to negotiate a better purchase

price than the one offered by the Selling Shareholders.  Indeed, some courts have relied upon the

failure to negotiate the ESOP transaction price to support a finding that the fiduciary did not act in

good faith on behalf of the ESOP.  *See Hall Holding*, 285 F.3d at 437 (finding ESOP fiduciary's

"lack of good faith is demonstrated by" among other things, the fact that there was "no negotiation

as to the price of the [employer's] stock"); *Shay*, 100 F.3d at 1489 (faulting the fiduciaries for

failing to test a valuation without empirical support by getting a second valuation and/or

"complet[ing] the transaction without negotiation"); *Horn v. McQueen*, 215 F. Supp. 2d 867, 881

(W.D. Ky 2002) (finding fiduciary breached duty of good faith when it did not know how the

purchase price was set and "price paid by the ESOP for the . . . shares was not reached through

negotiations").   No court, however, has relied solely on a fiduciary's failure to negotiate the

purchase price to conclude that the fiduciary acted in bad faith, and instead has considered the

---

[30] FBTS also points out that it received the report ten days before closing, and therefore had additional time to review the report and ask questions had its meeting or further review raised any.

failure to negotiate in light of all of the fiduciary's other conduct and the circumstances specific to the particular transaction at issue. Therefore, although FBTS's failure to negotiate the purchase price on behalf of the Maran ESOP is one factor that this Court may consider when determining whether FBTS acted in good faith, it alone is insufficient to support the conclusion that FBTS is incapable of demonstrating that it acted on behalf of the Maran ESOP in good faith.

### b. Did FBTS Satisfy Its Duties of Care and Loyalty?

The Secretary also moves for summary judgment with respect to his claim that FBTS violated its duty of prudence under ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). The Secretary relies on many of the same facts and arguments that he relied upon to argue that he is entitled to summary judgment on his "good faith" claim, such as MHP's alleged conflict-of-interest, the timeframe to which MHP agreed to review the transaction, the failure to affirmatively provide the Angelo Gordon offer to MHP or otherwise consider it when valuing Maran, and the failure to negotiate the ultimate transaction purchase price. The Secretary also argues that "despite the fact that Epstein Becker had promised either to obtain renewals of Maran's supplier agreements with Walmart or else negotiate a 'carve out' in the transaction documents, FBTS failed to ensure that either occurred." (Sec'y Memo at 25.)

The duty to determine the fair market value of an employer's stock in good faith overlaps significantly with the duty of prudence. This Court is unable to assign the appropriate amount of weight, if any, to the additional facts the Secretary submits in support of its duty-of-prudence claim because FBTS has demonstrated there is a genuine dispute regarding whether FBTS even had any substantive supplier contracts with Walmart. *See supra* note 20. In sum, for the same reasons that this Court has determined that he is not entitled to judgment as a matter of law on his "good faith"

claim, the Secretary is not entitled to summary judgment on his claim alleging that FBTS failed to act prudently.

With respect to the Secretary's motion for summary judgment on his claim that FBTS violated its duty of loyalty under ERISA section 404(a)(1)(A), the Secretary argues that "FBTS did not act with an 'eye single' toward the EOSP's interest," but reduced its fee, selected MHP, and agreed to a compressed diligence timeframe to "curry favor" with CSG to earn future referral business. (Sec'y Memo at 24 (citing *Bierwirth*, 680 F.2d at 271).) Furthermore, he argues that FBTS, in effect, "rubber stamp[ed]" a deal that had already been made because it sought to be installed as ongoing trustee and earn the fee which was tied to the value of Maran's stock. (*Id.* at 25.) FBTS disputes each of these allegations: it submits that it reduced its fee to match a competing offer from another company bidding to become the Maran ESOP's fiduciary; that although CSG suggested FBTS retain MHP, FBTS made the choice to do so independently based on its previous experiences working with MHP, as well as on MHP's accounting prowess; and that the six-week timeframe was fairly typical for these types of transactions.

The duty of loyalty is grounded in the motivation driving a fiduciary's conduct, and liability will not lie where a fiduciary's decisions were motivated by what is best for the ESOP, even if those decisions also incidentally benefit the fiduciary. *See Bierwrith*, 680 F.2d at 271. The record currently reflects a genuine material dispute as to FBTS's true motivations driving several of the decisions it made while representing the ESOP. Consequently, the Secretary has not carried his burden to demonstrate that he is entitled to judgment as a matter of law on his claim alleging that FBTS violated its duty of loyalty.

*B.  FBTS's Motion*

FBTS has cross-moved for summary judgment on the Secretary's claims, arguing that the record evidence demonstrates as a matter of law that it complied with its duties of prudence and loyalty, and that the Maran ESOP Transaction qualified for an exception to the general rule prohibiting self-interested transactions because it determined the fair market value of Maran in good faith. FBTS argues that it satisfied its duties because, among other things, it: (1) ensured the data provided by Maran to MHP was complete and accurate by including representation and warranty provisions regarding the veracity of the financial and company information provided; (2) questioned the financial forecasts made by Maran at due diligence meetings; (3) retained MHP, an indisputably qualified expert to prepare a valuation of Maran; (4) attended and participated in meetings with Maran, MHP and Epstein Becker; (5) questioned the assumptions and methodologies employed to value Maran; and (6) specifically discussed Maran's relationship with Walmart and the attendant opportunities and risks associated with that relationship.

Notwithstanding these actions, there are genuine issues of material fact relating to: (1) FBTS's true motivations driving its decisions to select MHP as valuation advisor; (2) MHP's independence; (3) the relevance of the Angelo Gordon offer; (4) the reasonableness of treating the financial information and projections provided by Huang as presumptively accurate; (5) the rigor with which FBTS reviewed and challenged MHP's methodologies; and (6) FBTS's failure to negotiate and ultimately approve the Transaction at the designated purchase price. Accordingly, FBTS has failed to demonstrate that it is entitled to judgment as a matter of law on the Secretary's claims.

## IV.    Conclusion

The parties' cross-motions for summary judgment are DENIED.[31]  The Clerk of Court is directed to close the motions docketed as ECF Nos. 161 and 165.

A final pretrial conference is scheduled for October 20, 2016 at 9:45 AM.

Dated: September 28, 2016
        New York, New York

                                        SO ORDERED.

                                        GEORGE B. DANIELS
                                        UNITED STATES DISTRICT JUDGE

---

[31] FBTS also moved for summary judgment as to Count VI of the Secretary's Amended Complaint, which alleged that that FBTS and Maran had improperly entered into indemnification agreements.  Count VI was dismissed over two years ago pursuant to a Consent Order requiring FBTS to "neither seek nor accept indemnification from Maran or the ESOP if FBTS is found by this Court or any other Court to have breached its ERISA fiduciary duties to the ESOP."  (Consent Order Dismissing Count VI of the Amended Complaint and Maran, Inc., (ECF No. 88).)  Accordingly, FBTS's motion for summary judgment as to Count VI is DENIED AS MOOT.