

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 2 1 2017

| | |
|---|---|
| R. ALEXANDER ACOSTA,<br>Secretary of the United States<br>Department of Labor,<br><br>       Plaintiff,<br><br>       v.<br><br>FIRST BANKERS TRUST SERVICES, INC.,<br>MARAN, INC., et al.,<br><br>       Defendants. | No. 1:12-cv-08648-GBD |

## [~~PROPOSED~~] CONSENT ORDER AND JUDGMENT

Plaintiff R. Alexander Acosta, Secretary of the United States Department of Labor ("Secretary"), and defendant First Bankers Trust Services, Inc. ("FBTS" and, with the Secretary, the "Parties"), by and through their respective attorneys, have negotiated an agreement to settle all civil claims and issues between them in this action, and each consents to the entry of this Consent Order by the Court as the sole and complete memorialization of the terms of such agreement.

    **A.**    This action was filed by the Secretary pursuant to his authority under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq. as amended.

    **B.**    The Secretary filed this ERISA action in connection with the November 30, 2006 purchase of Maran, Inc. stock by the Maran, Inc. Employee Stock Ownership Plan (the "Maran ESOP").

    **C.**    The Secretary and FBTS have engaged in a constructive and collaborative effort to establish binding policies and procedures relating to when FBTS serves as trustee

or other fiduciary of an employee stock ownership plan ("ESOP") subject to Title I of ERISA that is purchasing or selling, or contemplating purchasing or selling, or receives an offer to purchase or sell, employer securities that are not publicly traded. The policies and procedures agreed upon by the Parties are set forth in Exhibit A to this Consent Order.

D.    The Parties each acknowledge that its representations are material factors in the other Party's decision to enter into this Consent Order.

E.    The Parties agree to settle on the terms and conditions hereafter set forth and stipulate and agree to the entry of this Consent Order as a full and complete resolution of all of the civil claims, causes of action and issues arising between them in this action without adjudication of any issue of fact or law raised in the Secretary's Amended Complaint in this action.

**NOW THEREFORE**, in consideration of the mutual covenants set forth in this Consent Order and other valuable and sufficient consideration, the Parties have agreed as herein stated. Accordingly, it is ORDERED, ADJUDGED AND DECREED that:

### I.    <u>JURISDICTION</u>

The Court has jurisdiction over the Parties to this Consent Order and subject matter of this action and is empowered to provide the relief herein.

### II.    <u>MONETARY RELIEF</u>

A.    Within 30 (thirty) days of the Court's entry of this Consent Order, FBTS shall pay or cause its insurers to pay the Maran ESOP the sum of $6,642,857.14 (the "Settlement Amount") to fully settle the claims against FBTS in the Secretary's Amended Complaint in this action. This payment shall not be offset in any manner by any payments from Maran, Inc.; the Maran ESOP, David Greenberg, Richard Huang, or any other party.

B.    To the extent that the Maran ESOP or Maran has advanced to FBTS

2

payment for any fees and expenses that FBTS has incurred or anticipates incurring in defense of this action or any investigation covered by this Consent Order, FBTS, within 10 (ten) days of execution of this Consent Order, shall re-pay any such advanced fees and expenses plus interest at the rate prescribed by the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the Court's entry of this Consent Order.

     **C.**     Upon payment of the Settlement Amount and any payments pursuant to paragraph II(B), FBTS is hereby assessed a penalty under ERISA § 502(l), 29 U.S.C. § 1132(l), in the amount of $1,328,571.43 (the "Penalty Amount"), equal to 20% (twenty percent) of the Settlement Amount.  However, FBTS has petitioned for a waiver of said penalty under 29 C.F.R. 2570.85(a)(2), which the Secretary has granted.

     **D.**     FBTS will provide to the Secretary proof of payment of the Settlement Amount.  Such proof will include wire transfer confirmations of the payment and such other proof as may be requested by the Secretary.  Any proof provided under this paragraph will be sent to the Secretary's representative at the following address:

          Jonathan Kay
          Regional Director New York Regional Office
          Employee Benefits Security Administration
          U.S. Department of Labor
          33 Whitehall St., Suite 1200
          New York, NY 10004

The Secretary will notify FBTS of his receipt of satisfactory proof.

### III.   PROCESS REQUIREMENTS FOR EMPLOYEE STOCK OWNERSHIP PLAN TRANSACTIONS

     The Parties agree that FBTS will apply the policies and procedures described in Exhibit A hereto whenever FBTS serves as a trustee or other fiduciary of any ESOP that is purchasing or selling, is contemplating purchasing or selling, or receives an offer to

purchase or sell, employer securities that are not publicly traded.  The policies and procedures agreed upon by the Parties are set forth in Exhibit A to this Consent Order. FBTS agrees to begin to implement the policies and procedures in Exhibit A immediately after this Consent Order is entered by the Court, and will fully implement them within no later than thirty (30) days after entry of this Consent Order.

### IV.   NON-EXCLUSIVITY

This Consent Order, including Exhibit A hereto, is not intended to specify all of FBTS's obligations as an ERISA fiduciary and in no way supersedes any of FBTS's obligations under ERISA or its implementing regulations.

### V.   RELEASES

A.   This Consent Order provides full, final, and complete judicial resolution of any and all of the claims and causes of action alleged in the Secretary's Amended Complaint in this action.  Notwithstanding the foregoing, nothing in this Consent Order shall be deemed to waive any claim by the Secretary relating to the obligations set forth in this Consent Order.

B.   Except for the obligations set forth above and in Exhibit A to this Consent Order, the Secretary and his agents, representatives, assigns, predecessors and successors in interest, acting in their official capacities, do hereby waive, release and forever discharge any and all claims, demands, actions, causes of action, liabilities, or fines (including any payment under Section 502(l) of ERISA) they may have against FBTS and its directors, officers, agents, attorneys, employees, representatives, assigns, predecessors, and successors in interest based upon the allegations in the Secretary's Amended Complaint in this action.

C.   FBTS and its directors, officers, agents, attorneys, employees

4

representatives, assigns, predecessors and successors in interest, do hereby release the Secretary and his officers, agents, attorneys, employees, and representatives, both in their individual and governmental capacities, from all actions, claims and demands of whatsoever nature, including those arising under the Equal Access to Justice Act or any statute, rule, or regulation, that relate in any manner to the investigations, filing, prosecution, and maintenance of the Secretary's Amended Complaint..

    **D.**    The Secretary's claims against any other persons are expressly preserved. Except as set forth in paragraphs III(A) and (B) above, nothing in this Consent Order shall preclude the Secretary from initiating or continuing any audit or investigation, or from pursuing any claims or actions, against any entities or persons relating to any ERISA-covered plan. Nothing in this Consent Order resolves any claims that have been or may be asserted against FBTS by the Maran ESOP or by any other person.

## VI.   RETENTION OF JURISDICTION

This Court shall retain jurisdiction over the Parties and subject matter of this action for the purposes of enforcing and/or interpreting the terms of this Consent Order.

## VII.   COST AND EXPENSES

The Parties each shall bear their own costs, expenses, and attorneys' fees in connection with this action and this Consent Order. FBTS agrees not to seek or accept indemnification from Maran, Inc. or use any assets of Maran, Inc. or the Maran ESOP for any payments made or required to be made pursuant to this Consent Order, or for any expenses, including attorney's fees, associated with the negotiation, consideration, documentation, or implementation of this Consent Order.

## VIII.   CONFLICT RESOLUTION

The Parties agree that should any issues arise relating to compliance with the terms

of this Consent Order, as a precondition to seeking the Court's involvement, the Party asserting the issue(s) will provide written notice of the issue(s) to the other Party and will use reasonable efforts to resolve them informally. If the issues cannot be resolved within ninety (90) days of the date of the written notice, the Parties shall have the option of seeking resolution by more formal means, including but not limited to mediation or litigation. Failure by any Party to seek enforcement of any provision of this Consent Order shall not be construed as a waiver of such enforcement with regard to that provision or any other provision.

### IX.   PARTIES BOUND

By entering into this Consent Order, the Parties hereto represent that they have been informed by counsel of the effect and purpose of this Consent Order and agree to be bound by its terms. Any attorney signing each expressly represents that he or she is authorized to execute this Consent Order on behalf of the Party represented and that the attorney has fully disclosed any conflicts of interest relating to his or her representation for purposes of executing this Consent Order. This Consent Order is not binding on any governmental agency other than the United States Department of Labor.

### X.   MULTIPLE ORIGINALS

This Consent Order may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same instrument. The date of execution of this Consent Order is the date on which it is signed by the Court.

### XI.   ENTRY OF JUDGMENT

The Court finds that there is no just reason to delay the entry of this Consent Order and expressly directs the entry thereof as a final Order and Judgment.

6

**IN WITNESS WHEREOF,** the Parties through their respective duly authorized representatives have executed this Consent Order on the date(s) set forth hereunder.

_George B. Donals_                           SEP 2 1 2017

UNITED STATES DISTRICT COURT JUDGE

**FOR THE SECRETARY:**

Respectfully Submitted,


NICHOLAS C. GEALE
Acting Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor
Plan Benefits Security Division

ROBERT FURST
Counsel for Litigation
Plan Benefits Security Division

JEFFREY HAHN
ERIC LUND
Office of the Solicitor
Plan Benefits Security Division
U.S. Department of Labor
P.O. Box 1914
Washington, DC  20013
Tel: (202) 693-5600
Fax: (202) 693-5610
Hahn.Jeffrey.M@dol.gov
Lund.Eric@dol.gov


MICHAEL HARTMAN
Office of the Solicitor

New York Regional Office
U.S. Department of Labor
201 Varick Street
Room 983
New York, NY 10014
Tel: (646) 264-3673
Fax (646) 264-3660 (FAX)
Hartman.Michael@dol.gov

*Attorneys for Plaintiff*

**FOR FIRST BANKERS TRUST SERVICES, INC.:**

Daniel Schnapp
Fox Rothschild LLP
100 Park Avenue, 15th Floor
New York, NY 10017
(212) 878-7960 - direct
(212) 692-0940- fax
Email: DSchnapp@foxrothschild.com

9

## EXHIBIT A

## AGREEMENT CONCERNING PROCESS REQUIREMENTS FOR EMPLOYEE STOCK OWNERSHIP PLAN TRANSACTIONS

First Bankers Trust Services, Inc. ("FBTS") agrees to apply the following policies and procedures whenever FBTS serves as trustee or other fiduciary of an employee stock ownership plan ("ESOP") subject to Title I of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA") that is purchasing or selling, is contemplating purchasing or selling, or receives an offer to purchase or sell, employer securities that are not publicly traded ("Transaction").

**A.** **Selection and Use of valuation advisor - General.** FBTS shall do the following:

1. Prudently investigate the valuation advisor's qualifications;

2. Take reasonable steps to determine that the valuation advisor receives complete, accurate, and current information necessary to value the plan sponsor's securities;

3. Document what steps FBTS took – including who at FBTS took those steps – to determine that the valuation advisor received complete, accurate, and current information and to ensure FBTS understood the advice of the valuation advisor; and

4. Prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any Transaction in reliance on the advice.

**B.** **Selection of valuation advisor - Conflicts of Interest.** FBTS shall not use a valuation advisor for a Transaction that has previously performed work for any party to the Transaction other than the ESOP or its trustee, including but not limited to a "preliminary valuation" for or on behalf of the plan sponsor (as distinguished from the

10

ESOP), a committee of employees of the plan sponsor, any counterparty to the ESOP involved in the Transaction, or any other entity that is structuring the Transaction (such as an investment bank). FBTS shall not use a valuation advisor for a Transaction that has a familial or corporate relationship (such as a parent-subsidiary relationship) to any of the aforementioned persons or entities. FBTS shall obtain written confirmation from the valuation advisor selected that none of the above-referenced relations exist.

C.      Selection of valuation advisor - Process.

1.      In selecting a valuation advisor for a Transaction, FBTS shall prepare a written analysis addressing the following topics:

a.      The reason for selecting the particular valuation advisor;

b.      A list of all the valuation advisors that FBTS considered;

c.      A discussion of the qualifications of the valuation advisors that FBTS considered;

d.      A list of at least three references checked and discussion of the references' views on the valuation advisor;

e.      Whether the valuation advisor was the subject of prior criminal, civil, or regulatory proceedings/investigations related to its previous valuation work and the outcome of such proceedings or investigations; and

f.      A full explanation of the basis for concluding that FBTS' selection of the valuation advisor was prudent.

2.      If FBTS selects a valuation advisor from a roster of valuation advisors that it has previously used or who have previously been approved in connection with FBTS's vendor risk management program, FBTS need not undertake anew the analysis outlined above if the following conditions are satisfied:

11

a.      FBTS previously performed the analysis described above in connection with a prior engagement of the valuation advisor or in connection with the vendor risk management program;

b.      The previous analysis was completed within the prior calendar year immediately preceding FBTS's selection of the valuation advisor;

c.      FBTS documents in writing in the vendor risk management program file that it previously performed the analysis, the date(s) on which FBTS performed the analysis and the results of the analysis;

d.      The FBTS vendor risk management program file contains the valuation advisor's confirmation that the information it previously provided pursuant to item (C)(1)(e) above is still accurate.

**D.      Oversight of valuation advisor – Required Analysis.**  Prior to approving a Transaction, FBTS shall request that the valuation advisor document the following items in its Valuation Report[1] and, if the valuation advisor does not so document, FBTS shall prepare or require the preparation of supplemental documentation of the following items to the extent they were not documented by the valuation advisor:

1.      Use of Projections: The individual(s) responsible for providing any projections reflected in the Valuation Report, and, as to those individuals, conduct reasonable inquiry as to, and record in writing:

a.      Whether those individuals have or reasonably may be determined to have any conflicts of interest in regard to the ESOP including but not limited

---

[1] All references to the term "Valuation Report" refer to the valuation advisor's report on which FBTS relies prior to the Transaction in deciding whether to approve or reject the Transaction.

to any interest in the purchase or sale of the plan sponsor's stock being considered;

       b.     Whether those individuals serve as agents or employees of persons with such conflicts, and the precise nature of any such conflicts; and

       c.     How FBTS and the valuation advisor considered such conflicts in determining the value of the plan sponsor's securities.

       2.     An opinion as to the reasonableness of any projections considered in connection with the Transaction that explains in writing why and to what extent the projections are or are not reasonable. At a minimum, the analysis shall consider how the projections compare to, and whether they are reasonable in light of, the plan sponsor's five-year historical averages and/or medians and the five-year historical averages and/or medians of a group of comparable public companies (if any exist) for the following metrics, unless five-year data are unavailable (in which case, the analysis shall use averages extending as far back as possible):

       a.     Return on assets;

       b.     Return on equity;

       c.     EBIT and EBITDA margins;

       d.     Ratio of capital expenditures to sales;

       e.     Revenue growth rate; and

       f.     Ratio of free cash flows (of the enterprise) to sales.

       3.     If it is determined that any of these metrics should be disregarded in assessing the reasonableness of the projections, document in writing both the calculations of the metric (unless calculation is impossible) and the basis for the conclusion that the metric should be disregarded. The use of additional metrics to evaluate the reasonableness of projections other than those listed in section (D) (2) (a)-(f) above is not precluded as

long as the appropriateness of those metrics is documented in writing.

      4.    If comparable companies are used for any part of a valuation - whether as part of a guideline company method of valuation, to gauge the reasonableness of projections, or for any other purpose, explain in writing the basis for concluding that the comparable companies are actually comparable to the plan sponsor being valued, including on the basis of size, customer concentration (if such information is publicly available), and volatility of earnings.  If a guideline company analysis is performed, explain in writing any discounts applied to the multiples selected, and if no discount is applied to any given multiple, explain in detail the reasons.

      5.    If the plan sponsor is projected to meet or exceed its historical performance or the historical performance of the group of comparable public companies on any of the metrics described in paragraph (D) (2) above, document in writing all material assumptions supporting such projections and why those assumptions are reasonable.

      6.    To the extent that FBTS or its valuation advisor considers any of the projections provided by the plan sponsor to be unreasonable, document in writing any adjustments made to the projections.

      7.    If adjustments are applied to the plan sponsor's historical or projected financial metrics in a valuation analysis, determine and explain in writing why such adjustments are reasonable.

      8.    Describe the risks facing the plan sponsor that could cause the plan sponsor's financial performance to fall materially below the projections relied upon by the valuation advisor.

      9.    If greater weight is assigned to some valuation methods than to others, explain in writing the weighting assigned to each valuation method and the basis for

the weightings assigned.

10.     Consider, as appropriate, how the ESOP document provisions regarding stock distributions, the duration of the ESOP loan, and the age and tenure of the ESOP participants, may affect the plan sponsor's prospective repurchase obligation, the prudence of the Transaction or the fair market value of the stock.

11.     Analyze and document in writing:

a.     Whether the plan sponsor will be able to service the debt taken on in connection with the Transaction (including the ability to service the debt in the event that the plan sponsor fails to meet the projections relied upon in valuing the stock);

b.     Whether the Transaction is fair to the ESOP participants from a financial point of view;

c.     Whether the Transaction is fair to the ESOP participants relative to all the other parties to the Transaction;

d.     Whether the terms of the financing of the Transaction are market-based, commercially reasonable, and in the best interests of the ESOP participants;

e.     Whether the terms of any loan the ESOP receives in connection with the Transaction are as favorable as the terms of any loans between the plan sponsor and any executive of the plan sponsor made within the two years preceding the Transaction; and

f.     The financial impact of the Transaction on the plan sponsor, and document in writing the factors considered in such analysis and conclusions drawn therefrom.

12.     Explain any material differences between the present valuation and the most recent prior valuation of the plan sponsor performed within the past 24 months by

15

any valuation firm for any purpose (if any exist).

### E.   Financial Statements.

1.    FBTS shall request that the plan sponsor provide FBTS and its valuation advisor with unqualified audited financial statements for the preceding five fiscal years, unless unqualified audited financial statements extending back five years are unavailable (in which case, FBTS shall request unqualified audited financial statements extending as far back as possible).

2.    If the plan sponsor provides to FBTS or its valuation advisor unaudited or qualified audited financial statements for any of the preceding five fiscal years (including interim financial statements that update or supplement the last available unqualified audited financial statement), FBTS shall determine whether it is prudent to rely on these financial statements notwithstanding the risk posed by using unaudited or qualified audited financial statements.

3.    If FBTS proceeds with the Transaction notwithstanding the lack of unqualified audited financial statements (including interim financial statements that update or supplement the last available unqualified audited financial statement), FBTS shall document the basis for FBTS' reasonable belief that it is prudent to rely on the financial statements, and explain in writing how FBTS accounted for any risk posed by using financial statements other than unqualified audited financial statements.  If FBTS does not believe that it can reasonably conclude that it would be prudent to rely on the financial statements used in the Valuation Report, FBTS shall not proceed with the Transaction. While FBTS need not audit the financial statements themselves, it must carefully consider the reliability of those statements in the manner set forth herein.

4.    FBTS may approve a Transaction notwithstanding the lack of

unqualified audited financial statements (including interim financial statements that update or supplement the last unqualified audited financial statement) only if the stock purchase agreement includes a provision requiring the selling or purchasing shareholder(s) who is(are) an officer, manager, or member of the board of directors of the plan sponsor to compensate the ESOP for any losses or other harms caused by or related to financial statements that did not accurately reflect the plan sponsor's financial condition.

F. **Fiduciary Review Process - General.** In connection with any Transaction, FBTS agrees to do the following:

1. Take reasonable steps necessary to determine the prudence of relying on the plan sponsor's financial statements provided to the valuation advisor, as set out more fully in paragraph E above;

2. Critically assess the reasonableness of any projections (particularly management projections), and if the Valuation Report does not document in writing the reasonableness of such projections to FBTS' satisfaction, FBTS shall prepare supplemental documentation explaining why and to what extent the projections are or are not reasonable;

3. If FBTS believes the projections are unreasonable, FBTS shall ask the valuation advisor to account for the unreasonable projections in its valuation, request new and reasonable projections from management, or reject the Transaction. FBTS must document the basis for its decision.

4. Ensure that the information the valuation advisor obtains from the plan sponsor and purchasing or selling shareholder(s) includes the following, to the extent it exists:

a. Any prior attempts by the purchasing or selling shareholder(s) to purchase or sell their stock in the plan sponsor within the proceeding two

17

(2) years;

      b.    Any prior defaults within the past five years by the plan sponsor under any lending or financing agreement;

      c.    Any management letters provided to the plan sponsor by its accountants within the past five years; and

      d.    Any information related to a valuation of the plan sponsor provided to the Internal Revenue Service within the past five years.

    **G.**    **Fiduciary Review Process - Documentation of Valuation Analysis.** FBTS shall document in writing its analysis of the Valuation Report relating to a Transaction. FBTS' documentation shall specifically address each of the following topics and shall include FBTS' conclusions regarding the Valuation Report's treatment of each topic and explain in writing the basis for its conclusions:

      1.    Marketability discounts;

      2.    Minority interests and control premiums;

      3.    Projections of the plan sponsor's future financial performance and the reasonableness or unreasonableness of such projections, including, if applicable, the basis for assuming that the plan sponsor's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

      4.    Analysis of the plan sponsor's strengths and weaknesses, which may include, as appropriate, personnel, plant and equipment, capacity, research and development, marketing strategy, business planning, financial condition, and any other factors that reasonably could be expected to affect future performance;

      5.    Specific discount rates chosen, including whether any weighted average cost of capital used by the valuation advisor was based on the plan sponsor's actual

18

capital structure or that of the relevant industry and why the chosen capital structure weighting was reasonable;

6.   All adjustments to the plan sponsor's historical financial statements;

7.   Consistency of the general economic and industry-specific narrative in the Valuation Report with the quantitative aspects of the Valuation Report;

8.   Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

9.   The comparability of the companies chosen as part of any analysis based on the plan sponsor's comparable companies;

10.   Material assumptions underlying the Valuation Report and any testing and analysis of these assumptions;

11.   Where the Valuation Report made choices between averages, medians, and outliers (e.g., in determining the multiple(s) used under the guideline company method of valuation), the reasons for the choices;

12.   Treatment of corporate debt;

13.   Whether the methodologies employed were standard and accepted methodologies and the basis for any departures from standard and accepted methodologies;

14.   The plan sponsor's ability to service any debt or liabilities to be taken on in connection with the Transaction;

15.   The Transaction's reasonably foreseeable risks as of the date of the Transaction; and

16.   Any other material considerations or variables that could have a

significant effect on the price of the plan sponsor's securities.

**H.    Fiduciary Review Process - Reliance on Valuation Report.**

1.    FBTS, through its employees who are primarily responsible for the proposed Transaction, including any employee who participated in decisions on whether to proceed with the Transaction or the price of the Transaction, shall do the following, and document in writing its work with respect to each:

      a.    Read and understand the Valuation Report;

      b.    Identify and question the valuation report's underlying assumptions;

      c.    Make reasonable inquiry as to whether the information in the Valuation Report is materially consistent with information in FBTS' possession;

      d.    Analyze whether the Valuation Report's conclusions are consistent with the data and analysis; and

      e.    Analyze whether the Valuation Report is internally consistent in material aspects.

2.    FBTS shall document in writing the following:  (a) the identities of its employees who were primarily responsible for the proposed Transaction, including any employee who participated in decisions on whether to proceed with the Transaction or the price of the Transaction; (b) any material points as to which such employee disagreed and why; and (c) whether any such employee concluded or expressed the belief prior to FBTS's approval of the Transaction that the valuation report's conclusions were inconsistent with the data and analysis therein or that the valuation report was internally inconsistent in material aspects.

3.    If the employees who were primarily responsible for the Transaction,

20

including any employee who participated in decisions on whether to proceed with the Transaction or the price of the Transaction, believe that the Valuation Report's conclusions are not consistent with the data and analysis or that the Valuation Report is internally inconsistent in material respects, FBTS shall not proceed with the Transaction.

I.   **Preservation of Documents.** In connection with any Transaction approved by FBTS, FBTS will create a Transaction folder and preserve, for at least six (6) years the following:

1.   The full name, business address, business telephone number and email address at the time of FBTS' consideration of the Transaction of each employee who was primarily responsible for the Transaction, including any employee who participated in decisions on whether to proceed with the Transaction or the price of the Transaction, and any other FBTS employee who made any material decision(s) on behalf of FBTS in connection with the Transaction;

2.   All relevant notes and records created by FBTS in connection with its consideration of the Transaction, including all documentation required by this Consent Order;

3.   The vote (yes or no) of each employee of FBTS who voted on the proposed transaction and a signed certification by each voting employee, in his or her representative capacity, and any other FBTS employee who made any material decision(s) on behalf of FBTS in connection with the proposed Transaction that they have read the valuation report, identified its underlying assumptions, and considered the reasonableness of the valuation report's assumptions and conclusions;

4.   All relevant documents FBTS and the employees identified in paragraph (I)1 above relied on in making the decisions;

21

5.      All relevant electronic or other written communications FBTS and the employees identified in paragraph (I)1 above had with service providers (including any valuation advisor), the plan sponsor, any non-ESOP counterparties, and any advisors retained by the plan sponsor or non-ESOP counterparties;

J.      **Debt and Fair Market Value.** The principal amount of the debt financing the Transaction, irrespective of the interest rate, cannot exceed the plan sponsor's securities' fair market value.  Accordingly, FBTS shall not cause an ESOP to engage in a leveraged stock purchase Transaction in which the principal amount of the debt financing the Transaction exceeds the fair market value of the plan sponsor's securities acquired with that debt, irrespective of the interest rate or other terms of the debt used to finance the Transaction.

K.      **Control.**  If FBTS approves a Transaction in which the ESOP cedes any degree of control to which it would otherwise be entitled based on its ownership interest, including but not limited to the unencumbered ability to vote its shares (for example, by electing members of the board of directors), FBTS must document any consideration received in exchange for such limitation on the ESOP's control (or how the limitation on control is otherwise reflected in the purchase price) and why it is fair to the ESOP.  If FBTS approves a Transaction in which the ESOP pays a control premium, FBTS must document why it believes that the ESOP is obtaining voting control, and control in fact, and identify any limitations on such control as well as the specific amount of consideration the ESOP received for such limitation(s).

L.      **Consideration of Claw-Back.**  In evaluating a proposed Transaction, FBTS shall consider whether it is appropriate to request a claw-back arrangement or other purchase price adjustment(s) to protect the ESOP against the possibility of adverse

consequences in the event of significant corporate events or changed circumstances.  FBTS

shall document in writing its consideration of the appropriateness of a claw-back or other

purchase price adjustment(s).

**M.**     **Other Professionals.**  FBTS may, consistent with its fiduciary

responsibilities under ERISA, employ, or delegate fiduciary authority to qualified

professional service providers to aid FBTS in the exercise of its powers, duties, and

responsibilities in the Transaction as long as it is prudent to do so.